**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAY SOUTHGATE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PURECYCLE TECHNOLOGIES, INC., DUSTIN OLSON, and LAWRENCE SOMMA,<br><br>Defendants. | Case No.: 1:23-cv-08605-JGK |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     STATEMENT OF FACTS ..................................................................................... 2

        A.      Background Of PureCycle's Business ................................................ 2

        B.      DB's Incompetence, Which Defendants Become Aware Of In Late 2020, Puts Operations At The Facility Perpetually Behind Schedule And Over Budget ......... 3

        C.      Defendants Tout The Completion Of PureCycle's First Two Bondholder Milestones; Unbeknownst To Investors, PureCycle's Relations With DB Are Rapidly Deteriorating ................................................................................ 5

        D.      Defendants Continue Touting The Progress Of Operations And Raise Over $219 Million In An Offering ................................................................................ 6

        E.      Defendants Disclose That PureCycle Has Requested An Extension Of The September Milestone, Citing A Seal Failure ........................................................... 7

        F.      The Risks Of Defendants' Fraud Further Materialize ........................................... 7

        G.      Defendants Disclose That PureCycle Will Again Fail To Meet Its 50% Production Capacity Milestone; PureCycle's Share Price Plummets ...................................... 8

III.    ARGUMENT ....................................................................................................... 8

        A.      Applicable Legal Standards Disfavor Defendants' Motion .................................. 8

        B.      Plaintiff States A 10(b) Claim .............................................................................. 8

                1.      Plaintiff Alleges Materially False And Misleading Statements .................. 9

                        (a)     Statements About The Progress Of Operations, Ability To Meet Milestones, Commercial Prospects, And Costs Were Materially False And Misleading ........................................................ 9

                        (b)     Statements About Operational Status, Production Capacity, Rate And Commercial Production Were Materially False And Misleading ............................................................................ 10

                        (c)     The PSLRA Safe Harbor Does Not Insulate Defendants From Liability ........................................................................ 11

                                (i)     The Safe Harbor Does Not Protect Material Omissions ... 11

                                (ii)    The Safe Harbor Does Not Protect Misrepresentations Of Present Or Past Facts ....................................................... 12

(iii)   Defendants' Statements Were Not Accompanied By Meaningful Cautionary Language ................................... 12

(d)   The Truth-On-The-Market Defense Does Not Shield Defendants 13

(e)   Statements About Progress Of Operations And Costs Are Not Non-Actionable Opinions .................................................... 15

(f)   Defendants' Statements Are Not Mere Puffery Or General Corporate Optimism.................................................... 16

2.   Plaintiff Alleges Scienter .......................................... 17

(a)   Defendants' Admissions Support A Strong Inference Of Scienter ................................................................ 17

(b)   The Construction Monitor's Reports Support A Strong Inference Of Scienter .................................................... 19

(c)   PureCycle's Quarterly Production Reports Support A Strong Inference Of Scienter .................................................... 20

(d)   The Bleecker Street Research Report Bolsters A Strong Inference Of Scienter .................................................... 21

(e)   Plaintiff's Motive Allegations Bolster A Strong Inference Of Scienter .................................................... 22

C.   Plaintiff Alleges Loss Causation........................................................... 23

IV.   PLAINTIFF STATES A §20(a) CLAIM ........................................................ 24

V.   CONCLUSION ............................................................................. 24

## TABLE OF AUTHORITIES

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................. 23

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) .................................................................. 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................. 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................. 8

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ................................................ 10, 12

*City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
2011 WL 4357368 (S.D.N.Y. Sept. 19, 2021)...................................................... 18

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...................................................... 11

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)................................................................... 18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................. 23

*Flynn v. Sientra*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ........................................................ 22

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................ 9, 10

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000).............................................................................. 14, 15

*Gordon v. Vanda Pharms. Inc.*,
2021 WL 911755 (E.D.N.Y. Mar. 10, 2021)........................................................ 23

*Henning v. Orient Paper, Inc.*,
2011 WL 2909322 (C.D. Cal. July 20, 2011)....................................................... 21

*Ho v. Duoyuan Global Water, Inc.,*
  887 F. Supp. 2d 547 (S.D.N.Y. Aug. 24, 2012) ....................................................................... 21

*Hutchinson v. Perez,*
  2012 WL 5451258 (S.D.N.Y. Nov. 8, 2012) ............................................................................ 18

*In re Barrick Gold Sec. Litig.,*
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ...................................................................... 18, 20

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.,*
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................................... 24

*In re EVCI Colleges Holding Corp. Sec. Litig.,*
  469 F. Supp. 2d 88 (S.D.N.Y. 2006) ....................................................................................... 12

*In re Keyspan Corp. Sec. Litig.,*
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................................................... 14

*In re Molycorp, Inc. Sec. Litig.,*
  2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ......................................................................... 19

*In re Petrobas Sec. Litig.,*
  116 F. Supp. 2d 368 (S.D.N.Y. 2015) ..................................................................................... 24

*In re Portal Software, Inc. Sec. Litig.,*
  2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ........................................................................ 23

*In re QuantumScape Sec. Class Action Litig.,*
  580 F. Supp. 3d 714 (N.D. Cal. Jan. 14, 2022) ....................................................................... 21

*In re Regeneron Pharm., Inc. Sec. Litig.,*
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ............................................................................. 12

*In re Salix Pharms. Ltd.,*
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .............................................................. 11, 13, 16

*In re Signet Jewelers Ltd. Sec. Litig.,*
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................................................................... 9

*In re Wells Fargo & Co. Sec. Litig.,*
  2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) .................................................................. 10, 24

*Litwin v. Blackstone Grp., L.P.,*
  634 F.3d 706 (2d Cir. 2011) .................................................................................................... 14

iv

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)............................................................................................. 24

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)............................................................................................................. 8

*Metz v. U.S. Life Ins. Co. in the City of New York*,
662 F.3d 600 (2d Cir. 2011)............................................................................................. 8

*Meyer v. Jinkosolar Holdings Co. Ltd.*,
761 F.3d 245 (2d Cir. 2014)........................................................................................... 14

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)........................................................................................... 14

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)...................................................................................... 16, 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
575 U.S. 175 (2015)................................................................................................... 15, 16

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis,*
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)................................................................. 16

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004)........................................................................................... 13

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)............................................................................................. 18

*Shemian v. Rsch. In Motion Ltd.*,
2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ............................................................... 14

*Skiadas v. Acer Therapeutics Inc.,*
2020 WL 4208442 (S.D.N.Y. July 21, 2020) ................................................................ 23

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)........................................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................... 17, 22

*Tomaszewski v. Trevana, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa 2020) ......................................................................................... 23

## I.    **PRELIMINARY STATEMENT**

During the Class Period[1], PureCycle, a cash-strapped company which touted its "proprietary" polypropylene recycling process, misled investors about its progress towards building, commissioning, and starting up its first commercial polypropylene recycling facility, and its efforts to test and prove the commercial viability of its recycling process at the facility.

Unbeknownst to investors, and as Defendants admit in a lawsuit they filed against Denham-Blythe ("DB"), the company PureCycle hired to handle every aspect of creating the facility, since construction of the facility began, PureCycle had been aware that DB was not cut out for the job and DB's incompetence put progress at the facility perpetually behind schedule and over budget. Unbeknownst to investors, during the Class Period, PureCycle was in the midst of a heated dispute with DB, to the point that DB deleted and made inaccessible to PureCycle documents about the

---

[1] PureCycle Technologies, Inc. ("PureCycle" or the "Company), Dustin Olson ("Olson"), and Lawrence Somma ("Somma"), are collectively referred to as "Defendants."  Olson and Somma are collectively referred to as the "Individual Defendants".  Citations to "MTD" refer to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (ECF 38).  Citations to "¶__" refer to Plaintiff's Consolidated Amended Class Action Complaint (ECF 35) (the "Complaint").  Citations to "DB Compl." refer to PureCycle's complaint against DB, attached as Exhibit A to the Complaint.  The "Class Period" is April 25, 2023 through December 18, 2023, both dates inclusive.  ¶1.

Unless otherwise indicated, all emphasis is added, and all internal citations and quotations are omitted.

facility and abandoned the job site, leaving PureCycle scrambling to try to commission and start up the facility on its own.

The truth materialized during the Class Period, when Defendants repeatedly failed to meet their required milestones under their $250 million loan agreement to build the facility, causing PureCycle's share price to plummet.

Defendants do their best to confuse the issues and improperly cabin Plaintiff's allegations as based on Defendants' failure to disclose the initiation of arbitration proceedings against DB earlier than PureCycle did. But none of Defendants' arguments address the elephant in the room – their own admissions – that concede that Defendants did not disclose the known issues to the public. Defendants' admissions in their lawsuit against DB directly contradict the rosy picture they painted for investors and supports a strong inference of their actual knowledge or at least, reckless disregard, of the truth. The inference of scienter is further bolstered by the timing of Defendants' offering of senior notes in August 2023, in which PureCycle raised over $219 million in much-needed cash.

Further, the massive drops in PureCycle's share price following a series of disclosures where the risks of Defendants' fraud materialized demonstrates both the materiality of Defendants' false statements and loss causation.

## II.     STATEMENT OF FACTS

### A.     Background Of PureCycle's Business

PureCycle's business is focused on commercializing a polypropylene recycling process which was developed and licensed to PureCycle by Procter & Gamble. ¶41. PureCycle claimed its "proprietary purification process" could convert polypropylene waste, called "feedstock" or "feed", into "ultra-pure recycled polypropylene" ("UPR") pellets. ¶46.

2

The viability of PureCycle's business hinged on the success of its first commercial recycling plant in Ohio, called the Ironton Facility (or the "Facility"). Defendants claimed the Facility would have a remarkable production capacity of *107 million pounds of UPR* per year when fully operational, which PureCycle claimed it would be able to sell for approximately $0.75 to $1.50 per pound. ¶49.

On October 1, 2020, PureCycle entered into a loan agreement with the Southern Ohio Port Authority ("SOPA"), whereby SOPA issued revenue bonds and loaned the $250 million in proceeds from the sale to PureCycle for purposes of creating the Facility (the "SOPA Loan Agreement"). ¶50. Under the SOPA Loan Agreement PureCycle had to complete the Facility by December 1, 2022 and was required to maintain at least $100 million of cash on its balance sheet. ¶51.

On October 7, 2020, PureCycle hired the Denham-Blythe Company, Inc. ("DB" or "D-B") for purposes of designing, engineering, procurement, construction and installation, workmanship, inspection, and conducting all other support necessary for building, commissioning and starting up the Facility. ¶52. DB had experience building warehouses and shopping malls, not chemical manufacturing plants. ¶156. In November 2020, DB commenced construction activities at the Facility. ¶52.

**B.    DB's Incompetence, Which Defendants Become Aware Of In Late 2020, Puts Operations At The Facility Perpetually Behind Schedule And Over Budget**

Unbeknownst to investors, and as described by Defendants themselves in a countercomplaint PureCycle filed against DB in October 2023, starting "almost immediately" after construction commenced at the Facility, PureCycle realized that DB could not do the job. ¶58. The project was perpetually behind schedule and increasingly over budget. ¶58. *Inter alia,* DB

3

lacked basic engineering skills, failed to timely order necessary materials, did not have a functional system to log and organize materials, and was unable to manage subcontractors. ¶58.

For example, DB did not have piping and instrument diagrams, thus piping subcontractors performed their work without established and approved engineering drawings to guide their work. ¶59. Subcontractors were mistakenly assigned the same tasks, resulting in duplicative work and increased costs. ¶59. Piping was available but could not be installed because DB had not timely ordered structural steel. ¶59. Deliveries of material were strewn about the site and not properly logged and then new material would have to be ordered. ¶59.

Nonetheless, up until January 31, 2023, PureCycle approved every request by DB to extend the project schedule and increase costs. ¶158. For example, on November 22, 2022 - days away from the December 1, 2022 deadline – months of work were still needed and DB requested another extension of the project schedule and an additional $934,000, which PureCycle approved. ¶60.

PureCycle failed to complete the Facility by the December 1, 2022 deadline and represented to investors that this was due to external factors out of its control – specifically, "the COVID-19 outbreak, the ongoing military conflict between Russia and Ukraine, and certain U.S. weather-related events." ¶57.

PureCycle was able to reach an agreement with SOPA to waive PureCycle's default for failure to meet the December 1, 2022 deadline, but the waiver came at a cost. ¶55. PureCycle had to deposit an additional $87.3 million in collateral and close a financing transaction which would provide at least $150 million of working capital. ¶55. SOPA also set forth numerous additional required bondholder milestones. ¶56. For example, PureCycle had to: complete mechanical construction of the Facility by June 30, 2023; commence production of UPR pellets by July 1, 2023; achieve 50% operating capacity by September 30, 2023, which required producing 4.45

4

million pounds of UPR pellets in a single month by September 30, 2023, and; complete performance testing by November 30, 2023, which required running the Facility at 100% capacity 24 hours per day for five days.  ¶56.

PureCycle also had to consent to the appointment of an independent Construction Monitor who would provide monthly progress reports to the bondholders regarding PureCycle's adherence to the construction timeline and budget.  ¶56 n.2.  PureCycle was further required to provide Quarterly Production Reports to the bondholders summarizing the status of operations at the Facility.  ¶71.

DB submitted another request to extend the project schedule and for more money on January 31, 2023, which Defendants denied in late February 2023.  ¶61.  The parties' relations became increasingly hostile after this point.  ¶61.

**C.    Defendants Tout The Completion Of PureCycle's First Two Bondholder Milestones; Unbeknownst To Investors, PureCycle's Relations With DB Are Rapidly Deteriorating**

On April 25, 2023, PureCycle announced completion of mechanical construction of the Facility, the first bondholder milestone under the limited waiver agreement with SOPA.  ¶62. Defendants told investors that they would "now begin operation pre-startup, safety review processes, and the march toward initial pellet production[.]"  ¶63.

Unbeknownst to investors, progress at the Facility was behind schedule and costs were ever-increasing due to DB's incompetence, and relations with DB were rapidly deteriorating.  By this time, DB had issued a notice of payment default to PureCycle and threatened to walk off the job, and as required under the parties' contract, PureCycle and DB had scheduled mediation to attempt to resolve their dispute.  ¶61.

Throughout May 2023, Defendants represented to investors that the Facility was "operational and in service", "commissioned and ready for startup[,]" (¶68) and that they would

be able to meet the remaining bondholder milestones (¶67). Undisclosed to investors, relations between PureCycle and DB further deteriorated; PureCycle and DB attended two unsuccessful mediation sessions in May, and DB issued a renewed payment default notice to PureCycle. ¶¶66, 72.

On June 20, 2023, Defendants announced completion of the second bondholder milestone – production of UPR pellets at the Facility. ¶73. Olson touted the completion of the milestone as a "demonstrat[ion] that the fundamental technology works as expected, and at scale." ¶73. Defendants did not tell investors that PureCycle had discovered that Facility documents stored on a shared server with DB had been deleted or made inaccessible to PureCycle, DB had abandoned the job, and DB had filed a $17 million demand for binding arbitration against PureCycle. ¶75.

**D.    Defendants Continue Touting The Progress Of Operations And Raise Over $219 Million In An Offering**

On August 8, 2023, Defendants told investors that the Facility had been shut down since the first production of pellets in June 2023 and for the entire of month of July due to "expected" "glitches". ¶81. Defendants reassured investors that PureCycle was "running and raising production rates every day" and was "well-positioned" to meet its bondholder milestones. ¶¶79, 82.

Defendants did not disclose to investors that DB's abandonment necessitated PureCycle to undertake an inspection of all Facility systems to finish DB's job and make any necessary repairs. ¶¶75-76. These events caused additional, significant delays in necessary validation processes for starting up and commissioning the Facility, and further cost overruns. ¶76. Thus, after the first production of pellets, instead of focusing meeting the next milestone, Defendants had to halt operations to clean up the mess caused by their dispute with DB. Defendants also did not disclose

that on August 7, 2023, the Facility had to be shut down due to a power outage which damaged a seal system which had been experiencing problems since April. ¶¶78, 90.

On August 21, 2023, Defendants announced an offering of senior notes, in which PureCycle raised approximately $219.25 million. ¶19.

**E.    Defendants Disclose That PureCycle Has Requested An Extension Of The September Milestone, Citing A Seal Failure**

On September 13, 2023, Defendants disclosed that they had provided a notice of Force Majeure to the SOPA trustee seeking to extend the next milestone to produce 4.45 million pounds of UPR pellets by September 30, 2023. ¶86. Defendants explained the Facility had been shut down due to an August 7, 2023 power outage caused by a "severe weather impact." ¶85. Defendants stated that they had resumed operations after the outage but had to shut down on September 3, 2023 due to a seal system failure which resulted in a loss of fluid pressure. ¶85. On this news, PureCycle's share price fell by 18.4%. ¶88.

**F.    The Risks Of Defendants' Fraud Further Materialize**

On November 7, 2023, Defendants confirmed PureCycle did not meet the September milestone, citing the August power outage and "additional mechanical issues", but reassured investors that PureCycle had achieved "run high levels of rate", which were "good indicators of the system's ability to run nameplates" and "completed commercial shipments of [its] on-spec material". ¶95. On November 8, 2023, Defendants disclosed that they would shut down the Facility for two weeks to address "a number of improvement projects". ¶97. On November 9, 2023, Defendants disclosed that PureCycle and SOPA had executed a second limited waiver, which extended the September milestone to December 31, 2023, and required PureCycle to deposit another $50 million in collateral. ¶98. PureCycle was also required to withdraw the Force Majeure Notice, which the SOPA trustee had contested. ¶91.

7

On this news, PureCycle's share price fell by $0.64, or 14.7%, from $4.36 per share to close at $3.72 per share on November 8, 2023, and continued to fall the next trading day, dropping another $0.63 per share, or 16.9%, to close at $3.09 per share on November 9, 2023.  ¶99.

### G.    Defendants Disclose That PureCycle Will Again Fail To Meet Its 50% Production Capacity Milestone; PureCycle's Share Price Plummets

On December 18, 2023, before the market opened, Defendants disclosed that the Facility had been shut down since the week prior, again due to a seal failure.  ¶101.  Defendants disclosed that PureCycle would not be able to meet the 50% production capacity milestone, which had been extended from September 30, 2023, to December 31, 2023 under the second limited waiver agreement.  ¶102.  On this news, PureCycle's share price plummeted by $2.16, or *43.5%,* from $4.96 per share to close at $2.80 per share on December 18, 2023, on unusually heavy trading volume.  ¶102.

## III.    ARGUMENT

### A.    Applicable Legal Standards Disfavor Defendants' Motion

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff."  *Metz v. U.S. Life Ins. Co. in the City of New York*, 662 F.3d 600, 602 (2d Cir. 2011).  A complaint need only "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

### B.    Plaintiff States A 10(b) Claim

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See Matrixx Initiatives, Inc. v. Siracusano*,

563 U.S. 27, 37-39 (2011).  Defendants challenge falsity, scienter, and loss causation.  As to these and all required elements, the Complaint is sufficient.

### 1.    Plaintiff Alleges Materially False And Misleading Statements

"To allege a material misrepresentation or omission adequately, a plaintiff must plead facts that, if true, would be sufficient to show that the defendant either made an untrue statement of a material fact or omitted to state a material fact necessary to make whatever statements it made not misleading."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018).  "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

### (a)    Statements About The Progress Of Operations, Ability To Meet Milestones, Commercial Prospects, And Costs Were Materially False And Misleading

Defendants' representations about the progress of operations and ability to meet bondholder milestones (*e.g.,* ¶¶108, 109, 115, 116, 120, 130, 136, 143, 145), including the reasons for and nature of delays (*e.g.,* ¶¶109, 115, 118, 124, 128, 132, 134, 141), commercial prospects (*e.g.,* ¶¶108, 109, 113, 120, 126, 137, 143), and costs (¶¶108, 120, 139) were materially false and misleading because Defendants did not disclose that the Facility's progress was, and had been, perpetually behind schedule and increasingly overbudget since late 2020 due to DB's known deficiencies (¶¶58-61).  Further, these statements were materially false and misleading because Defendants did not disclose the existence, nature, or extent of PureCycle's fallout with DB and the additional delays and costs caused by it (¶¶75-76).

Defendants' argument that they had no duty to disclose "every detail regarding the dispute" with DB misses the mark.  MTD at 14-15.  By choosing to speak on the topics of progress of operations, milestones, delays, and costs, Defendants triggered their duty "to speak truthfully and

to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *See Freudenberg,* 712 F. Supp. 2d at 179.

Defendants' omissions created a materially misleading impression that PureCycle was on track to achieve its milestones, proof of concept, and commercialization, when, in reality, due to known, ongoing deficiencies in DB's work and the fallout from PureCycle's dispute with DB, "Defendants were far closer to the starting line than the last mile[.]" *See In re Wells Fargo & Co. Sec. Litig.,* 2021 WL 4482102, at *13 (S.D.N.Y. Sept. 30, 2021) (statement that project had reached "the last mile" was false and misleading where defendant had requested an extension for submission of plans); *Moshell v. Sasol Ltd.,* 481 F. Supp. 3d 280, 294 (S.D.N.Y. 2020) (statements that project was "progressing on track" and was "well managed" materially misleading due to omission of delays and cost overruns); *Chicago Bridge & Iron Co. N.V. Sec. Litig.,* 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (statements that project had "made some good progress" and reached a "milestone" actionable where defendant had instituted a three-month stop work order due to production problems).

**(b)**     **Statements About Operational Status, Production Capacity, Rate And Commercial Production Were Materially False And Misleading**

Statements touting the Facility as operational (*e.g.,* ¶¶109, 110, 111, 115, <u>120)</u>, production rate and capacity (*e.g.,* ¶¶115, 116, 132, 134, 136) and commercial production (¶¶113, 115, 134) were materially false and misleading.

First, the falsity of these statements is evidenced by the Quarterly Production Reports. *E.g.,* ¶175 (statement that as to Q2 2023, "Ironton is running and raising production rates every day" where the corresponding Quarterly Production Report noted production yield was "not applicable", "no changes to production capacity, and hours of beneficial operations were "[n]ot applicable … only one production run in June."); ¶176  (statements that as to Q3 2023, "operations

10

continue to improve daily", PureCycle "completed commercial shipments of [its] on-spec material" and achieved "key operational rates" of "14,000 pounds per hour of prep feed rate … approximately 97% of nameplate" where the corresponding Quarterly Production Report stated "no product sold", "zero" production yield, and "[z]ero hours of beneficial operations").

Second, these statements created a materially misleading impression that PureCycle was on track to achieve its milestones, proof of concept, and commercialization, when the opposite was true. *See Moshell,* 481 F. Supp. 3d at 294.

### (c)    The PSLRA Safe Harbor Does Not Insulate Defendants From Liability

The PSLRA safe harbor does not protect Defendants' statements about "expected timelines and costs" (MTD at 7-8) because these statements were material omissions, were not forward-looking, and were not accompanied by meaningful cautionary language, and, as described below, (Sec. III.B.2.a-d, *infra*) Defendants had actual knowledge of their statements' falsity. *See Salix,* 2016 WL 1629341, at \*9.

### (i)    The Safe Harbor Does Not Protect Material Omissions

The safe harbor does not protect material omissions. *Salix,* 2016 WL 1629341, at \*9. This is true, "regardless of whether the statements thereby rendered misleading were forward-looking." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*12 (S.D.N.Y. Mar. 25, 2013). Plaintiff alleges that Defendants' statements about expected timelines and costs omitted material facts about DB's deficiencies (¶¶8, 58-59), that, along with PureCycle's dispute with DB, caused operations to perpetually be behind schedule (both in accordance with the construction plan and the bondholder deadlines) (¶¶58-61, 165), and caused major cost overruns (¶¶76, 157). Accordingly, the safe harbor does not apply to these statements.

11

**(ii)    The Safe Harbor Does Not Protect Misrepresentations Of Present Or Past Facts**

Even if parts of Defendants' statements were forward-looking, the safe harbor does not apply because Defendants' statements contained misrepresentations of past or present facts. *In re Regeneron Pharm., Inc. Sec. Litig.,* 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005); *e.g.,* ¶115 ("We *are* well-positioned to accomplish the remaining milestones. Ironton *is* running and raising production rates every day[.]"); ¶120 ("We *recently initiated* a re-start of Ironton, and the facility *is* operational …. [W]e expect to achieve our next milestone of operating at 50% capacity[.]."). These representations of past and present facts are contradicted by, *inter alia,* PureCycle's Quarterly Production Reports. *E.g.,* ¶175 (no changes to production capacity, no beneficial hours of operations, and no production yield; contradicting statements at ¶115); ¶176 (no product had been sold, zero production yield and zero hours of beneficial operations; contradicting statements at ¶120). *See Chicago Bridge,* 2018 WL 2382600, at *8 (statements about projects' progress which included forward-looking aspects "and alleged misrepresentations of present fact—that the Nuclear Projects were achieving important milestones" not protected by PSLRA safe harbor).

**(iii)    Defendants' Statements Were Not Accompanied By Meaningful Cautionary Language**

"To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.,* 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). Defendants have the burden to show that "cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.,* 604 F.3d 758,772 (2d Cir. 2010).

Defendants' warnings of *hypothetical* risks were insufficient—and themselves misleading—not only because they were so vague (*e.g.,* MTD at 10 ("things could happen to delay us because this is just life.")), but because these risks had *already* materialized (*e.g.,* MTD at 9

12

(warnings of hypothetical "unexpected construction problems" and "stoppage of work")). *See Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[2]

Defendants' argument that "no reasonable investor could have been misled" because they "promptly disclosed" production delays (MTD at 10) is a red herring. Defendants *never* disclosed to investors that starting "[a]lmost immediately after [DB] began its work on the Facility" in late 2020, "[DB's] deficiencies placed the project behind schedule." ¶47. Moreover, when Defendants did speak on the topic of delays, their statements created the materially misleading impression that delays were caused by unexpected, external factors, or were minor "teething". For example, Defendants told investors that PureCycle missed the December 1, 2022 deadline to complete the Facility due to COVID-19, weather events, and the Russia-Ukraine conflict (¶128), when in fact, *as Defendants admit*, the actual reason for the missed deadline was DB's known, ongoing, deficient work. DB Compl., ¶¶47-55.

> **(d)     The Truth-On-The-Market Defense Does Not Shield Defendants**

Defendants argue that they disclosed material adverse facts which contradicted their positive representations about the progress of operations and costs by "regularly" posting the Construction Monitor's Reports on PureCycle's website. MTD at 13. However, "[t]here are

---

[2] The purportedly cautionary language that Defendants point to came from PureCycle's Form 10-K filed with the SEC *before* the Class Period, which Defendants did not update during the Class Period. MTD at 9-10. "[A] defendant's failure to update cautionary language over time to reflect new information and new risks supports the conclusion that such statements are merely boilerplate." *Salix*, 2016 WL 1629341, at *12.

serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document … on the basis that the information is public knowledge and otherwise available to them." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,* 709 F.3d 109, 127 (2d Cir. 2013).  To charge the market with knowledge that operations at the Facility were behind schedule and that costs were ballooning due to DB's known deficiencies, Defendants must prove that "the truth of the matter" was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 167 (2d Cir. 2000).  This inquiry is "intensely fact-specific and [] rarely an appropriate basis for dismissing a §10(b) complaint[.]" *Id.*

*Even if* PureCycle contemporaneously posted the Construction Monitor's Reports to its website, which is unknown at this time, "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 718 (2d Cir. 2011).  Once Defendants chose to tout the progress of operations and costs, they were required to "tell the whole truth" about these topics. *See Meyer v. Jinkosolar Holdings Co. Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  Defendants' cited cases do not support their untenable position that a company can lie to investors so long as it posts the truth somewhere on its website.[3]  Accordingly, dismissal is unwarranted because Defendants

---

[3] In contrast to *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *20-21 (S.D.N.Y. Mar. 29, 2013) (MTD at 13), Plaintiff has "alleged sufficient facts regarding the existence and timing of Defendants' knowledge giving rise to a duty to disclose[]"; for example, the Construction Monitor's Reports were issued monthly and confirm that the Construction Monitor conducted

have failed to carry their burden to assert the truth-on-the-market defense.  *See Ganino,* 228 F.3d at 167.

> ### (e) Statements About Progress Of Operations And Costs Are Not Non-Actionable Opinions

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 183 (2015), which applies to opinion statements, does not apply to Defendants' statements about "cost and schedule projections" (MTD at 11).  Prefacing statements with phrases such as, "I think" does not render a statement a nonactionable opinion under *Omnicare.  See* 575 U.S. at 192-93 ("magic words" such as "we believe or we think" "can preface nearly any conclusion, and the resulting statements … remain perfectly capable of misleading investors.").  Taken in context and viewed holistically, as they must, Defendants' statements were not mere opinions - they were presented to investors as premised on past and present facts.  *E.g.,* ¶115 ("We are well-positioned to accomplish the remaining milestones.  *Ironton is running and raising production rates every day*."); ¶136 ("*we've already been able to touch 110%*, okay?  When you look at the volume through the system

---

monthly meetings at PureCycle's office.  In *In re Keyspan Corp. Sec. Litig.,* 383 F. Supp. 2d 358, 376 (E.D.N.Y. 2003) (MTD at 13), plaintiff alleged that defendant did not disclose it would become subject to public utilities regulations until May 2000, when in fact, defendant disclosed that information in its Form 10-K filed in March 2000.  These cases do not stand for the proposition that a defendant can make material misstatements and omissions to investors so long as it also posts other documents on its website from which the truth might be otherwise gleaned.

15

and *what we've been able to achieve* … we feel very confident in our ability to hit very high rates" above 50%).

Even if *Omnicare* applied, Defendants' statements are actionable because "the supporting fact[s] … supplied were untrue," and because Defendants' omission of material information rendered their statements misleading. *See* 575 U.S. at 186, 194. The facts supporting Defendants' statements were untrue, as evidenced by Defendants' admissions in the DB Complaint, the Construction Monitor's Reports, and PureCycle's Quarterly Production Reports. The omission of material information from these sources rendered Defendants' statements misleading because that information would "conflict with what a reasonable investor would take from the statement itself[.]" *See id.* at 176. For example, a reasonable investor would not have discerned from Defendants' positive statements at ¶115 that there had been zero hours of beneficial operations, zero production yield, and no changes to production capacity. *See Salix,* 2016 WL 1629341, at *12 n.10 (projections of future inventory levels were actionable, even if opinions, because they were either predicated upon untrue supporting facts regarding current inventory levels, or omitted material facts).

### (f)    Defendants' Statements Are Not Mere Puffery Or General Corporate Optimism

Defendants' challenges to several statements as non-actionable puffery and statements of corporate optimism (MTD at 12) are unavailing. To assess whether statements are puffery or general corporate optimism, a court must view the statements holistically and in context. *See Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *10 (S.D.N.Y. Apr. 14, 2020).

Defendants' statements are actionable because they "did more than just offer rosy predictions" – they misrepresented present and past facts. *See Novak v. Kasaks,* 216 F.3d 300, 315

16

(2d Cir. 2000).    For example, Defendants stated, "All of our core operations *have been* commissioned and *are ready* for startup …. There's a new energy building within our team, and we *are* ready to run this facility …. We *are currently* in the following position: completed key pre-startup and safety requirements; utility plant is operational and in service …. " (¶68) "while they knew that the contrary was true."  *See Novak,* 216 F.3d at 315 (statements that "the inventory situation was 'in good shape' or 'under control' while [defendants] allegedly knew that the contrary was true" were not puffery or general expressions of optimism).

## 2.    Plaintiff Alleges Scienter

Scienter is alleged if the facts, taken together and taken as true, give rise to an inference that defendants intentionally or recklessly misled investors "that is at least as compelling" as an inference that the defendant acted non-culpably.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 309-10.  The inference of scienter "need not be … of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.  "When the competing inferences rest in equipoise, the tie goes to the plaintiff."  *Akerman v. Arotech Corp*., 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).

### (a)    Defendants' Admissions Support A Strong Inference Of Scienter

Defendants admit that the reason PureCycle was perpetually behind schedule, failed to meet milestones, and incurred excessive costs was DB's deficient work, which Defendants admit they became aware of "[a]lmost immediately after [DB] began its work on the Facility [in November 2020]".  *E.g.,* ¶7; DB Compl., ¶¶47-57, 157.  Defendants admit that PureCycle's fallout with DB during the Class Period caused additional delays and resulted in additional cost overruns. ¶¶157-60, 165.  Thus, Defendants' *own* statements undermine Defendants' arguments (MTD at 18), and directly contradict Defendants' Class Period representations to investors.

17

For example, it was not external factors out of Defendants' control, such as the weather that caused equipment failures, delays, and cost overruns (*e.g.,* ¶¶128, 130, 139) and PureCycle's failures to meet bondholder milestones were not caused by mere "teething challenges" common to any startup (*e.g.,* ¶¶109, 115) - instead, it was known problems with DB and DB's work that caused these issues (¶¶58-61). And PureCycle did not shut down the Facility from June 20, 2023 through the entire month of July 2023 to simply work through "minor mechanical items" (¶18) - PureCycle was scrambling to complete DB's work after DB deleted or made inaccessible to PureCycle documents about the project and then abandoned the job. ¶165. *See Rothman v. Gregor*, 220 F.3d 81, 91-92 (2d Cir. 2000) (defendant's statements in pleadings in other lawsuits supported scienter).

Defendants' cited cases are inapposite. In *In re Barrick Gold Sec. Litig.,* 2015 WL 1514597, at *8, *10 (S.D.N.Y. Apr. 1, 2015), the only circumstantial evidence that defendants knew their stated cost and schedule estimates were false or misleading was that a bid from a company seeking to be hired for the project - which defendants did not hire – projected higher costs and longer timelines than those defendants projected to investors. Here, Defendants' admissions regarding DB establish their knowledge. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.,* 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) (statement of non-party executive referencing the termination of a contract was an "admission [that] by itself is enough to indicate" that company and its president knew their statements about potential renewal of that contract were false).

Further, *Barrick* supports Plaintiff's case – there, the court found allegations that defendants received monthly progress reports from their project manager (just as Defendants here did, as discussed below) regarding a lack of compliance with environmental regulations raised a

18

strong inference of scienter that defendants knew their statements about environmental compliance were false and misleading.  *See id.,* at *11.[4]

#### (b)    The Construction Monitor's Reports Support A Strong Inference Of Scienter

Defendants' knowledge that, *inter alia,* the project was behind schedule, that PureCycle would not meet its bondholder milestones, and about cost overruns is further established by the Construction Monitor's Reports, which, contrary to Defendants' assertions (MTD at 20), establishes "specific contradictory information the Individual Defendants received[.]"

Each of the monthly Construction Monitor's Reports during the Class Period concluded: "progress made through the Relevant Period *was not commensurate with the Project objectives.*" ¶¶177.  Each Report listed the "planned" and "forecasted" deadlines for completion of milestones under the construction plan and indicated that PureCycle was not completing any of its milestones in accordance with the construction plan.  ¶¶64, 70, 74, 178.  Further, the Reports detailed the increasing "out-of-scope" project costs; for example, the Report dated June 29, 2023, stated that

---

[4] Defendants' other cited authorities (MTD at 18) are also easily distinguishable.  Defendants cite *Hutchinson v. Perez*, 2012 WL 5451258, at *7 (S.D.N.Y. Nov. 8, 2012) and *City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.,* 2011 WL 4357368, at *1 (S.D.N.Y. Sept. 19, 2021) for the proposition that Plaintiff cannot show scienter without "confidential witnesses or internal reports".  In *In re Molycorp, Inc. Sec. Litig.,* 2015 WL 1097355, at *3, *10 (S.D.N.Y. Mar. 12, 2015) allegations that defendant knew by "early 2012" that there would be delays in the project schedule due to problems with a contractor's work were based only on confidential witness statements which conflicted with those allegations.  Here, unlike in those cases, Defendants' knowledge is demonstrated by their *own* statements in the DB Complaint.

as of April 30, 2023, the total out-of-scope costs amounted to nearly *$129 million* and noted that the "forecasted budget *will increase* due to the *delay of completion*[.]" ¶179.

The monthly Construction Monitor's Reports were addressed to Olson's attention, stated that the Construction Monitor held monthly meetings about the project's progress and budget at PureCycle's office, and confirmed that either PureCycle's CEO and/or the Chairman of PureCycle's board were present at the project site at "any one time" to "facilitate timely completion" of the project. ¶177. The Construction Monitor's Reports establish a strong inference that Defendants had actual knowledge of - or at least, had access to - material adverse information that contradicted their positive representations to investors. That inference is *at least* as cogent and compelling as any non-fraudulent inference. *See Barrick,* 2015 WL 1514597, at *11-12 (allegations that defendants had access to "monthly reports and statements from the Project Manager" which stated that the project was not in environmental compliance demonstrated scienter).

### (c)    PureCycle's Quarterly Production Reports Support A Strong Inference Of Scienter

PureCycle's Quarterly Production Reports confirm that, contrary to Defendants' rosy statements, PureCycle's production capacity and rate was not improving, the Facility was not operational, and thus, PureCycle had no reasonable basis to represent that it could achieve the September bondholder milestone, let alone any of the bondholder milestones that came thereafter. For example, Defendants' told investors that as to Q3 2023, "operations continue to improve daily", PureCycle "completed commercial shipments of our on-spec material" and "we were able to show the following key operational rates. 14,000 pounds per hour of prep feed rate, which is approximately 97% of nameplate". ¶176. Yet, PureCycle's Q3 2023 Quarterly Production Report reported "zero" production yield, "[z]ero hours of beneficial operations", and "no commercial

20

product sold". ¶176. Defendants do not, and cannot reasonably, dispute that they had access to the information in the Quarterly Production Reports, which PureCycle was required to put together and provide to bondholders under the SOPA Loan Agreement.

> ### (d) The Bleecker Street Research Report Bolsters A Strong Inference Of Scienter

The Bleecker Street Research Report supports the inference that Defendants knew, or recklessly disregarded the truth when Defendants attributed problems and delays to external factors such as "severe weather" (*e.g.,* ¶¶85, 124). Bleecker Street reported that the seal system which "failed in August and September [or 2023]" had "been having issues since the factory was mechanically complete in April [2023]" and was "perpetually unable to hold pressure." ¶170. Bleecker Street further reported that the August 7, 2023 power outage, which PureCycle told investors caused the seal failure, "was the pretext PureCycle needed to declare a Force Majeure." ¶170. Given that DB "struggled with basic engineering" (¶157), that Defendants admitted the seal system's inability to hold pressure (¶85), that the SOPA trustee disputed PureCycle's notice of Force Majeure (¶91), that PureCycle agreed to withdraw the Force Majeure notice (¶91), and that the seal system failed again in December 2023 (¶101), the Bleecker Street Research Report adds to the inference of scienter.

Defendants argue that the Bleecker Street Research Report cannot be relied upon because short sellers have a "motive to exaggerate" (MTD at 19), but at best, Defendants raise a factual dispute that is improperly decided on a motion to dismiss. *See Ho v. Duoyuan Global Water, Inc.,* 887 F. Supp. 2d 547, 564 (S.D.N.Y. Aug. 24, 2012) ("Even though Defendants claim that Muddy Waters is a biased party, and that it openly admits the possible inaccuracy of the Report, 'the reliability of the report is a question of fact.'"); *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *4 (C.D. Cal. July 20, 2011) (similar).

21

At this juncture, "[P]laintiff ha[s] adequately alleged that [the] publication has the minimum indicia of reliability to make [it] past the pleadings stage." *See In re QuantumScape Sec. Class Action Litig.,* 580 F. Supp. 3d 714, 732 (N.D. Cal. Jan. 14, 2022).

**(e)     Plaintiff's Motive Allegations Bolster A Strong Inference Of Scienter**

Defendants argue that Plaintiff cannot allege scienter without allegations of insider trading or other motive for personal gain. MTD at 16-17. However, the Supreme Court has held that allegations of motive are unnecessary to plead scienter. *See Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation … is not fatal.").

Moreover, that Defendants were motivated to defraud investors to keep PureCycle afloat supports scienter. *See Flynn v. Sientra*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) (allegation that defendants "were motivated to conceal the contamination at the Silimed plant from investors so that they could raise enough money in the SPO keep Sientra afloat" supported scienter). PureCycle had incurred significant losses since its inception, was critically low on cash throughout the Class Period, had numerous debt obligations, and by the start of the Class Period, had already far exceeded the original budget for the Ironton Facility and estimated that it would need an additional $55 to $80 million to complete the facility. ¶¶180-83, 186-91.

Further, the timing of PureCycle's August 21, 2023 offering supports scienter. At the time of the offering, Defendants knew or recklessly disregarded that PureCycle would not be able to meet the September milestone. ¶185. DB had abandoned the job, forcing PureCycle to halt operations from June 20, 2023 through the entire month of July 2023 as PureCycle tried to finish the job on its own and make necessary repairs, and the Facility had to be shut down due to an August 7, 2023 power outage which damaged a seal system that had been problematic for months – none of which had yet been revealed to investors.

Moreover, given that PureCycle had to put up an additional $87.3 million in collateral and close on a financing transaction of at least $150 million in exchange for the previous SOPA Loan Agreement waiver (¶183), Defendants likely assumed that obtaining another waiver would be costly. *See Skiadas v. Acer Therapeutics Inc.,* 2020 WL 4208442, at *7 (S.D.N.Y. July 21, 2020) (that defendants made disclosures regarding FDA approval of drug application "when they were trying to raise money from investors …. supports an inference of scienter"); *In re Portal Software, Inc. Sec. Litig.,* 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) ("plaintiffs' contention that defendants were motivated to inflate artificially Portal's stock price in the short term in order to conduct a successful secondary public offering and obtain much-needed capital does allege facts of a palpable motive for fraud").[5]

### C.  Plaintiff Alleges Loss Causation

To plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind". *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). A plaintiff alleges loss causation "when they allege that their share's 'price fell significantly after … 'events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020). "[L]oss causation is governed by the traditional 'short and plain statement'

---

[5] *See also Tomaszewski v. Trevana, Inc.*, 482 F. Supp. 3d 317, 333-34 (E.D. Pa 2020) (allegations that defendant was "struggling to survive", "oliceridine was [its] only viable drug candidate," and that defendant was "motivated by the need to raise funds to keep [the company] afloat" supported scienter).

rule laid out in Rule 8[.]" *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *3 (E.D.N.Y. Mar. 10, 2021).

Plaintiff alleges that Defendants concealed the existence, nature and extent of DB's deficient work and PureCycle's dispute with DB, both of which caused delays, equipment problems, and cost overruns, and that PureCycle's share price plummeted each time these concealed risks materialized during the Class Period. ¶150, ¶153, ¶154.

The "precipitous declines" in PureCycle's share price as the risks of its fraud materialized sufficiently allege loss causation. *See In re Petrobas Sec. Litig.,* 116 F. Supp. 2d 368, 380 (S.D.N.Y. 2015) ("dramatic[]" price drop following revelation of fraud demonstrated materiality); *In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*, 763 F. Supp. 2d 423, 483-84 (S.D.N.Y. 2011) ("precipitous declines" in stock once truth became known demonstrated loss causation).

## IV.    PLAINTIFF STATES A §20(a) CLAIM

For the reasons set forth herein, Plaintiff has alleged a primary violation of the securities laws, which is the only element of Plaintiff's §20(a) claim that Defendants challenge. Accordingly, Plaintiff has also stated a §20(a) claim. *See Wells Fargo*, 2021 WL 4482102, at *29.

## V.    CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' Motion. Alternatively, should the Court grant any portion of Defendants' Motion, Plaintiff requests leave to amend. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (dismissal of fraud claim without leave to amend "violated the liberal spirit of Rule 15").

DATED: June 5, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Natalie S. Pang*

Casey E. Sadler (*pro hac vice*)
  csadler@glancylaw.com
Natalie S. Pang (*pro hac vice*)
  npang@glancylaw.com

1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150

*Attorneys for Lead Plaintiff*

25

**CERTIFICATE OF COMPLIANCE**

I, Natalie S. Pang, counsel for Lead Plaintiff James Smith, hereby certify that the above Memorandum of Law in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss complies with the formatting rules proscribed in Local Rule 11.1 and the Honorable John G. Koeltl's Individual Practices, Section II.D., and contains 6,997 words.

Dated: June 5, 2024                                    */s/ Natalie S. Pang*
       Los Angeles, CA                            Natalie S. Pang

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 5, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 5, 2024.


*s/ Natalie S. Pang*
Natalie S. Pang