# EXHIBIT Y

**United States**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Form 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **May 8, 2023**

# PureCycle Technologies, Inc.

(Exact Name of Registrant as Specified in its Charter)

| Delaware | 001-40234 | 86-2293091 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **5950 Hazeltine National Drive,** | **Suite 300,** | **Orlando** | | |
|---|---|---|---|---|
| **Florida** | | | **32822** | |
| (Address of Principal Executive Offices) | | | (Zip Code) | |

**Registrant's telephone number, including area code: (877) 648-3565**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | PCT | The Nasdaq Stock Market LLC |
| Warrants, each exercisable for one share of common stock, $0.001 par value per share, at an exercise price of $11.50 per share | PCTTW | The Nasdaq Stock Market LLC |
| Units, each consisting of one share of common stock, $0.001 par value per share, and three quarters of one warrant | PCTTU | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (Sec.230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (Sec.240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01. Entry into a Material Definitive Agreement.**

<u>The Pure Plastic Term Loan Facility</u>

On May 8, 2023, PureCycle Technologies, Inc. (the "Company) entered into a $40 million term loan facility (the "Term Loan Facility") pursuant to a Credit Agreement (the "Term Loan Credit Agreement") dated as of May 8, 2023, among the Company, as the borrower, PureCycle Technologies Holdings Corp., PureCycle Technologies, LLC and the subsidiaries of the Company as are or may from time to time become parties to the Term Loan Facility as guarantors (the "Guarantors") and Pure Plastic LLC (as a "Lender," "Administrative Agent," and "Security Agent"), which matures on December 31, 2025. Affiliates of the Lender are greater than 5% beneficial owners of the Company.

Borrowings under the Term Loan Credit Agreement may be used to repay indebtedness for borrowed money of the Company, to pay fees and expenses associated with the Term Loan Credit Agreement and the other loan documents and for general corporate purposes not in contravention of any law or of any loan document.

The Term Loan Facility is structured as a single-draw, delayed draw term loan. The Lender has committed to fund the term loans on any business day from the closing date until June 8, 2023, subject to certain limited conditions precedent (such date of funding, the "Funding Date"). Amounts outstanding under the Term Loan Credit Agreement will bear interest at a variable annual rate equal to Term SOFR (as defined in the Term Loan Credit Agreement) in effect for such period plus an applicable margin. The applicable margin is equal to 7.5%. The Company is also required to pay, on the Funding Date, (i) a closing fee to the Lenders, equal to 2.00% times the aggregate principal amount of the term loans funded by the Lenders on the Funding Date, (ii) a commitment fee to the Lenders equal to 1.00% times the aggregate principal amount of each Lender's commitments on the Funding Date, (iii) a syndication fee to the Administrative Agent equal to 0.50% times the aggregate commitments of the Lenders on the Funding Date and (iv) a monitoring fee equal to $200,000 to the Administrative Agent for the account of the Administrative Agent and the Security Agent on the Funding Date and each anniversary of the Funding Date until maturity of the term loan. Additionally, the term loan will be issued with a 5.00% original issue discount. Subject to timely prior written notice, payment of breakage fees, if any, and payment of a prepayment premium equal to (i) 12% if such prepayment occurs during the first year following the closing date or (ii) 8% thereafter, the Company may at any time and from time to time voluntarily prepay all or any portion of any outstanding borrowings.

The Term Loan Credit Agreement contains representations, covenants and events of default that are customary for financing transactions of this nature. Events of default in the Term Loan Credit Agreement include, among others: (a) non-payment of principal, interest, fees or other amounts; (b) default of specific covenants; (c) breach of representations and warranties; (d) cross-defaults to other indebtedness in an amount greater than $1 million, subject to certain exceptions; (e) bankruptcy and insolvency proceedings; (f) inability to pay debts or attachment; (g) judgments; and (h) change of control. Upon the occurrence of an event of default, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders (as defined in the Term Loan Credit Agreement) accelerate all loans and exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Term Loan Credit Agreement and the other loan documents.

Amounts outstanding under the Term Loan Credit Agreement are guaranteed by the Guarantors, and are secured by a security interest in substantially all of the assets of the Company. Subject to certain limited exceptions, any majority-owned direct or indirect subsidiaries of the Company formed after the closing date of the Term Loan Facility will also be required to guaranty the obligations under the Term Loan Credit Agreement and grant security interests in substantially all of their respective assets.

<u>Amendment to Sylebra Credit Agreement</u>

On May 8, 2023, the Company entered into the First Amendment to Credit Agreement, by and among the Company, as borrower, PureCycle Technologies, LLC and PureCycle Technologies Holdings Corp., as Guarantors, the lenders party thereto, and Madison Pacific Trust Limited, as administrative agent and as security agent (the "Sylebra Amendment") in connection with the Company's $150 million revolving credit facility governed by the Credit Agreement (the "Revolving Credit Agreement"). The Sylebra Amendment, among other things: (i) permits the Company's entry into the Term Loan Facility, (ii) provides for a new basket under the Revolving Credit Agreement's indebtedness negative covenant allowing for offerings of unsecured convertible promissory notes of up to $200,000,000, (iii) provides for new baskets under the Revolving Credit Agreement's indebtedness and lien negative covenants of up to $90,000,000 in additional equipment financings and (iv) exempts the proceeds of any such convertible notes offerings from the requirement for mandatory prepayments under the Revolving Credit Agreement.

The foregoing descriptions of the Term Loan Credit Agreement and Sylebra Amendment are not complete and are qualified in their entirety by reference to the full text of the agreements, which are attached hereto as Exhibits 10.1 and 10.2.

**Item 2.02. Results of Operations and Financial Condition.**

On May 9, 2023, the Company issued a press release, attached hereto as Exhibit 99.1 and incorporated herein by reference, announcing the Company's financial results for the first quarter ended March 31, 2023, and certain other information.

The information contained in Item 7.01 concerning the presentation to the Company's investors is hereby incorporated into this Item 2.02 by reference.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information contained under Item 1.01 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 7.01. Regulation FD Disclosure.**

The slide presentation attached hereto as Exhibit 99.2, and incorporated herein by reference, will be presented to certain investors of the Company on May 9, 2023 and may be used by the Company in various other presentations to investors.

**Item 8.01. Other Events.**

Pursuant to Section 2.4(b)(vi)(C)(I) of the loan agreement dated as of October 1, 2020, by and between the Southern Ohio Port Authority ("SOPA") and PureCycle: Ohio LLC ("PCO") (as amended, the "Loan Agreement"), PCO, an indirect wholly-owned subsidiary of the Company, posted to the Electronic Municipal Market Access ("EMMA") site materials which include PCO's interim financial statements for the fiscal quarter ending March 31, 2023 (the "Quarterly Reporting Package"). The Quarterly Reporting Package is filed as Exhibit 99.3 to this current report on Form 8-K.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit Number | Description of Exhibit |
|---|---|
| 10.1 | Credit Agreement, dated as of May 8, 2023, among PureCycle Technologies, Inc., as the Borrower, PureCycle Technologies Holdings Corp. and PureCycle Technologies, LLC, as Guarantors, Pure Plastic LLC, as the Lender and Pure Plastic LLC, as the Administrative Agent and Security Agent. |
| 10.2 | First Amendment to Credit Agreement, Dated as of May 8, 2023, among PureCycle Technologies, Inc. as the Borrower,PureCycle Technologies, LLC and PureCycle Technologies Holdings Corp., as Guarantors, the Lenders party thereto, and Madison Pacific Trust Limited, asAdministrative Agent and as Security Agent. |
| 99.1 | Press release by PureCycle Technologies, Inc., dated May 9, 2023. |
| 99.2 | PureCycle Technologies, Inc. presentation to investors. |
| 99.3 | PureCycle: Ohio LLC: Quarterly Reporting Package. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.


**PURECYCLE TECHNOLOGIES, INC.**
**By: /s/ Lawrence Somma**
**Name: Lawrence Somma**
**Title: Chief Financial Officer**


**Date: May 9, 2023**

**Exhibit 10.1**

**CREDIT AGREEMENT**

**Dated as of May 8, 2023**

**among**

**PURECYCLE TECHNOLOGIES, INC.**
as Borrower,

**THE SUBSIDIARIES OF THE BORROWER PARTY HERETO,**
as the Guarantors,

**PURE PLASTIC LLC,**
as Administrative Agent,

**PURE PLASTIC LLC,**
as Security Agent,

**and**

**THE LENDERS PARTY HERETO**

**TABLE OF CONTENTS**

*Page*

| | | |
|---|---|---|
| Article I DEFINITIONS AND ACCOUNTING TERMS | | 1 |
| 1.01 | Defined Terms | 1 |
| 1.02 | Other Interpretive Provisions | 24 |
| 1.03 | Accounting Terms | 25 |
| 1.04 | Rounding | 25 |
| 1.05 | Times of Day | 25 |
| 1.06 | [Reserved] | 26 |
| 1.07 | Interest Rates | 26 |
| Article II COMMITMENTS AND CREDIT EXTENSIONS | | 26 |
| 2.01 | Loans | 26 |
| 2.02 | Borrowings and Continuations of Loans | 26 |
| 2.03 | [Reserved] | 27 |
| 2.04 | [Reserved] | 27 |
| 2.05 | Prepayments | 27 |
| 2.06 | Termination or Reduction of Commitments | 30 |
| 2.07 | Repayment of Loans | 30 |
| 2.08 | Interest and Default Rate | 30 |
| 2.09 | Fees | 31 |
| 2.10 | Computation of Interest and Fees | 32 |
| 2.11 | Evidence of Debt | 32 |
| 2.12 | Payments Generally; Administrative Agent's Clawback | 32 |
| 2.13 | Sharing of Payments by Lenders. | 34 |
| 2.14 | [Reserved] | 35 |
| 2.15 | Defaulting Lenders. | 35 |
| Article III TAXES, YIELD PROTECTION AND ILLEGALITY | | 36 |
| 3.01 | Taxes. | 36 |
| 3.02 | Illegality | 41 |
| 3.03 | Inability to Determine Rates | 41 |
| 3.04 | Increased Costs | 43 |
| 3.05 | Compensation for Losses | 44 |
| 3.06 | Mitigation Obligations; Replacement of Lenders. | 45 |
| 3.07 | Survival | 45 |
| Article IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS | | 45 |
| 4.01 | Conditions to Closing Date | 45 |
| 4.02 | Conditions to Funding Date | 48 |
| Article V REPRESENTATIONS AND WARRANTIES | | 49 |
| 5.01 | Existence, Qualification and Power | 49 |
| 5.02 | Authorization; No Contravention | 49 |

| 5.03 | Governmental Authorization; Other Consents | 49 |
| 5.04 | Binding Effect. | 50 |
| 5.05 | Financial Statements; No Material Adverse Effect | 50 |
| 5.06 | Litigation | 50 |
| 5.07 | No Default | 50 |
| 5.08 | Ownership of Property; Liens | 51 |
| 5.09 | Environmental Matters. | 51 |
| 5.10 | Insurance | 52 |
| 5.11 | Taxes | 52 |
| 5.12 | ERISA Compliance. | 52 |
| 5.13 | Margin Regulations; Investment Company Act | 53 |
| 5.14 | Disclosure | 53 |
| 5.15 | Compliance with Laws | 54 |
| 5.16 | Solvency | 54 |
| 5.17 | Casualty, Etc | 54 |
| 5.18 | Sanctions Concerns and Anti-Corruption Laws | 54 |
| 5.19 | [Reserved] | 54 |
| 5.20 | Subsidiaries; Equity Interests; Loan Parties | 54 |
| 5.21 | Security Interests and Collateral Documents | 55 |
| 5.22 | EEA Financial Institutions. | 55 |
| 5.23 | Covered Entities | 55 |
| 5.24 | Beneficial Ownership Certification | 55 |
| 5.25 | Labor Matters | 55 |
| Article VI AFFIRMATIVE COVENANTS | | 56 |
| 6.01 | Financial Statements. | 56 |
| 6.02 | Certificates; Other Information | 57 |
| 6.03 | Notices | 59 |
| 6.04 | Payment of Obligations | 60 |
| 6.05 | Preservation of Existence, Etc | 60 |
| 6.06 | Maintenance of Properties | 60 |
| 6.07 | Maintenance of Insurance | 60 |
| 6.08 | Compliance with Laws | 61 |
| 6.09 | Books and Records | 61 |
| 6.10 | Inspection Rights | 61 |
| 6.11 | Use of Proceeds | 62 |
| 6.12 | [Reserved] | 62 |
| 6.13 | Covenant to Guarantee Obligations and Give Security | 62 |
| 6.14 | Information Regarding Collateral | 63 |
| 6.15 | [Reserved] | 64 |
| 6.16 | Compliance with Terms of Leaseholds | 64 |
| 6.17 | Compliance with Environmental Laws | 64 |

| | | |
|---|---|---|
| 6.18 | [Reserved] | 64 |
| 6.19 | Anti-Corruption Laws; Sanctions. | 64 |
| 6.20 | Further Assurances | 64 |
| 6.21 | Post-Closing Matters. | 65 |
| 6.22 | Fees and Expenses. | 65 |
| Article VII NEGATIVE COVENANTS | | 65 |
| 7.01 | Liens | 65 |
| 7.02 | Indebtedness | 67 |
| 7.03 | Investments | 68 |
| 7.04 | Fundamental Changes | 69 |
| 7.05 | Dispositions | 70 |
| 7.06 | Restricted Payments | 70 |
| 7.07 | Change in Nature of Business | 70 |
| 7.08 | Transactions with Affiliates | 70 |
| 7.09 | Burdensome Agreements | 71 |
| 7.10 | Use of Proceeds | 71 |
| 7.11 | [Reserved] | 71 |
| 7.12 | [Reserved] | 71 |
| 7.13 | Amendments of Organization Documents; Fiscal Year; Legal Name, State of Formation; Form of Entity and Accounting Changes. | 71 |
| 7.14 | Sale and Leaseback Transactions | 72 |
| 7.15 | Sanctions | 72 |
| 7.16 | Anti-Corruption Laws | 72 |
| Article VIII EVENTS OF DEFAULT AND REMEDIES | | 72 |
| 8.01 | Events of Default. | 72 |
| 8.02 | Remedies upon Event of Default | 74 |
| 8.03 | Application of Funds | 74 |
| Article IX ADMINISTRATIVE AGENT | | 75 |
| 9.01 | Appointment and Authority | 75 |
| 9.02 | Rights as a Lender | 76 |
| 9.03 | Exculpatory Provisions | 76 |
| 9.04 | Reliance by Administrative Agent | 77 |
| 9.05 | Delegation of Duties | 78 |
| 9.06 | Resignation of Administrative Agent | 78 |
| 9.07 | Non-Reliance on Administrative Agent and Other Lenders | 79 |
| 9.08 | No Other Duties, Etc | 80 |
| 9.09 | Administrative Agent May File Proofs of Claim; Credit Bidding | 80 |
| 9.10 | Collateral and Guaranty Matters. | 81 |
| 9.11 | [Reserved] | 82 |
| 9.12 | Certain ERISA Matters. | 82 |
| 9.13 | Recovery of Erroneous Payments | 83 |

| | | |
|---|---|---|
| 9.16 | Application of Article IX | 83 |
| Article X CONTINUING GUARANTY | | 83 |
| 10.01 | Guaranty. | 83 |
| 10.02 | Rights of Lenders | 84 |
| 10.03 | Certain Waivers | 84 |
| 10.04 | Obligations Independent | 85 |
| 10.05 | Subrogation | 85 |
| 10.06 | Termination; Reinstatement | 85 |
| 10.07 | Stay of Acceleration | 85 |
| 10.08 | Condition of Borrower | 85 |
| 10.09 | Appointment of Holdings | 86 |
| 10.10 | Right of Contribution | 86 |
| 10.11 | Keepwell. | 86 |
| Article XI MISCELLANEOUS | | 86 |
| 11.01 | Amendments, Etc | 86 |
| 11.02 | Notices; Effectiveness; Electronic Communications. | 88 |
| 11.03 | No Waiver; Cumulative Remedies; Enforcement | 90 |
| 11.04 | Expenses; Indemnity; Damage Waiver. | 91 |
| 11.05 | Payments Set Aside | 93 |
| 11.06 | Successors and Assigns | 93 |
| 11.07 | Treatment of Certain Information; Confidentiality. | 98 |
| 11.08 | Right of Setoff. | 99 |
| 11.09 | Interest Rate Limitation | 100 |
| 11.10 | Integration; Effectiveness. | 100 |
| 11.11 | Survival of Representations and Warranties. | 100 |
| 11.12 | Severability | 101 |
| 11.13 | Replacement of Lenders. | 101 |
| 11.14 | Governing Law; Jurisdiction; Etc. | 102 |
| 11.15 | Waiver of Jury Trial. | 103 |
| 11.16 | Subordination | 103 |
| 11.17 | No Advisory or Fiduciary Responsibility. | 103 |
| 11.18 | Electronic Execution; Electronic Records; Counterparts | 104 |
| 11.19 | USA Patriot Act Notice. | 105 |
| 11.20 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 105 |
| 11.21 | Acknowledgement Regarding Any Supported QFCs. | 106 |
| 11.22 | Time of the Essence | 106 |
| 11.23 | ORIGINAL ISSUE DISCOUNT LEGEND | 106 |
| 11.24 | ENTIRE AGREEMENT | 107 |

TOC \f c \h \t "Heading 1,1"

BORROWER PREPARED SCHEDULES

Schedule 5.12    Pension Plans
Schedule 5.20(a)    Subsidiaries, Partnerships and Other Equity Investments
Schedule 5.20(b)    Loan Parties
Schedule 7.01    Existing Liens
Schedule 7.02    Existing Indebtedness
Schedule 7.03    Existing Investments

ADMINISTRATIVE AGENT PREPARED SCHEDULES

Schedule 1.01(a)    Certain Addresses for Notices
Schedule 1.01(b)    Initial Commitments and Applicable Percentages

EXHIBITS

Exhibit A    Form of Assignment and Assumption
Exhibit B    Form of Joinder Agreement
Exhibit C    Form of Loan Notice
Exhibit D-1    Perfection Certificate
Exhibit D-2    Perfection Certificate Supplement
Exhibit E    Form of Term Note
Exhibit F    Form of Solvency Certificate
Exhibit G    Forms of U.S. Tax Compliance Certificates
Exhibit H    Form of Notice of Loan Prepayment

**CREDIT AGREEMENT**

This **CREDIT AGREEMENT** (this "Agreement") is entered into as of May 8, 2023, among (a) **PURECYCLE TECHNOLOGIES, INC.,** a Delaware corporation (the "Borrower"), (b) the Guarantors (as defined herein), (c) the Lenders (as defined herein), (d) **PURE PLASTIC LLC**, as Administrative Agent, and (e) **PURE PLASTIC LLC**, as Security Agent.

**PRELIMINARY STATEMENTS**:

**WHEREAS**, the Loan Parties (as hereinafter defined) have requested that the Lenders make a term loan to the Borrower in an aggregate amount of $40,000,000.

**WHEREAS**, the Lenders have agreed to make such term loan to the Borrower on the terms and subject to the conditions set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**Article I**

**DEFINITIONS AND ACCOUNTING TERMS**

**1.01    Defined Terms**.

As used in this Agreement, the following terms shall have the meanings set forth below:

"Administrative Agent" means Pure Plastic LLC in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 1.01(a), or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in form and substance reasonable acceptable to the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement, including all schedules, exhibits and annexes hereto.

"Applicable Law" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Term Loan Facility represented by the principal amount of such Lender's Loans at such time, subject to adjustment as provided in Section 2.15. The Applicable Percentage of each Lender in respect of the Term Loan Facility is set forth opposite the name of such Lender on Schedule 1.01(b) or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

1

"Applicable Margin" means a percentage per annum equal to 7.5%.

"Appropriate Lender" means, at any time, with respect to the Term Loan Facility, a Lender that has a Commitment with respect to such Facility or holds a Loan under such Facility at such time.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form (including an electronic documentation form generated by use of an electronic platform) approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease, (c) all Synthetic Debt of such Person, and (d) in respect of any Sale and Leaseback Transaction, the present value (discounted in accordance with GAAP at the debt rate implied in the applicable lease) of the obligations of the lessee for rental payments during the term of such lease.

"Audited Financial Statements" means the audited Consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2022, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"Augusta Project" means (i) the development, construction, financing, operation and maintenance of a polypropylene recycling plant consisting of one or more polypropylene purification lines located in or near Augusta, Georgia and (ii) the development, construction, financing, operation and maintenance of associated polypropylene feed pre-processing prep facilities (whether or not located in or near Augusta, Georgia) that collect, sort and prepare polypropylene for purification and recycle and purify polyethylene and other non-polypropylene plastics.

"Availability Period" means the period from and including the Closing Date to but excluding the Commitment Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Base Rate" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, and (b) the rate of interest in effect for such day as announced from time to time by the Administrative Agent as its "prime rate,", subject to the interest rate floors set forth therein; *provided* that if the Base Rate shall be less than zero, such rate shall be deemed zero for purposes of this Agreement. The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below

2

such announced rate. Any change in such prime rate announced by the Administrative Agent shall take effect at the opening of business on the day specified in the announcement of such change.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02(p).

"Borrowing" means a Term Loan Borrowing.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks are authorized to close under the Laws of, or are in fact closed in, the country where the Administrative Agent's Office is located, Delaware and New York.

"Capitalized Lease" means any lease that has been or is required to be, in accordance with GAAP, recorded, classified and accounted for as a capitalized lease or financing lease.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower or any of its Subsidiaries free and clear of all Liens (other than Permitted Liens):

(a)    readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than three hundred sixty days (360) days from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof;

(b)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than ninety (90) days from the date of acquisition thereof;

(c)    commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than one hundred eighty (180) days from the date of acquisition thereof; and

(d)    Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

3

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code in which the Borrower or any Loan Party is a United States shareholder within the meaning of Section 951(b) of the Code.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Change of Control" shall mean the occurrence of any of the following for any reason: (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than 40% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were not (i) directors of the Borrower on the Closing Date, (ii) nominated or appointed by the board of directors of the Borrower or (iii) approved by the board of directors of the Borrower as director candidates prior to their election; or (c) the acquisition of direct or indirect Control of the Borrower by any Person or group; or (d) the Borrower ceases to own, directly or indirectly, and Control 100% (other than directors' qualifying shares) of the ordinary voting economic power of any Guarantor.

"Closing Date" means the date hereof.

"CME" means CME Group Benchmark Administration Limited.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of the "Collateral" or other similar term referred to in the Collateral Documents and all of the other property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Security Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the Security Agreement, the Perfection Certificate, the Intellectual Property Security Agreement, the Intercreditor Agreement, each consent and agreement delivered pursuant to the Security Agreement, each of the mortgages, collateral assignments, Perfection Certificate Supplements, security agreements, pledge agreements or other similar agreements delivered to the Security Agent pursuant to Section 6.13, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Security Agent for the benefit of the Secured Parties.

"Commitment" means, as to each Lender, its obligation to make a Term Loan to the Borrower pursuant to Section 2.01, in an aggregate principal amount equal to the amount set forth opposite such Lender's name on Schedule 1.01(b) under the caption "Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate Commitment of all of the Lenders on the Closing Date is $40,000,000.

"Commitment Termination Date" means the earliest to occur of (i) the Funding Date (after giving effect to any Loans made on such date), and (ii) June 8, 2023.

4

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"<u>Communication</u>" means this Agreement, any Loan Document and any document, any amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to any Loan Document.

"<u>Conforming Changes</u>" means, with respect to the use, administration of or any conventions associated with SOFR or any proposed Successor Rate or Term SOFR, as applicable, any conforming changes to the definitions of "SOFR", "Term SOFR" and "Interest Period", timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day", timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent in consultation with the Borrower and the Lenders, to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consolidated</u>" means, when used with reference to financial statements or financial statement items of the Borrower and its Subsidiaries or any other Person, such statements or items on a consolidated basis in accordance with the consolidation principles of GAAP.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Covered Entity</u>" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Credit Extension</u>" means a Borrowing.

"<u>Daily Simple SOFR</u>" with respect to any applicable determination date means the SOFR published on such date on the Federal Reserve Bank of New York's website (or any successor source).

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means a rate per annum equal to five percent (5%) in excess of the rate otherwise applicable thereto to the fullest extent permitted by Applicable Law.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means, subject to Section 2.15(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.15(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each other Lender promptly following such determination.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any property by any Loan Party or Subsidiary (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Institution" means, as of any date, (a) those Persons who are identified in writing by the Borrower to the Administrative Agent from time to time as direct competitors of the Loan Parties, and (b) in the case of each Person identified pursuant to clause (a) above, any of their Affiliates that are clearly identifiable as Affiliates on the basis of such Affiliate's name; *provided*, *however*, that (i) "Disqualified Institution" shall exclude any Person that Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to the Administrative Agent from time to time; (ii) no designation of any Person as a "Disqualified Institution" shall retroactively disqualify any assignments or participations made, or information provided, to such Person before it was designated as a Disqualified Institution, and such Person shall not be deemed to be a "Disqualified Institution" in respect of any assignments or participations made to such Person prior to the date of such designation; and (iii) in connection with any assignment or participation, any Eligible Assignee or participant with respect to such proposed assignment or participation that is an investment bank, a commercial bank,

6

a finance company, a fund, or other Person which merely has an economic interest in any such direct competitor, and is not itself such a direct competitor of Loan Parties, shall not be deemed to be a "Disqualified Institution" for the purposes of this definition.

"Disqualified Stock" means, with respect to any Person, any Equity Interests of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date that is 91 days after the Maturity Date; *provided*, *however*, that if such Equity Interests are issued to any plan for the benefit of employees of Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Stock solely because it may be required to be repurchased by Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided further*, *however*, that any class of Equity Interests of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Equity Interests that are not Disqualified Stock shall not be deemed to be Disqualified Stock.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, as to any Loans under this Agreement, the effective yield on such Loans as reasonably determined by the Administrative Agent, taking into account the applicable interest rate margins, interest rate benchmark floors and all fees, including recurring, up-front or similar fees or original issue discount (amortized over the shorter of (x) the life of such loans and (y) the four years following the date of incurrence thereof) payable generally to lenders making such Loans.

"Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 11.06 (subject to such consents, if any, as may be required under Section 11.06(b)(iii)).

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetland, flora and fauna.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws (including common law), regulations, standards, ordinances, rules, judgments, interpretations, orders, decrees, permits, agreements or governmental restrictions relating to pollution or the protection of the Environment or human health (to the extent related to exposure to hazardous materials), including those relating to the manufacture, generation, handling, transport, storage, treatment, Release or threat of Release of Hazardous Materials, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, directly or indirectly relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, certification, registration, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Issuance" means, any issuance by any Loan Party or any Subsidiary to any Person of its Equity Interests, other than (a) any issuance of its Equity Interests pursuant to the exercise of options or warrants, (b) any issuance of its Equity Interests pursuant to the conversion of any debt securities to equity or the conversion of any class of equity securities to any other class of equity securities, and (c) any issuance of options or warrants relating to its Equity Interests. The term "Equity Issuance" shall not be deemed to include any Disposition.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Sections 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Borrower or any ERISA Affiliate from a Multiemployer Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or receipt of notification that a Multiemployer Plan is insolvent; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate or (i) a failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Borrower or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

8

"Excluded Accounts" has the meaning specified in the Security Agreement.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Sections 3.01(b) or (d), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(f) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings and proceeds of Involuntary Dispositions), indemnity payments and any purchase price adjustments; *provided*, *however*, that an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"Facility" means the Term Loan Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) the Aggregate Commitments have terminated, and (b) all Obligations have been paid in full (other than contingent indemnification obligations).

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, as of the date of this Agreement (or any amended or successor version described above) and any intergovernmental agreement (and related fiscal or regulatory legislation, or related official rules or practices) implementing the foregoing.

"Federal Funds Rate" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; *provided* that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Foreign Lender" means, with respect to the Borrower (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means (a) any Subsidiary that is not a Domestic Subsidiary (including any CFC), (b) any Subsidiary of any Subsidiary that is a CFC, and (c) any FSHCO.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"FSHCO" means any Subsidiary substantially all of the assets of which constitute the Equity Interests of CFCs or other FSHCOs.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funding Date" means the date on which the Term Loan is made by the Lenders pursuant to Section 2.01 and 2.02.

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession) including, without limitation, the FASB Accounting Standards Codification, that are applicable to the circumstances as of the date of determination, consistently applied and subject to Section 1.03.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness of the kind described in clauses (a) through i) of the definition thereof or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of the kind described in clauses (a) through (i) of the definition thereof or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed or expressly undertaken by such Person (it being understood that, unless such Person shall have assumed or become liable for the payment of such Indebtedness, the amount of such Guarantee shall be the lesser of (i) the fair market value of the asset securing such Indebtedness and (ii) the stated principal amount of such Indebtedness). The amount of any Guarantee described in the immediately preceding clause (a) shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning set forth in Section 10.01.

"Guarantors" means, collectively, (a) PureCycle Technologies Holdings Corp., a Delaware corporation, (b) PureCycle Technologies, LLC, a Delaware limited liability company, and (c) the

10

Subsidiaries of the Borrower as are or may from time to time become parties to this Agreement pursuant to Section 6.13.

"Guaranty" means, collectively, the Guarantee made by the Guarantors under Article X in favor of the Secured Parties, together with each other guaranty delivered pursuant to Section 6.13.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations (including, without limitation, earnout obligations) of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse (it being understood that, unless such Person shall have assumed or become liable for the payment of such Indebtedness, the amount of such Indebtedness shall be the lesser of (i) the fair market value of the asset securing such Indebtedness and (ii) the stated principal amount of such Indebtedness);

(f)    all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g)    all obligations of such Person in respect of Disqualified Stock;

(h)    all obligations under PACE Financings; and

(i)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means all (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 11.04(b).

11

"Information" has the meaning specified in Section 11.07(a).

"Intercompany Debt" has the meaning specified in Section 7.02(d).

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, by and among the Administrative Agent, the Security Agent, the Sylebra Administrative Agent and the Sylebra Security Agent.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement, dated as of the date hereof, by the Borrower in favor of the Security Agent for the benefit of the Secured Parties, together with each other intellectual property security agreement delivered pursuant to Section 6.13.

"Interest Payment Date" means, as to any Term SOFR Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made.

"Interest Period" means as to each Term SOFR Loan, the period commencing on the date such Term SOFR Loan is disbursed or continued as a Term SOFR Loan and ending on the date one month thereafter, as set forth in the Loan Notice; *provided* that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the Maturity Date.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guaranties Indebtedness of such other Person), or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person which constitute all or substantially all of the assets of such Person or of a division, line of business or other business unit of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of any Loan Party or any Subsidiary.

"Ironton Bonds" means, collectively, (i) the Southern Ohio Port Authority Exempt Facility Revenue Bonds (PureCycle Project), Tax-Exempt Series 2020A, in the original principal amount of $219,550,000, (ii) Southern Ohio Port Authority Subordinate Exempt Facility Revenue Bonds (PureCycle Project), Tax-Exempt Series 2020B, in the original principal amount of $20,000,000 and (iii) Southern Ohio Port Authority Subordinate Exempt Facility Revenue Bonds (PureCycle Project), Taxable Series 2020C, in the original principal amount of $10,000,000, in each case of clauses (i)-(iii), (A) issued pursuant to that certain Indenture of Trust, dated October 1, 2020, between the Southern Ohio Port Authority and UMB Bank, N.A. and (B) governed by that certain Loan Agreement, dated October 1, 2020, between the Southern Ohio Port Authority and PureCycle: Ohio LLC.

"Ironton Project" means (i) the development, construction, financing, operation and maintenance of a polypropylene recycling plant consisting of one or more polypropylene purification lines located in or near Ironton, Ohio and (ii) the development, construction, financing, operation and maintenance of

12

associated polypropylene feed pre-processing prep facilities (whether or not located in or near Ironton, Ohio) that collect, sort and prepare polypropylene for purification and recycle and purify polyethylene and other non-polypropylene plastics.

"Ironton Project Investment Period" means the period beginning on the Closing Date and ending on (i) if there are any outstanding Loans under and as defined in the Sylebra Credit Agreement on the six-month anniversary of the Closing Date, the six-month anniversary of the Closing Date or (ii) if there are no outstanding Loans under and as defined in the Sylebra Credit Agreement on the six-month anniversary of the Closing Date, the earlier of (A) the date on which the first Borrowing occurs after such six month period and (B) December 31, 2023.

"IRS" means the United States Internal Revenue Service.

"ISP" means the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time).

"Joinder Agreement" means a joinder agreement substantially in the form of Exhibit B executed and delivered in accordance with the provisions of Section 6.13.

"Judgment Currency" has the meaning specified in Section 11.22.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" means each of the Persons identified as a "Lender" on the signature pages hereto, each other Person that becomes a "Lender" in accordance with this Agreement and, their successors and assigns.

"Lending Office" means, as to the Administrative Agent or any Lender, the office or offices of such Person described as such in such Person's Administrative Questionnaire, or such other office or offices as such Person may from time to time notify the Borrower and the Administrative Agent; which office may include any Affiliate of such Person or any domestic or foreign branch of such Person or such Affiliate.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means an extension of credit by a Lender to the Borrower under Article II in the form of a Term Loan.

"Loan Documents" means, collectively, (a) this Agreement, (b) the Notes, (c) the Guaranty, (d) the Collateral Documents, (e) each Joinder Agreement, and (f) all other certificates, agreements, documents and instruments executed and delivered, in each case, by or on behalf of any Loan Party pursuant to the foregoing and any amendments, modifications or supplements thereto or to any other Loan Document or waivers hereof or to any other Loan Document.

"Loan Notice" means a notice of a Borrowing, which shall be substantially in the form of Exhibit C or such other form as may be approved by the Administrative Agent (including any form on an

13

electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Loan Party Agent" has the meaning specified in Section 10.09.

"Master Agreement" has the meaning set forth in the definition of "Swap Contract."

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), or condition (financial or otherwise) of the Borrower or the Borrower and its Subsidiaries taken as a whole; or (b) a material adverse effect on (i) the ability of any Loan Party to perform its Obligations under any Loan Document to which it is a party, (ii) the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party or (iii) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent, the Security Agent or any Lender under any Loan Documents.

"Maturity Date" means December 31, 2025; *provided*, *however*, that if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five (5) plan years, has made or been obligated to make contributions.

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Borrower or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means the aggregate cash or Cash Equivalents proceeds received by the Borrower or any Subsidiary in respect of any Disposition, Equity Issuance, or Involuntary Disposition, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees and sales commissions), (b) taxes paid or payable as a result thereof and (c) in the case of any Disposition or any Involuntary Disposition, the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior to any Lien of the Security Agent) on the related property; it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by the Borrower or any Subsidiary in any Disposition, Equity Issuance, or Involuntary Disposition.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 11.01 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note" means any Term Note.

"Notice of Loan Prepayment" means a notice of prepayment with respect to a Loan, which shall be substantially in the form of Exhibit H or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, and (b) all

14

costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof pursuant to any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Officer's Certificate" means a certificate signed by a Responsible Officer in a form approved by the Administrative Agent.

"OID" has the meaning specified in Section 2.02(c).

"Organization Documents" means, (a) with respect to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable documents with respect to any non-U.S. jurisdiction); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction) and (d) with respect to all entities, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction).

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06).

"Outstanding Amount" means with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments, as the case may be, occurring on such date.

"PACE Financing" means any property assessed clean energy financing or similar energy efficiency or renewable energy financing repaid through assessments against property (without regard to the name given to such financing).

"Participant" has the meaning specified in Section 11.06(d).

"Participant Register" has the meaning specified in Section 11.06(d).

"Patriot Act" has the meaning specified in Section 11.19.

"PBGC" means the Pension Benefit Guaranty Corporation.

15

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum funding standards with respect to Pension Plans and set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan but excluding a Multiemployer Plan) that is maintained or is contributed to by the Borrower and any ERISA Affiliate or with respect to which the Borrower or any ERISA Affiliate has any liability and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Perfection Certificate" means a certificate in the form of Exhibit D-1 or any other form approved by the Administrative Agent and the Security Agent, dated as of the Closing Date, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"Perfection Certificate Supplement" shall mean a certificate supplement in the form of Exhibit D-2 or any other form approved by the Administrative Agent and the Security Agent.

"Permitted Liens" has the meaning set forth in Section 7.01.

"Permitted Transfers" means (a) Dispositions of inventory in the ordinary course of business; (b) Dispositions of property to the Borrower or any Subsidiary; provided, that if the transferor of such property is a Loan Party then the transferee thereof must be a Loan Party; (c) Dispositions of accounts receivable in connection with the collection or compromise thereof; (d) licenses, sublicenses, leases or subleases granted to others not interfering in any material respect with the business of the Borrower and its Subsidiaries; (e) any Disposition constituting an Investment otherwise permitted hereunder; and (f) the sale or disposition of Cash Equivalents and the investments set forth on Schedule 7.03 for fair market value.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PIK Amount" has the meaning specified in Section 2.08(d).

"PIK Election" has the meaning specified in Section 2.08(d).

"PIK Election Notice" has the meaning specified in Section 2.08(d).

"PIK Interest" has the meaning specified in Section 2.08(d).

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Borrower or any ERISA Affiliate or any such Plan to which the Borrower or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan Assets" means "plan assets" as defined by 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA.

"Platform" has the meaning specified in Section 6.02(p).

"Prep Equipment Lease" means a plastics sorting/separating and washing facilities equipment lease to be entered into by the Borrower and/or a Subsidiary of the Borrower, as lessee, and a third party lessor.

"Prepayment Premium" has the meaning specified in Section 2.05(a)(ii).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

16

"Public Lender" has the meaning specified in Section 6.02(p).

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning specified in Section 11.21.

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Receiver" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Collateral.

"Recipient" means the Administrative Agent, the Security Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 11.06(c).

"Regulation U" means Regulation U of the FRB, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment, or into, from or through any building, structure or facility.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve Systems or the Federal Reserve Bank of New York, or any successor thereto.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Repricing Transaction" means any amendment, modification or waiver of the pricing terms of the Term Loans which reduces the Effective Yield applicable to the Term Loans.

"Request for Credit Extension" means with respect to a Borrowing or continuation of Loans, a Loan Notice.

"Required Lenders" means, at any time, Lenders holding at least 50.1% of the Total Outstandings. The portion of the Commitments or the Facility held by any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Rescindable Amount" has the meaning specified in Section 2.12(b)(ii).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Resignation Effective Date" has the meaning set forth in Section 9.06(a).

17

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party, solely for purposes of the delivery of the Officer's certificates pursuant to Section 4.01(b), the secretary or any assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. To the extent requested by the Administrative Agent, each Responsible Officer will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization documentation, in form and substance satisfactory to the Administrative Agent.

"Restricted Payment" means (a) any dividend or other distribution, direct or indirect, on account of any shares (or equivalent) of any class of Equity Interests of the Borrower or any of its Subsidiaries, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares (or equivalent) of any class of Equity Interests of the Borrower or any of its Subsidiaries, now or hereafter outstanding, and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc., and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to any Loan Party or any Subsidiary, any arrangement, directly or indirectly, with any Person whereby such Loan Party or such Subsidiary shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sanction(s)" means any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, the Security Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"Security Agreement" means the Security Agreement, dated as of the date hereof, by the Borrower in favor of the Security Agent for the benefit of the Secured Parties.

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Borrower and its Subsidiaries as of such date, determined in accordance with GAAP.

"SOFR" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

"SOFR Adjustment" (a) with respect to Term SOFR means 0.1000% (10.00 basis points), and (b) pursuant to Section 3.03(b), with respect to Daily Simple SOFR means 0.26161%.

"Solvency Certificate" means a solvency certificate in substantially in the form of Exhibit F.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such

18

Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Loan Party" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 10.11).

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise Controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Successor Rate" has the meaning specified in Section 3.03(b).

"Supported QFC" has the meaning specified in Section 11.21.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Sylebra Administrative Agent" means Madison Pacific Trust Limited, as the administrative agent under the Sylebra Credit Agreement, and its successors and assigns.

"Sylebra Credit Agreement" means the Credit Agreement, dated as of March 15, 2023, by and among the Borrowers, the Guarantors, the lenders from time to time party thereto, the Sylebra Administrative Agent and the Sylebra Security Agent, as amended by the First Amendment to Credit Agreement, dated as of the date hereof, and as further amended, amended and restated, modified,

19

extended, restated, replaced or supplemented from time to time in accordance with the terms hereof and thereof.

"Sylebra Security Agent" means Madison Pacific Trust Limited, as the security agent under the Sylebra Credit Agreement, and its successors and assigns.

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the Consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including Sale and Leaseback Transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Borrowing" means a borrowing consisting of simultaneous Term Loans having the same Interest Period made by each of the Lenders pursuant to Section 2.01.

"Term Loan Facility" means, at any time, the aggregate amount of the Term Loans at such time.

"Term Loan" has the meaning specified in Section 2.01.

"Term Note" means a promissory note made by the Borrower in favor of a Lender evidencing Term Loans made by such Lender, substantially in the form of Exhibit E.

"Term SOFR" means for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; *provided* that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, *plus* the SOFR Adjustment for such Interest Period; *provided* that if the Term SOFR determined in accordance with the foregoing provision of this definition would otherwise be less than 4%, the Term SOFR shall be deemed 4% for purposes of this Agreement.

"Term SOFR Loan" means a Loan that bears interest at a rate based Term SOFR.

"Term SOFR Screen Rate" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"Threshold Amount" means $1,000,000.

"Total Outstandings" means the aggregate Outstanding Amount of all Commitments or all Loans, as applicable.

"Trade Date" has the meaning specified in Section 11.06(g)(i).

"UCC" means the Uniform Commercial Code as in effect in the State of New York; *provided* that if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UCP" means the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time).

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"U.S. Loan Party" means any Loan Party that is organized under the laws of the United States, any state thereof for the District of Columbia.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes" has the meaning specified in Section 11.21.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(f)(ii)(B)(3).

"Voting Stock" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right to so vote has been suspended by the happening of such contingency.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.02    Other Interpretive Provisions**.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

21

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including the Loan Documents and any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, modified, extended, restated, replaced or supplemented from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such law and any reference to any law, rule or regulation shall, unless otherwise specified, refer to such law, rule or regulation as amended, modified, extended, restated, replaced or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any and all references to "Borrower" regardless of whether preceded by the term "a", "any", "each of", "all", "and/or", or any other similar term shall be deemed to refer, as the context requires, to each and every (and/or any, one or all) parties constituting a Borrower, individually and/or in the aggregate.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

**1.03    Accounting Terms**.

(a)    <u>Generally</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, (i) Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 on financial liabilities shall be disregarded, (ii) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be

22

made, without giving effect to any election under FASB ASC Topic 825 "Financial Instruments" (or any other financial accounting standard having a similar result or effect) to value any Indebtedness of the Borrower or any Subsidiary at "fair value", as defined therein, and (iii) any change in GAAP (either before or after the Closing Date) requiring leases which were previously classified as operating leases to be treated as capitalized leases shall be disregarded and such leases shall continue to be treated as operating leases consistent with GAAP as in effect immediately before such change in GAAP became effective. For purposes of determining the amount of any outstanding Indebtedness, no effect shall be given to any election by the Borrower to measure an item of Indebtedness using fair value (as permitted by Financial Accounting Standards Board Accounting Standards Codification 825–10–25 (formerly known as FASB 159) or any similar accounting standard).

(b)    Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding**.

Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    [Reserved]**.

**1.07    Interest Rates.**

The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to any reference rate referred to herein or with respect to any rate (including, for the avoidance of doubt, the selection of such rate and any related spread or other adjustment) that is an alternative or replacement for or successor to any such rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or the effect of any of the foregoing, or of any Conforming Changes. The Administrative Agent and its affiliates or other related entities may engage in transactions or other activities that affect any reference rate referred to herein, or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing) or any related spread or other adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any reference rate referred to herein or any alternative, successor or replacement rate (including, without limitation, any Successor Rate) (or any component of any of the foregoing), in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or other action or omission related to or affecting the selection, determination, or calculation of any rate (or component thereof) provided by any such information source or service.

23

**Article II**

**COMMITMENTS AND CREDIT EXTENSIONS**

**1.01    Loans**.

Subject to the terms and conditions set forth herein, each Lender with a Commitment severally agrees to make on any Business Day during the Availability Period, a single loan (the "Term Loan") to the Borrower, in Dollars, in the amount set forth opposite such Lender's name on Schedule 1.01(a). Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed. Term Loans will be Term SOFR Loans, as further provided herein. No portion of any Loan shall be funded or held by any Lender with Plan Assets unless such Loan is eligible for and satisfies all conditions for relief under a PTE.

**1.02    Borrowings and Continuations of Loans**.

(a)    The Term Loan shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which shall be given by a Loan Notice. Such Loan Notice must be received by the Administrative Agent no later than 11:00 a.m. two (2) Business Days prior to the requested date of the Term Loan (or such later date and time as agreed by the Administrative Agent in its sole discretion).

(b)    Following receipt of the Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the Term Loan. Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 11:00 a.m. on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)    The Term Loan shall be issued with five percent (5.00%) original issue discount (" OID"). The Borrower shall pay the OID to the Lenders. The OID shall be non-refundable and due and payable on the Funding Date.

(d)    Except as set forth in Sections 3.02 and 3.03, the Term Loan will be automatically continued as a Term SOFR Loan on the last day of each Interest Period for such Term Loan.

(e)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans upon determination of such interest rate.

(f)    Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all of the portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent, and such Lender.

(g)    With respect to SOFR or Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document; *provided* that, with respect to any such amendment effected, the Administrative Agent

24

shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

**1.03** **[Reserved]**.

**1.04** **[Reserved]**

**1.05** **Prepayments**.

(a)    Optional.

(i)    The Borrower may, upon notice to the Administrative Agent pursuant to delivery to the Administrative Agent of a Notice of Loan Prepayment, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty (except as set forth in Section 2.05(a)(ii)); *provided* that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m. two Business Days prior to any date of prepayment of Term SOFR Loans; and (ii) any prepayment of Term SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof, or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Interest Period of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and will notify each Lender and the Borrower of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable to the Lenders on the date specified therein. Any prepayment of any Term SOFR Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

| Period | Prepayment **Premium** |
|---|---|
| From the Closing Date to (and including) the first anniversary of the Closing Date | 12.00% |
| Thereafter | 8.00% |

(ii)    In the event that (A) the Term Loans are prepaid or repaid in whole or in part (whether pursuant to Section 2.05(a)(i), Section 2.03(b), assignments pursuant to Section 11.13 (other than with respect to Defaulting Lenders) or in connection with an acceleration pursuant to Section 8.02, but in all cases excluding any prepayment or repayment pursuant to Section 2.05(b)(i), Section 2.05(b)(ii), or Section 2.05(b)(iv)) prior to maturity or (B) the Borrower effects any amendment to this Agreement resulting in a Repricing Transaction, the Borrower shall pay to the applicable Lenders (it being understood that such premium shall apply to any Non-Consenting Lender that is replaced under Section 11.13 in connection with any Repricing Transaction) a prepayment premium expressed as a percentage of (x) in the case of clause (A) above, the principal amount of such Term Loans prepaid, repaid or accelerated on the amount so prepaid, repaid or accelerated and (y) in the case of clause (B) above, the principal amount of the applicable Term Loans outstanding immediately prior to such amendment, in the amount set forth in the applicable table below opposite the time period in which such prepayment, repayment, acceleration or amendment occurs (each such premium being a "Prepayment Premium"):

25

Any Prepayment Premium referred to in this Section 2.05(a)(ii) shall be paid to the Administrative Agent in accordance with Section 2.12 upon any applicable repayment, prepayment, acceleration or amendment (including via any distributions or any other transfers on account of all or any part of the principal balance of any Term Loan for any reason or at any time (whether or not upon maturity, whether mandatory or optional, whether voluntary or involuntary, including following any default or any acceleration (whether automatic or following notice), or following the filing by or against any Loan Party of any petition under any Debtor Relief Law (whether or not such payment, distribution, or transfer is under a plan of reorganization or liquidation or ordered by any court of competent jurisdiction) or otherwise)).

(b)     Mandatory.

(i)     Dispositions and Involuntary Dispositions. The Borrower shall prepay the Loans as hereinafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds received by the Borrower or any Subsidiary from all Dispositions (other than Permitted Transfers) and Involuntary Dispositions within five (5) days of the date of such Disposition or Involuntary Disposition; provided, however, that so long as no Default shall have occurred and be continuing, such Net Cash Proceeds shall not be required to be so applied (A) until the aggregate amount of the Net Cash Proceeds derived from any such Disposition or Involuntary Disposition in any fiscal year of the Borrower is equal to or greater than $500,000 and (B) at the election of the Borrower (as notified by the Borrower to the Administrative Agent on or prior to the date of such Disposition or Involuntary Disposition) to the extent such Loan Party or such Subsidiary reinvests all or any portion of such Net Cash Proceeds in assets used or useful in its business (but specifically excluding current assets as classified by GAAP) within 120 days after the receipt of such Net Cash Proceeds; provided that, if such Net Cash Proceeds shall have not been so reinvested, such Net Cash Proceeds shall be immediately applied to prepay the Loans.

(ii)     Equity Issuance. Immediately upon the receipt by any Loan Party or any Subsidiary of the Net Cash Proceeds of any Equity Issuance, the Borrower shall prepay the Loans as hereinafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds; provided, however, that so long as no Default shall have occurred and be continuing, such Net Cash Proceeds shall not be required to be so applied in connection with Indebtedness incurred under Section 7.02(m).

(iii)     Debt Issuance. Immediately upon the receipt by the Borrower or any Subsidiary of the Net Cash Proceeds of any issuance of any Indebtedness for borrowed money, the Borrower shall prepay the Loans as hereinafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds; provided, however, that so long as no Default shall have occurred and be continuing, such Net Cash Proceeds shall not be required to be so applied in connection with Indebtedness incurred under Section 7.02(m).

(iii)     Extraordinary Receipts. Immediately upon receipt by the Borrower or any Subsidiary of any Extraordinary Receipt received by or paid to or for the account of any Loan Party or any of its Subsidiaries, and not otherwise included in clauses (ii), (iii) or (iv) of this Section 2.05(b), the Borrower shall prepay the Loans as hereinafter provided in an aggregate principal amount equal to 100% of all Net Cash Proceeds received therefrom; provided, however, that so long as no Default shall have occurred and be continuing, such Net Cash Proceeds shall not be required to be so applied (A) until the aggregate amount of the Net Cash Proceeds derived from any such Extraordinary Receipt in any fiscal year of the Borrower is equal to or greater than $500,000 and (B) at the election of the Borrower (as notified by the Borrower to the Administrative Agent on or prior to the date of such Extraordinary Receipt) to the extent such Loan Party or such Subsidiary reinvests all or any portion of such Net Cash Proceeds in assets used or useful in its business (but specifically excluding current assets

26

as classified by GAAP) within 120 days after the receipt of such Net Cash Proceeds; *provided* that, if such Net Cash Proceeds shall have not been so reinvested, such Net Cash Proceeds shall be immediately applied to prepay the Loans.

(iv)    Application of Payments. Each prepayment of Loans pursuant to the foregoing provisions of clauses (i) through (v) of this Section 2.05(b) shall be applied to the Term Loan Facility in the manner set forth in clause (vii) of this Section 2.05(b). Subject to Section 2.15, such prepayments shall be paid to the Lenders in accordance with their respective Applicable Percentages in respect of the Facility.

(v)    [Reserved].

(vi)    Application of Other Payments. Except as otherwise provided in Section 2.15, prepayments of the Term Loan Facility made pursuant to this Section 2.05(b) shall be applied to the outstanding Term Loans.

Within the parameters of the applications set forth above, prepayments pursuant to this Section 2.05(b) shall be applied to Term SOFR Loans in direct order of Interest Period maturities. All prepayments under this Section 2.05(b) shall be subject to Section 3.05, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

**1.06    Termination or Reduction of Commitments**.

Unless previously terminated, the aggregate Commitments shall be automatically and permanently reduced to zero on the Commitment Termination Date. Upon the occurrence of the Funding Date, the Borrower shall pay to each Lender a fully earned, non-refundable commitment fee equal to one percent (1.00%) *times* the aggregate principal amount of such Lender's Commitments on the Funding Date prior to the Borrowing. In addition, upon the occurrence of the Funding Date, the Borrower shall pay to the Administrative Agent a fully-earned, non-refundable syndication fee equal to one half percent (0.50%) *times* the aggregate principal amount of the Lenders' Commitments on the Funding Date prior to the Borrowing.

**1.07    Repayment of Loans**.

The Borrower shall repay to the Lenders on the Maturity Date the aggregate principal amount of all Term Loans outstanding on such date.

**1.08    Interest and Default Rate**.

(a)    Interest. Subject to the provisions of Section 2.08(b), each Term SOFR Loan under a Facility shall bear interest on the outstanding principal amount thereof for each Interest Period from the applicable Borrowing date at a rate per annum equal to the Term SOFR for such Interest Period plus the Applicable Margin. To the extent that any calculation of interest or any fee required to be paid under this Agreement shall be based on (or result in) a calculation that is less than zero, such calculation shall be deemed zero for purposes of this Agreement.

(b)    Default Rate

(i)    If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Law.

(ii)    If any amount (other than principal of any Loan) payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then

27

upon the request of the Required Lenders such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Law.

(iii)    Upon the request of the Required Lenders, while any Event of Default exists (including a payment default), all outstanding Obligations may accrue at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Law.

(iv)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    <u>Interest Payments</u>. Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)    <u>PIK Interest</u>. Notwithstanding anything to the contrary contained in this <u>Section 2.08</u>, and so long as no Event of Default has occurred and is continuing, the Borrower may elect, at its option, to pay in kind ("<u>PIK Interest</u>") all of the interest due on the principal amount of the Loans (a "<u>PIK Election</u>"). PIK Interest shall be capitalized on a compounding basis by adding to the outstanding principal amount of the Loans such PIK Interest on the applicable Interest Payment Date. The Borrower shall make a PIK Election with respect to any Interest Payment Date by providing irrevocable notice of such election (the "<u>PIK Election Notice</u>") no later than 12:00 pm not less than three (3) Business Days prior to such Interest Payment Date. Each PIK Election Notice shall include the information to the following effect: (i) that the Borrower is making a PIK Election, (ii) the relevant Interest Payment Date, (iii) the portion of the then-applicable interest rate to be paid as PIK Interest, and (iv) the increase in the principal amount of the Loans to be effective upon the relevant Interest Payment Date as a result of the PIK Election (each, a "<u>PIK Amount</u>") and the principal amount of the Loans outstanding as of such Interest Payment Date after giving effect to the payment of PIK Interest as a result of the PIK Election. If the Borrower does not deliver (or is not deemed to have delivered) a PIK Election Notice in accordance with the immediately preceding sentence, the interest on the Loans will be payable on the related Interest Payment Date entirely in cash. All PIK Interest shall automatically become immediately due and payable in full on the earliest to occur of (i) an Event of Default and (ii) the Maturity Date.

**1.09    <u>Fees</u>**.

(a)    <u>Closing Fee</u>. Upon the occurrence of the Funding Date, the Borrower shall pay to each Lender a fully earned, non-refundable closing fee equal to two percent (2.00%) *times* the aggregate principal amount of the Term Loans funded by such Lender on the Funding Date.

(b)    <u>Monitoring Fee</u>. The Borrower agrees to pay an annual monitoring fee equal to $200,000 to the Administrative Agent for the account of the Administrative Agent and the Security Agent. The first annual payment of the Monitoring Fee shall be due on the Funding Date and each annual payment of the Monitoring Fee thereafter shall be due in advance on the anniversary of the Funding Date until the maturity of the Term Loans.

(c)    <u>Calculation Agent Fees</u>. To the extent any Credit Extensions have been made under this Agreement, the Borrower shall pay to the Administrative Agent any fees owed to any calculation agent engaged by the Administrative Agent to make computations of interest and other amounts hereunder.

28

(d)    Third-Party Administrative Agent Fees. If a third-party administrative agent becomes a sub-agent of the Administrative Agent pursuant to Section 9.06 or is appointed as a successor Administrative Agent pursuant to Section 9.07, the Borrower shall pay to such third-party administrative agent, or reimburse the Administrative Agent for, all such fees of such third-party administrative agent as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**1.10    Computation of Interest and Fees**.

All computations of interest and fees shall be made on the basis of a three hundred sixty (360) day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365 day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**1.11    Evidence of Debt**.

(a)    Maintenance of Accounts. The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender in the ordinary course of business. The Administrative Agent shall maintain the Register in accordance with Section 11.06(c). The accounts or records maintained by each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the Register, the Register shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)    Maintenance of Records. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

**1.12    Payments Generally; Administrative Agent's Clawback**.

(a)    General. All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. Subject to Section 2.07(a) and as otherwise specifically provided for in this Agreement, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)

29

(i)    <u>Funding by Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Term SOFR Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Term SOFR Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(i)    <u>Payments by Borrower; Presumptions by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders the amount due. With respect to any payment that the Administrative Agent makes for the account of the Lenders hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "<u>Rescindable Amount</u>"): (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative agent has for any reason otherwise erroneously made such payment; then each of the Appropriate Lenders severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this <u>clause (b)</u> shall be conclusive, absent manifest error.

(c)    <u>Failure to Satisfy Conditions Precedent</u>. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

30

(d)    <u>Obligations of Lenders Several</u>. The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to <u>Section 11.04(c)</u> are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under <u>Section 11.04(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 11.04(c)</u>.

(e)    <u>Funding Source</u>. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)    <u>Pro Rata Treatment</u>. Except to the extent otherwise provided herein: (i) each Borrowing shall be made from the Appropriate Lenders, each payment of fees under <u>Sections 2.02(c)</u>, <u>2.06</u> and <u>2.09</u> shall be made for account of the Appropriate Lenders, and the termination of the amount of the Commitments shall be applied to the respective Commitments of the Lenders, *pro rata* according to the amounts of their respective Commitments; (ii) each Borrowing shall be allocated pro rata among the Lenders according to the amounts of their respective Commitments (in the case of the making of Loans) or their respective Loans that are to be included in such Borrowing (in the case of continuations of Loans); (iii) each payment or prepayment of principal of Loans by the Borrower shall be made for account of the Appropriate Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans held by them; and (iv) each payment of interest on Loans by the Borrower shall be made for account of the Appropriate Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the respective Appropriate Lenders.

## 1.13    <u>Sharing of Payments by Lenders</u>.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of the Facility due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facility due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of the Facility owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facility owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then, in each case under <u>clauses (a)</u> and (<u>b</u>) above, the Lender receiving such greater proportion shall (A) notify the Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facility then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this <u>Section 2.13</u> shall not be construed to apply to (A) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender or Disqualified Institution), or (B) any payment

31

obtained by a Lender as consideration for the assignment of or sale of a participations to any assignee or participant, other than an assignment to any Loan Party or any Affiliate thereof (as to which the provisions of this Section 2.13 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**1.14** **[Reserved]**.

**1.15** **Defaulting Lenders**.

(a) Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 11.01.

(ii) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 11.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent and the Security Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender; *third*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fourth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fifth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *sixth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *seventh*, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders *pro rata* in accordance with the Commitments hereunder without giving effect to Section 2.15(a)(v). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii) Certain Fees. No Defaulting Lender shall be entitled to receive any fee payable under Sections 2.02(c), 2.06 and 2.09 for any period during which that Lender is

32

a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with their Commitments (without giving effect to Section 2.15(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**Article III**

**TAXES, YIELD PROTECTION AND ILLEGALITY**

**1.01    Taxes**.

(a)    Defined Terms. For purposes of this Section 3.01, the term "Applicable Law" includes FATCA.

(b)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes . Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of an applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(c)    Payment of Other Taxes by the Loan Parties . The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Tax Indemnifications.

(i)    Each of the Loan Parties shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent and the Security Agent), or by the Administrative Agent or Security Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

33

(ii)      Each Lender shall, and does hereby, severally indemnify the Administrative Agent and the Security Agent and shall make payment in respect thereof within ten (10) days after demand therefor, for (A) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent and the Security Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (B)  any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(d) relating to the maintenance of a Participant Register and (C) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent or the Security Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent and the Security Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent and the Security Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent and the Security Agent to the Lender from any other source against any amount due to the Administrative Agent and the Security Agent under this clause (d)(ii).

(e)      Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority, as provided in this Section 3.01, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)      Status of Lenders; Tax Documentation.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower, the Administrative Agent and the Security Agent, at the time or times reasonably requested by the Borrower, the Administrative Agent or the Security Agent, such properly completed and executed documentation reasonably requested by the Borrower, the Administrative Agent or the Security Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, if reasonably requested by the Borrower, the Administrative Agent or the Security Agent, any Lender shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower, the Administrative Agent or the Security Agent as will enable the Borrower, the Administrative Agent or the Security Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower, the Administrative Agent and the Security Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower, the Administrative Agent or the Security Agent), executed copies of IRS Form W–9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

34

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower, the Administrative Agent and the Security Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower, the Administrative Agent or the Security Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W–8BEN–E (or W–8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W–8BEN–E (or W–8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W–8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of <u>Exhibit G–1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of IRS Form W–8BEN–E (or W–8BEN, as applicable); or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W–8IMY, accompanied by IRS Form W–8ECI, IRS Form W–8BEN–E (or W–8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G–2</u> or <u>Exhibit G–3</u>, IRS Form W–9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G–4</u> on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower, the Administrative Agent and the Security Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower, the Administrative Agent or the Security Agent), executed copies (or originals, as required) of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower, the Administrative Agent or the Security Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA

(including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower, the Administrative Agent and the Security Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower, the Administrative Agent or the Security Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower, the Administrative Agent or the Security Agent as may be necessary for the Borrower, the Administrative Agent and the Security Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for the purposes of this clause (f)(ii)(D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower, the Administrative Agent and the Security Agent in writing of its legal inability to do so.

(iv)    On or prior to the date that the Administrative Agent (and any successor thereto) becomes a party to this Agreement, and from time to time as reasonably requested by the Borrower, (x) if the Administrative Agent is a U.S. Person, it shall provide the Borrower executed copies of IRS Form W-9, or (y) if the Administrative Agent is not a U.S. Person, it shall provide the Borrower executed copies of IRS Form W-8IMY certifying that the Administrative Agent is acting as a "qualified intermediary" or a "nonqualified intermediary," as applicable, and accompanied by any required attachments (including, as applicable, certification documents from each beneficial owner). In addition, with respect to any U.S.-source fees, interest or other payments received on its behalf, the Administrative Agent or the Security Agent, as applicable, shall provide the Borrower executed copies of IRS Form W-8BEN-E claiming an exemption under an applicable tax treaty or IRS Form W-8ECI, in each case, that would allow the Borrower to make such payments to it without deduction or withholding of any U.S. federal withholding Taxes. The Administrative Agent and the Security Agent each agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower of its legal ineligibility to do so.

(g)    Treatment of Certain Refunds. Unless required by Applicable Law, at no time shall the Administrative Agent or the Security Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to such Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that each Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (g), in no event will the applicable Recipient be required to pay any amount to such Loan Party pursuant to this clause (g) the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (g) shall not be construed to require any Recipient to

make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)    [Reserved].

(i)    Survival. Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**1.02    Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Term SOFR Loans shall be suspended, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loan to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loan and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon SOFR, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.05.

**1.03    Inability to Determine Rates**.

(a)    If in connection with any request for a Term SOFR Loan or a continuation of any of such Loans, as applicable, (i) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (A) no Successor Rate has been determined in accordance with Section 3.03(b), and the circumstances under clause (i) of Section 3.03(b) or the Scheduled Unavailability Date has occurred, or (B) adequate and reasonable means do not otherwise exist for determining Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan, or (ii) the Administrative Agent or the Required Lenders determine that for any reason that Term SOFR for any requested Interest Period with respect to a proposed Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

Thereafter, the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods) until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of this Section 3.03(a), until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.

Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein and (ii) any outstanding Term SOFR Loans shall be deemed to have been converted to Base Rate Loans immediately at the end of their respective applicable Interest Period.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Required Lenders notify the Administrative Agent

37

(with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or Required Lenders (as applicable) have determined, that:

(i)       adequate and reasonable means do not exist for ascertaining one month interest periods of Term SOFR, including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)       CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one month interest periods of Term SOFR or the Term SOFR Screen Rate shall or will no longer be made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide such interest periods of Term SOFR after such specific date (the latest date on which one month interest periods of Term SOFR or the Term SOFR Screen Rate are no longer available permanently or indefinitely, the "Scheduled Unavailability Date");

then, on a date and time determined by the Administrative Agent (any such date, the " Term SOFR Replacement Date"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with Daily Simple SOFR *plus* the SOFR Adjustment for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "Successor Rate").

If the Successor Rate is Daily Simple SOFR plus the SOFR Adjustment, all interest payments will be payable on a quarterly basis.

Notwithstanding anything to the contrary herein, (i) if the Administrative Agent determines that Daily Simple SOFR is not available on or prior to the Term SOFR Replacement Date, or (ii) if the events or circumstances of the type described in Section 3.03(b)(i) or (ii) have occurred with respect to the Successor Rate then in effect, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with an alternative benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such alternative benchmark. and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such benchmark, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments, shall constitute a "Successor Rate". Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of the implementation of any Successor Rate.

38

Any Successor Rate shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than zero%, the Successor Rate will be deemed to be zero% for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Successor Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; *provided* that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

For purposes of this Section 3.03, those Lenders that either have not made, or do not have an obligation under this Agreement to make, the relevant Loans in Dollars shall be excluded from any determination of Required Lenders.

**1.04    Increased Costs**.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense affecting this Agreement or Term SOFR Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      <u>Certificates for Reimbursement</u>. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in <u>clause (a)</u> or (<u>b</u>) of this <u>Section 3.04</u> and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)      <u>Delay in Requests</u>. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 3.04</u> shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this <u>Section 3.04</u> for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**1.05**     <u>**Compensation for Losses**</u>.

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, or continue any Loan on the date or in the amount notified by the Borrower; or

(c)      any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to <u>Section 11.13</u>;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

**1.06**     <u>**Mitigation Obligations; Replacement of Lenders**</u>.

(a)      <u>Designation of a Different Lending Office</u>. If any Lender requests compensation under <u>Section 3.04</u>, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender, or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then at the request of the Borrower, such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      <u>Replacement of Lenders</u>. If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>

40

and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.06(a), the Borrower may replace such Lender in accordance with Section 11.13.

**1.07**    **Survival**.

All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all Obligations hereunder, resignation of the Administrative Agent and the Facility Termination Date.

**Article IV**

**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**1.01**    **Conditions to Closing Date**.

The effectiveness of this Agreement is subject to satisfaction of the following conditions precedent on or prior to the Closing Date:

(a)    Execution of Credit Agreement; Loan Documents. The Administrative Agent and the Security Agent shall have received (i) counterparts of this Agreement, duly executed by a Responsible Officer of each Loan Party and a duly authorized officer of each Lender, (ii) for the account of each Lender requesting a Note, a Note duly executed by a Responsible Officer of the Borrower, (iii) counterparts of the Security Agreement, duly executed by a Responsible Officer of the Borrower, together with certificates and instruments representing the applicable Investment Related Property (as defined in the Security Agreement) constituting Collateral, accompanied by undated stock powers or instruments of transfer executed in blank, (iv) counterparts of an Intellectual Property Security Agreement, if applicable, duly executed by a Responsible Officer of the Borrower, (v) counterparts of the Intercreditor Agreement, duly executed by a duly authorized officer of each of the Sylebra Administrative Agent and the Sylebra Security Agent, (vi) counterparts of any other Loan Document, duly executed by a Responsible Officer of the applicable Loan Party and a duly authorized officer of each other Person party thereto, and (vii) a copy of the first amendment to the Sylebra Credit Agreement, dated as of the date hereof, duly executed by a duly authorized officer of each Person party thereto.

(b)    Officer's Certificate. The Administrative Agent and the Security Agent shall have received an Officer's Certificate dated the Closing Date, duly executed by a Responsible Officer of each Loan Party certifying as to the Organization Documents of each Loan Party (which, to the extent filed with a Governmental Authority, shall be certified as of a recent date by such Governmental Authority), the resolutions of the governing body of each Loan Party, the good standing, existence or its equivalent of each Loan Party and of the incumbency (including specimen signatures) of the Responsible Officers of each Loan Party.

(c)    Legal Opinions of Counsel. The Administrative Agent and the Security Agent shall have received an opinion or opinions of counsel for the Loan Parties, dated the Closing Date and addressed to the Administrative Agent, the Security Agent and the Lenders, in form and substance acceptable to the Administrative Agent and the Security Agent.

(d)    Financial Statements. The Administrative Agent and the Lenders shall have received copies of the financial statements referred to in Section 5.05, each in form and substance satisfactory to each of them.

(e)    UCC and Lien Searches. The Administrative Agent and the Security Agent shall have received, in form and substance satisfactory to the Administrative Agent and Security Agent (i) searches of UCC filings in the jurisdiction of incorporation or formation, as applicable, of each Loan Party dated a recent date, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens, (ii) searches of the United States Patent and Trademark Office and United States Copyright Office dated a recent date, copies of the lien

41

notices or comparable documents on file that name any Loan Party as debtor, and evidence that no Liens exist other than Permitted Liens, (iii) tax lien, judgment and bankruptcy searches for each Loan Party dated a recent date and evidence that no Liens exist other than Permitted Liens, and (iv) such other searches that are required by the Perfection Certificate or that the Administrative Agent and the Security Agent deems necessary or appropriate, and evidence that no Liens exist other than Permitted Liens.

(f)    Perfection Certificate. The Administrative Agent and the Security Agent shall have received a Perfection Certificate in substantially the form of Exhibit D-1, duly executed by the Borrower.

(g)    Financing Statements. The Administrative Agent and the Security Agent shall have received proper financing statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Administrative Agent and the Security Agent may deem necessary or desirable in order to perfect the Liens created under the Collateral Documents, covering the Collateral described in the Collateral Documents, and evidence that all other actions, recordings or filings that the Administrative Agent and the Security Agent may deem necessary or desirable in order to perfect the Liens created under the Collateral Documents have been taken, including payment of all fees and taxes relating thereto.

(h)    [Reserved].

(i)    [Reserved].

(j)    [Reserved].

(k)    Officer's Certificate. The Administrative Agent and the Security Agent shall have received an Officer's Certificate dated the Closing Date, duly executed by a Responsible Officer of the Borrower certifying that (i) the conditions specified in Sections 4.01(s) and (t) have been satisfied, (ii) that there has been no event or circumstance since December 31, 2022 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (iii) there does not exist any pending or ongoing, action, suit, investigation, litigation or proceeding in any court or before any other Governmental Authority (i) affecting the Credit Agreement or the other Loan Documents, that has not been settled, dismissed, vacated, discharged or terminated prior to the Closing Date or (ii) that purports to affect any Loan Party or any of its Subsidiaries, or any transaction contemplated by the Loan Documents, which action, suit, investigation, litigation or proceeding could reasonably be expected to have a Material Adverse Effect, that has not been settled, dismissed, vacated, discharged or terminated prior to the Closing Date.

(l)    [Reserved].

(m)    [Reserved].

(n)    Anti-Money-Laundering; Beneficial Ownership. Upon the reasonable request of any Lender not less than five (5) Business Days prior to the Closing Date, the Borrower shall have provided to such Lender, and such Lender shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act, and any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered to each Lender that so requests, a Beneficial Ownership Certification in relation to such Loan Party.

(o)    Consents. The Administrative Agent and the Security Agent shall have received evidence that all members, boards of directors, governmental, shareholder and material third party consents and approvals necessary in connection with the entering into of this Agreement have been obtained.

42

(p)    [Reserved].

(q)    <u>Due Diligence</u>. The Lenders shall have completed a due diligence investigation of the Borrower and its Subsidiaries in scope, and with results, satisfactory to the Lenders.

(r)    <u>Additional Information</u>. The Administrative Agent, the Security Agent and/or each Lender, as applicable, shall have received such additional information and materials which the Administrative Agent, the Security Agent and/or any Lender shall reasonably request or require.

(s)    <u>Representations and Warranties</u>. The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall (i) with respect to representations and warranties that contain a materiality qualification, be true and correct on and as of the Closing Date and (ii) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects on and as of the Closing Date, and except that for purposes of this <u>Section 4.01</u>, the representations and warranties contained in <u>Sections 5.05(a</u>) and (<u>b</u>) shall be deemed to refer to the most recent statements furnished pursuant to  <u>Sections 6.01(a</u>) and (<u>b</u>), respectively.

(t)    <u>Default</u>. No Default shall exist at the time of and immediately after giving effect to the Closing Date.

Without limiting the generality of the provisions of <u>Section 9.03(c</u>), for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, the Administrative Agent, the Security Agent and each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent, the Security Agent or a Lender unless the Administrative Agent (in the case of a Lender) shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**1.02    <u>Conditions to Funding Date</u>**.

The obligation of each Lender to make its Loan on the Funding Date is subject to the occurrence of the Closing Date and the satisfaction of the following conditions precedent on or prior to the Funding Date:

(a)    <u>Representations and Warranties</u>. The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall (i) with respect to representations and warranties that contain a materiality qualification, be true and correct on and as of the Funding Date and (ii) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects on and as of the Funding Date, and except that for purposes of this <u>Section 4.02</u>, the representations and warranties contained in <u>Sections 5.05(a</u>) and (<u>b</u>) shall be deemed to refer to the most recent statements furnished pursuant to  <u>Sections 6.01(a</u>) and (<u>b</u>), respectively.

(b)    <u>Default</u>. No Default shall exist or would result from the Borrowing of Loans on the Funding Date or from the application of the proceeds thereof.

(c)    <u>Loan Notice</u>. The Administrative Agent shall have received a Loan Notice with respect to the Loans to be made on the Funding Date.

(d)    <u>Existing Indebtedness of the Loan Parties</u>. All of the existing Indebtedness for borrowed money of the Borrower and its Subsidiaries (other than Indebtedness permitted to exist pursuant to <u>Section 7.02</u>) shall be repaid in full and all security interests related thereto shall be terminated on or prior to the Funding Date.

(e)    Solvency Certificate. The Administrative Agent and the Security Agent shall have received a Solvency Certificate signed by a Responsible Officer of the Borrower as to the financial condition, solvency and related matters of the Borrower and its Subsidiaries, taken as a whole, after giving effect to the Borrowing under the Loan Documents and the other transactions contemplated hereby.

The Borrowing of Loans on the Funding Date shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the Funding Date.

**Article V**

**REPRESENTATIONS AND WARRANTIES**

Each Loan Party represents and warrants to the Administrative Agent and the Lenders, on the Closing Date and on the Funding Date, that:

**1.01    Existence, Qualification and Power**.

Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect. The copy of the Organization Documents of each Loan Party provided to the Administrative Agent pursuant to the terms of this Agreement is a true and correct copy of each such document, each of which is valid and in full force and effect.

**1.02    Authorization; No Contravention**.

The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Material Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in the creation of (or the requirement to create) any Lien (other than Permitted Liens) under (i) any Contractual Obligation to which such Loan Party is a party or affecting such Person or the properties of such Loan Party or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (d) violate any Applicable Law; except in each case referred to in clause (b)(i) or (d), to the extent such conflict, breach, contravention or violation could not reasonably be expected to have a Material Adverse Effect.

**1.03    Governmental Authorization; Other Consents**.

No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document; (b) the grant by the Borrower of the Liens granted by it pursuant to the Collateral Documents; (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) those approvals, consents, exemptions, authorizations, actions, notices or filings which have been duly obtained, taken, given or made and are in full force and effect, (ii)

44

filings necessary to perfect Liens created under the Loan Documents, and (iii) those approvals, consents, exemptions, authorizations, actions, notices or filings the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

**1.04    Binding Effect**.

This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principals of equity.

**1.05    Financial Statements; No Material Adverse Effect**.

(a)    Audited Financial Statements. The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in Shareholders' Equity for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    Quarterly Financial Statements. The unaudited Consolidated balance sheets of the Borrower and its Subsidiaries dated September 30, 2022, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the fiscal quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in Shareholders' Equity for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)    Material Adverse Effect. Since the date of the balance sheet included in the Audited Financial Statements (and, in addition, after delivery of the most recent annual audited financial statements in accordance with the terms hereof, since the date of such annual audited financial statements), there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

**1.06    Litigation**.

There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Subsidiary or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document or any of the transactions contemplated hereby, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

**1.07    No Default**.

Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to, or a party to, any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

45

**1.08    Ownership of Property; Liens**.

(a)    Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Liens.

**1.09    Environmental Matters**.

(a)    Except as could not, individually or in the aggregate, reasonably be expected to result in any Material Adverse Effect on any of the Loan Parties or any of their respective Subsidiaries:

(i)    (A) None of the properties currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries is listed or formally proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (B) there are no, and to the best knowledge of the Loan Parties and their Subsidiaries never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to the best of the knowledge of the Loan Parties, on any property formerly owned, leased or operated by any Loan Party or any of its Subsidiaries; (C) there is no and never has been any asbestos or asbestos-containing material on, at or in any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries; (D) Hazardous Materials have not been released on, at, under or from any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries or any property by or on behalf, or otherwise arising from the operations, of any Loan Party or any of its Subsidiaries; and (E) no Loan Party or any of its Subsidiaries has become subject to any Environmental Liability or knows of any facts or circumstances that could reasonably be expected to give rise to any Environmental Liability;

(ii)    (A) Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Materials at, on, under, or from any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and (B) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner which could not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries;

(iii)    The Loan Parties and their respective Subsidiaries: (A) are, and within the period of all applicable statutes of limitation have been, in compliance with all applicable Environmental Laws; (B) hold all Environmental Permits (each of which is in full force and effect) required for any of their current or intended operations or for any property owned, leased, or otherwise operated by any of them; (C) are, and within the period of all applicable statutes of limitation have been, in compliance with all of their Environmental Permits; (D) to the extent within the control of the Loan Parties and their respective Subsidiaries, will timely renew and comply with each of their Environmental Permits and any additional Environmental permits that may be required of any of them without material expense, and timely comply with any current, future or potential Environmental Law without material expense; and (E) are not aware of any requirements proposed for adoption or implementation under any Environmental Law; and

46

(b)    The Loan Parties and their respective Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof the Borrower has reasonably concluded that such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**1.10    Insurance**.

The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of any Loan Party, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates.

**1.11    Taxes**.

Each Loan Party and each of its Subsidiaries have timely filed all federal, state and other material tax returns and reports required to be filed, and have timely paid all federal, state and other material Taxes (whether or not shown on a tax return), including in its capacity as a withholding agent, levied or imposed upon it or its properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect, nor is there any tax sharing agreement applicable to the Borrower or any Subsidiary.

**1.12    ERISA Compliance**.

(a)    Except as would not reasonably be expected to have a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws. Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter or is entitled to rely on a favorable opinion letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently pending with the IRS. To the best knowledge of the Loan Parties, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)    There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    Except as would not reasonably be expected to have a Material Adverse Effect, (i) no ERISA Event has occurred, and no Loan Party is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan; (ii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher; (iii) no Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (iv) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (v) no Pension Plan has been terminated by the Borrower or any ERISA Affiliate or by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

47

(d)     Neither the Borrower nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan or Multiemployer Plan other than (i) on the Closing Date, those listed on Schedule 5.12 hereto and (ii) thereafter, Pension Plans and Multiemployer Plans not otherwise prohibited by this Agreement.

(e)     The Borrower represents and warrants that the Borrower does not and will not hold Plan Assets nor will the Borrower use Plan Assets to make payments on any loans hereunder.

**1.13   Margin Regulations; Investment Company Act**.

(a)     Margin Regulations. Neither the Borrower nor any of its Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U), or extending credit for the purpose of purchasing or carrying margin stock. No extensions of credit hereunder will be used for any purpose which violates, or which would be inconsistent with, the provisions of Regulation U.

(b)     Investment Company Act. None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**1.14   Disclosure**.

The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any other Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) (other than projections, budgets or other estimates or forward-looking statements or information of a general economic or industry nature or reports or studies prepared by third parties that were not expressly commissioned by a Loan Party (collectively, "Projections") furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that, with respect to the Projections, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed by such Loan Party to be reasonable at the time such Projections were prepared.

**1.15   Compliance with Laws**.

Each Loan Party and each Subsidiary thereof is in compliance with the requirements of all Applicable Law and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**1.16   Solvency**.

The Borrower and its Subsidiaries, taken as a whole, are Solvent.

**1.17   Casualty, Etc**.

Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake,

48

embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**1.18    Sanctions Concerns and Anti-Corruption Laws**.

(a)    Sanctions Concerns. No Loan Party, nor any Subsidiary, nor, to the knowledge of the Loan Parties and their Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by one or more individuals or entities that are (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals or HMT's Consolidated List of Financial Sanctions Targets, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction. The Borrower and its Subsidiaries have conducted their businesses in compliance with all applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Sanctions.

(b)    Anti-Corruption Laws. The Loan Parties and their Subsidiaries have conducted their business in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other applicable anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

**1.19    [Reserved]**.

**1.20    Subsidiaries; Equity Interests; Loan Parties**.

(a)    Subsidiaries, Joint Ventures, Partnerships and Equity Investments . Set forth on Schedule 5.20(a), is the following information which is true and complete in all respects as of the Closing Date and as of the last date such Schedule was required to be updated in accordance with Sections 6.02, 6.13 and 6.14: (i) a complete and accurate list of all Subsidiaries, joint ventures and partnerships and other equity investments of the Loan Parties as of the Closing Date and as of the last date such Schedule was required to be updated in accordance with Sections 6.02, 6.13 and 6.14, (ii) the number of shares of each class of Equity Interests in each Subsidiary outstanding, (iii) the number and percentage of outstanding shares of each class of Equity Interests owned by the Loan Parties and their Subsidiaries and (iv) the class or nature of such Equity Interests (*i.e*., voting, non-voting, preferred, etc.). The outstanding Equity Interests in all Subsidiaries are validly issued, fully paid and non-assessable and are owned free and clear of all Liens except those created under the Collateral Documents and Permitted Liens.

(b)    Loan Parties. Set forth on Schedule 5.20(b) is a complete and accurate list of all Loan Parties, showing as of the Closing Date, or as of the last date such Schedule was required to be updated in accordance with Sections 6.02, 6.13 and 6.14, (as to each Loan Party) (i) the exact legal name, (ii) any former legal names of such Loan Party in the four (4) months prior to the Closing Date, (iii) the jurisdiction of its incorporation or organization, as applicable, (iv) the type of organization, (v) the jurisdictions in which such Loan Party is qualified to do business, (vi) the address of its chief executive office, (vii) the address of its principal place of business, (viii) its U.S. federal taxpayer identification number or, in the case of any non-U.S. Loan Party that does not have a U.S. taxpayer identification number, its unique identification number issued to it by the jurisdiction of its incorporation or organization, (ix) the organization identification number, (x) ownership information (*e.g*., publicly held or if private or partnership, the owners and partners of each of the Loan Parties) and (xi) the industry or nature of business of such Loan Party.

**1.21    Security Interests and Collateral Documents**.

The Collateral Documents, once executed and delivered, will create, in favor of the Security Agent, for the benefit of the Secured Parties, as security for the obligations purported to be secured thereby, a valid and enforceable security interest in and Lien upon all of the Collateral (subject to any applicable provisions set forth in the Collateral Documents with respect to limitations or exclusions from

49

the requirement to perfect the security interests and Liens on the collateral described therein), and upon (i) filing, recording, registering or taking such other actions as may be necessary with the appropriate Governmental Authorities (including payment of applicable filing and recording Taxes), (ii) the taking of possession or control by Security Agent of the Collateral under the Security Agreement with respect to which a security interest may be perfected only by possession or control which possession or control shall be given to the Security Agent to the extent possession or control by the Security Agent is required by the Security Agreement and (iii) delivery of the applicable documents to the Security Agent in accordance with the provisions of the applicable Collateral Documents, for the benefit of the Secured Parties, such security interest shall be a perfected security interest in and Lien upon all of the Collateral (subject to any applicable provisions set forth in the Collateral Documents with respect to limitations or exclusions from the requirement to perfect the security interests and Liens on the collateral described therein) and the Collateral shall be subject to no Liens other than Permitted Liens.

**1.22    EEA Financial Institutions**.

No Loan Party is an EEA Financial Institution.

**1.23    Covered Entities.**

No Loan Party is a Covered Entity.

**1.24    Beneficial Ownership Certification**.

The information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

5.25    **Labor Matters**.

There are no collective bargaining agreements or Multiemployer Plans covering the employees of the Borrower or any of its Subsidiaries as of the Closing Date and neither the Borrower nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five (5) years preceding the Closing Date.

**Article VI**

**AFFIRMATIVE COVENANTS**

Each of the Loan Parties hereby covenants and agrees that on the Closing Date and thereafter until the Facility Termination Date, such Loan Party shall, and shall cause each of its Subsidiaries to:

**1.01    Financial Statements**.

Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)    Audited Financial Statements. As soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower (or, if earlier, fifteen (15) days after the date required to be filed with the SEC (without giving effect to any extension permitted by the SEC)) a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related Consolidated statements of income or operations, changes in Shareholders' Equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit.

50

(b)    Quarterly Financial Statements. As soon as available, but in any event within sixty (60) days after the end of each fiscal quarters of each fiscal year of the Borrower (or, if earlier, five (5) days after the date required to be filed with the SEC (without giving effect to any extension permitted by the SEC)), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related Consolidated statements of income or operations, changes in Shareholders' Equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, certified by the chief executive officer, chief financial officer, treasurer or controller who is a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Borrower and its Subsidiaries, subject only to normal year-end audit adjustments and the absence of footnotes.

(c)    Projections. No later than 60 days after the beginning of each fiscal year of the Borrower, an annual business plan and budget of the Borrower and its Subsidiaries on a Consolidated basis, including forecasts and financial projections of the Borrower for such fiscal year.

As to any information contained in materials furnished pursuant to Section 6.02(f), the Borrower shall not be separately required to furnish such information under Section 6.01(a) or (b) above, but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in Sections 6.01(a) and (b) above at the times specified therein.

**1.02    Certificates; Other Information**.

Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)    [Reserved].

(b)    Updated Schedules and Perfection Certificate Supplement. Concurrently with the delivery of the financial statements referred to in Section 6.01(a) and (b), updated Schedules to this Agreement and a Perfection Certificate Supplement to the extent required.

(c)    Calculations. Concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b), a certificate including the amount of all Dispositions, issuances of Indebtedness and Equity Issuances that were made during the prior fiscal year and amounts received in connection with any Extraordinary Receipt during the prior fiscal year.

(d)    Changes in Entity Structure. Within ten (10) days prior (or such shorter period of time as the Administrative Agent may agree to in its sole discretion) to any merger, consolidation, dissolution or other change in entity structure of any Loan Party or any of its Subsidiaries permitted pursuant to the terms hereof, provide notice of such change in entity structure to the Administrative Agent, along with such other information as reasonably requested by the Administrative Agent. Provide notice to the Administrative Agent, not less than ten (10) days prior (or such shorter period of time as the Administrative Agent may agree to in its sole discretion) of any change in any Loan Party's legal name, state of organization, or organizational existence.

(e)    Audit Reports; Management Letters; Recommendations. Promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Borrower by independent accountants in connection with the accounts or books of any Loan Party or any of its Subsidiaries, or any audit of any of them.

(f)      Annual Reports; Etc. Promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto.

(g)      Debt Securities Statements and Reports. Promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement evidencing Indebtedness of more than the Threshold Amount and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02.

(h)      SEC Notices. Promptly, and in any event within five (5) Business Days (or such longer period of time as the Administrative Agent may agree to in its sole discretion) after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof.

(i)      Notices. At all times during which there are any outstanding Loans under and as defined in the Sylebra Credit Agreement, not later than five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all amendments, waivers and other modifications so received under or pursuant to any indenture, loan or credit or similar agreement evidencing Indebtedness of more than the Threshold Amount and, from time to time upon request by the Administrative Agent, such information and reports regarding such indentures and loan and credit and similar agreements evidencing Indebtedness of more than the Threshold Amount as the Administrative Agent may reasonably request.

(j)      Environmental Notice. Promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse Effect.

(k)      Anti-Money-Laundering; Beneficial Ownership Regulation. Promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent, the Security Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(l)      Beneficial Ownership. To the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, an updated Beneficial Ownership Certification promptly following any change in the information provided in the Beneficial Ownership Certification (if any) delivered to any Lender in relation to such Loan Party that would result in a change to the list of beneficial owners identified in such certification.

( m )    Additional Information. Promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request.

(m)      Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(h) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 1.01(a); or (ii) on

52

which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (x) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (y) the Borrower shall notify the Administrative Agent and each Lender (by fax transmission or e-mail transmission) of the posting of any such documents and provide to the Administrative Agent by e-mail electronic versions (*i.e.*, soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

(n)    The Borrower hereby acknowledges that (i) the Administrative Agent and/or an Affiliate thereof may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks, Syndtrak, ClearPar or a substantially similar electronic transmission system (the "*<u>Platform</u>*") and (ii) certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (A) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (B) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, any Affiliate thereof, and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States federal and state securities laws (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in <u>Section 11.07</u>); (C) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (D) the Administrative Agent and any Affiliate thereof shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

**1.03**    <u>Notices</u>.

Promptly, but in any event within two (2) Business Days and, only with respect to subsection (c) below, three (3) Business Days, notify the Administrative Agent, the Security Agent and each Lender:

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of the occurrence of any ERISA Event;

(d)    of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(e)    of any (i) occurrence of any Disposition of property or assets for which the Borrower is required to make a mandatory prepayment pursuant to <u>Section 2.05(b)(i)</u>, (ii) Equity Issuance for which the Borrower is required to make a mandatory prepayment pursuant to <u>Section 2.05(b)(ii)</u>, (iii) Debt Issuance for which the Borrower is required to make a mandatory

53

prepayment pursuant to Section 2.05(b)(iii), and (iv) receipt of any Extraordinary Receipt for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.05(b)(iv);

(f)   of any announcement by Moody's or S&P of any change in a Debt Rating;

(f)   of any Lien (other than Permitted Liens) or claim made or asserted against any of the Collateral; and

(g)   of any other event or occurrence that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and to the extent applicable, stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**1.04   Payment of Obligations**.

Pay and discharge as the same shall become due and payable, (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary; and (b) all lawful claims which, if unpaid, would by law become a Lien upon its property.

**1.05   Preservation of Existence, Etc**.

(a)   Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05;

(b)   take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(c)   preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**1.06   Maintenance of Properties**.

(a)   Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted;

(b)   make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(c)   use the standard of care typical in the industry in the operation and maintenance of its facilities.

**1.07   Maintenance of Insurance**.

(a)   Maintenance of Insurance. Maintain with financially sound and reputable insurance companies not Affiliates of the Loan Parties, such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to

54

its assets and properties against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons. All such insurance shall (i) provide for not less than thirty (30) days' prior notice to the Security Agent of termination, lapse or cancellation of such insurance (or 10 days' prior notice in the case of termination, lapse or cancellation as a result of the non-payment of premiums), (ii) name the Security Agent as mortgagee and/or loss payee, as applicable (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of general liability insurance), (iii) if reasonably requested by the Security Agent, include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Security Agent.

(b)       Evidence of Insurance. Annually, upon expiration of current insurance coverage, the Loan Parties shall provide, or cause to be provided, to the Security Agent, such evidence of insurance as required by the Security Agent, including, but not limited to: (i) certified copies of such insurance policies, (ii) evidence of such insurance policies (including, without limitation and as applicable, ACORD Form 28 certificates (or similar form of insurance certificate), and ACORD Form 25 certificates (or similar form of insurance certificate)), (iii) declaration pages for each insurance policy and (iv) insurance endorsements of the type described in clause (a) of this Section 6.07 if the Security Agent is not on the declarations page for such policy.

1.08    **Compliance with Laws**.

Comply with the requirements of all Applicable Law and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

1.09    **Books and Records**.

(a)    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be; and

(a)       maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.

1.10    **Inspection Rights**.

Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided*, *however*, that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

1.11    **Use of Proceeds**.

Use the proceeds of the Credit Extensions to repay all Indebtedness for borrowed money of the Borrower under all existing secured credit facilities, to pay fees and expenses associated with this Agreement and the other Loan Documents and for general corporate purposes not in contravention of any Law or of any Loan Document.

**1.12**    **[Reserved]**.

**1.13**    **Covenant to Guarantee Obligations and Give Security**.

(a)    Upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party after the Closing Date, other than any direct or indirect Subsidiary directly involved in the ownership, operation or maintenance of the Ironton Project for so long as the following is prohibited by the terms of any indenture, lease, loan, credit or similar agreement for the Ironton Project, at the Borrower's expense:

(i)    within 30 days after such formation or acquisition (or such longer period of time as the Administrative Agent may agree to in its sole discretion), cause such Subsidiary to become a Guarantor hereunder by executing a Joinder Agreement, *provided*, *however*, no Foreign Subsidiary shall be required to become a Guarantor to the extent such Guaranty would result in a material adverse tax consequence for the Borrower;

(ii)    within 30 days after such formation or acquisition (or such longer period of time as the Administrative Agent may agree to in its sole discretion), cause such Subsidiary to furnish to the Administrative Agent and the Security Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent and Security Agent; and

(iii)    within 30 days after such formation or acquisition (or such longer period of time as the Administrative Agent may agree to in its sole discretion), cause such Subsidiary to deliver substantially the same documentation required pursuant to Sections 4.01(b) – (e) and 4.01(h) and such other documents or agreements as the Administrative Agent and the Security Agent may reasonably request, including without limitation, updated Schedules 5.12, 5.20(a), and 5.20(b).

(b)    Upon the acquisition of any property by the Borrower (other than Excluded Property (as defined in the Security Agreement)), if such property, in the judgment of the Security Agent, shall not already be subject to a perfected first priority security interest (subject to Permitted Liens) in favor of the Security Agent for the benefit of the Secured Parties, at the Borrower's expense:

(i)    within 10 days after such acquisition (or such longer period of time as the Security Agent may agree to in its sole discretion), furnish to the Security Agent a description of the property so acquired in detail reasonably satisfactory to the Security Agent;

(ii)    within 30 days after such acquisition (or such longer period of time as the Security Agent may agree to in its sole discretion), cause the Borrower to duly execute and deliver to the Security Agent deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, and other security and pledge agreements, as specified by and in form and substance reasonably satisfactory to the Security Agent, securing payment of all the Obligations under the Loan Documents and constituting Liens on all such properties;

(iii)    within 30 days after such acquisition (or such longer period of time as the Security Agent may agree to in its sole discretion), cause the Borrower to take whatever action (including, without limitation, the recording of mortgages, the filing of Uniform Commercial Code financing statements, and the giving of notices) as may be necessary or advisable in the opinion of the Security Agent to vest in the Security Agent (or in any representative of the Security Agent designated by it) valid and subsisting Liens on such property, enforceable against all third parties;

(iv)    within 30 days after such acquisition (or such longer period of time as the Security Agent may agree to in its sole discretion), deliver to the Security Agent, upon the request of the Security Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Security Agent and the other Secured Parties, of counsel for the Borrower acceptable to the Security Agent as to the matters contained in <u>clauses (ii)</u> and <u>(iii)</u> above and as to such other matters as the Security Agent may reasonably request; and

(v)    as promptly as practicable after such request, deliver, upon the request of the Security Agent in its sole discretion, to the Security Agent with respect to any such real property title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance reasonably satisfactory to the Security Agent, *provided* that to the extent that the Borrower shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after the receipt thereof, be delivered to the Security Agent.

(c)    At any time upon request of the Security Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Security Agent may deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages, leasehold deeds of trust, and other security and pledge agreements.

**1.14    Information Regarding Collateral**.

(a)    Not effect any change (i) in the Borrower's legal name, (ii) in the location of the Borrower's chief executive office, (iii) in the Borrower's identity or organizational structure, (iv) in the Borrower's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in the Borrower's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of certificate signed by a Responsible Officer), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent with certified Organization Documents reflecting any of the changes described in the preceding sentence.

(b)    Concurrently with the delivery of financial statements pursuant to Section 6.01(a) and (b), deliver to the Administrative Agent a Perfection Certificate Supplement.

6.15    **[Reserved]**.

6.16    **Compliance with Terms of Leaseholds**.

Make all payments and otherwise perform all obligations in respect of all leases of real property to which the Borrower or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

6.17    **Compliance with Environmental Laws**.

57

Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any investigation, study, sampling and testing, cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with all Environmental Laws; *provided*, *however*, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.18    **[Reserved]**.

**1.15    Anti-Corruption Laws; Sanctions**.

Conduct its business in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other applicable anti-corruption legislation in other jurisdictions and with all applicable Sanctions, and maintain policies and procedures designed to promote and achieve compliance with such laws and Sanctions.

**1.16    Further Assurances**.

Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject the Borrower's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

**1.17    Post-Closing Matters**.

(a)    On or before the date that is ten (10) days following the Closing Date (or such later date as the Administrative may approve in its sole discretion), the Loan Parties shall deliver, or cause to be delivered, to the Security Agent evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance naming the Security Agent, on behalf of the Lenders, as an additional insured or lenders' loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Borrower.

(b)    On or before the date that is thirty (30) days following the Closing Date (or such later date as the Administrative Agent may approve in its sole discretion), the Loan Parties shall deliver, or cause to be delivered, to the Security Agent insurance endorsements with respect to the Loan Parties, in each case, meeting the requirements of Section 6.07(a).

(c)    On or before the date that is ninety (90) days following the Closing Date (or such later date as the Administrative Agent may approve in its sole discretion), the Borrower shall comply with Section 4.03 of the Security Agreement and provide to the Security Agent a Deposit Account Control Agreement duly executed on behalf of each financial institution holding a Deposit Account (other than Excluded Accounts) of the Borrower. Notwithstanding the foregoing, no Deposit Account Control Agreement shall be required for Borrower's deposit account held with US Bank National Association, provided that (i) such deposit account is closed

by September 30, 2023 and (ii) such deposit account has a balance of not greater than $500,000 from and after June 13, 2023.

**1.18    Fees and Expenses**.

The Loan Parties shall pay (i) all fees and expenses of the Administrative Agent and the Security Agent owing pursuant to   Sections 2.06 and 2.09, (ii) all fees and expenses owing to the Lenders pursuant to   Sections 2.02(c), 2.06 and 2.09 and (iii) all fees, charges and disbursements of counsel to the Administrative Agent and the Security Agent (directly to such counsel if requested by the Administrative Agent and the Security Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent and the Borrower and the Security Agent), in each case, on the date that this Agreement is filed with the SEC.

**Article VII**

**NEGATIVE COVENANTS**

Each of the Loan Parties hereby covenants and agrees that on the Closing Date and thereafter until the Facility Termination Date, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**1.01    Liens**.

Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for the following (the "Permitted Liens"):

    (a)    Liens pursuant to any Loan Document;

    (b)    Liens existing on the Closing Date and listed on Schedule 7.01 and any renewals or extensions thereof, *provided* that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by Section 7.02(b), (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.02(b);

    (c)    Liens for Taxes not yet due or Liens for Taxes which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

    (d)    statutory Liens such as landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, workmen's, suppliers', construction or other like Liens arising in the ordinary course of business (i) which do not in the aggregate material detract from the value of the Collateral and do not materially impair the use thereof in the operation of the business of the Borrower or any Subsidiary, or (ii) which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted; *provided* that adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

    (e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance, other social security legislation or other employment laws or regulations, other than any Lien imposed by ERISA;

    (f)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance and return of money

59

bonds, bids, leases, government contracts, trade contracts, agreements with utilities and other obligations of a like nature incurred in the ordinary course of business;

(g)    zoning restrictions, easements, encroachments, licenses, rights-of-way, restrictions, covenants, minor title defects and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)    Liens securing judgments, decrees, attachments or awards for the payment of money (or appeal or other surety bonds relating to such judgments, decrees, attachments or awards) not constituting an Event of Default under Section 8.01(h);

(i)    Liens securing Indebtedness permitted under Section 7.02(c); *provided* that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(j)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any of its Subsidiaries with any Lender, in each case in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing solely the customary amounts owing to such bank with respect to cash management and operating account arrangements; *provided*, that in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(i)    Liens arising out of judgments or awards not resulting in an Event of Default; *provided* the applicable Loan Party or Subsidiary shall in good faith be prosecuting an appeal or proceedings for review;

(j)    any interest or title of a lessor, licensor or sublessor under any lease, license or sublease entered into by any Loan Party or any Subsidiary thereof in the ordinary course of business and covering only the assets so leased, licensed or subleased;

(m)    Liens of a collection bank arising under Section 4–210 of the UCC on items in the course of collection;

(n)    any zoning, building or similar laws or rights reserved to or vested in any Governmental Authority;

(o)    Liens securing Indebtedness permitted under Section 7.02(f);

(p)    [reserved];

(q)    Liens securing Indebtedness permitted under Section 7.02(k);

(r)    Liens securing Indebtedness under the Sylebra Credit Agreement permitted under Section 7.02(l); and

(s)    the replacement, extension or renewal of any Lien permitted by clauses (a) through (r) above upon or in the same property theretofore subject thereto or the replacement, extension or renewal (without increase in the amount or change in any direct or contingent obligor) of the Indebtedness secured thereby.

**1.02    Indebtedness**.

Create, incur, assume or suffer to exist any Indebtedness, except:

60

(a)    Indebtedness under the Loan Documents;

(b)    Indebtedness outstanding on the date hereof and listed on Schedule 7.02 and any refinancings, refundings, renewals or extensions thereof; *provided* that the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder and the direct or any contingent obligor with respect thereto is not changed, as a result of or in connection with such refinancing, refunding, renewal or extension;

(c)    Indebtedness in respect of (i) Capitalized Leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(i); *provided*, *however*, that the aggregate amount of all such Indebtedness at any one time outstanding under this clause (i) shall not exceed $25,000,000, and (ii) the Prep Equipment Lease;

(d)    Unsecured Indebtedness of a Subsidiary of the Borrower owed to the Borrower or a Subsidiary of the Borrower, which Indebtedness shall (i) be on terms (including subordination terms) acceptable to the Administrative Agent and (ii) be otherwise permitted under the provisions of Section 7.03 ("Intercompany Debt");

(e)    Indebtedness consisting of reimbursement obligations under surety, indemnity, performance, release and appeal bonds, in each case required in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrower or any Subsidiary, and letters of credit obtained in support thereof in the ordinary course of business;

(f)    so long as (i) no Event of Default has occurred and is continuing or would result from the incurrence and the application of the proceeds thereof and (ii) there are no outstanding Loans under and as defined in the Sylebra Credit Agreement immediately after the incurrence and the application of the proceeds thereof and during a period of sixty (60) consecutive days thereafter, Indebtedness of the Borrower or a Subsidiary of the Borrower incurred in connection with the financing of the Augusta Project;

(g)    at any time during which there are no outstanding Loans under and as defined in the Sylebra Credit Agreement, Indebtedness of Foreign Subsidiaries in an aggregate amount not to exceed $10,000,000;

(h)    Indebtedness under Swap Contracts entered into in the ordinary course of business and not for speculative purposes;

(i)    Guarantees of the Borrower or any Subsidiary in respect of Indebtedness otherwise permitted hereunder of the Borrower or any Subsidiary;

(j)    [reserved];

(k)    Indebtedness under equipment financings in an aggregate amount not to exceed $90,000,000;

(l)    Indebtedness under the Sylebra Credit Agreement in an aggregate amount not to exceed $150,000,000; and

(m)    unsecured Indebtedness under convertible promissory notes issued by the Borrower after the date hereof in an aggregate amount not to exceed $200,000,000.

61

1.03    **Investments**.

Make or hold any Investments, except:

(a)    Investments held by the Borrower and its Subsidiaries in the form of cash or Cash Equivalents;

(b)    advances to officers, directors and employees of the Borrower and Subsidiaries in an aggregate amount not to exceed $1,000,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c)    (i) Investments by the Borrower and its Subsidiaries in their respective Subsidiaries outstanding on the date hereof, (ii) additional Investments by the Borrower and its Subsidiaries in Loan Parties, and (iii) additional Investments by Subsidiaries of the Borrower that are not Loan Parties in other Subsidiaries that are not Loan Parties and (iv) so long as no Default has occurred and is continuing or would result from such Investment and there are no outstanding Loans under and as defined in the Sylebra Credit Agreement, additional Investments by the Loan Parties in Domestic Subsidiaries in an aggregate amount not to exceed $25,000,000 at any time outstanding;

(d)    so long as no Event of Default has occurred and is continuing or would result from such investment and there are no outstanding Loans under and as defined in the Sylebra Credit Agreement, Investments by the Loan Parties in Foreign Subsidiaries and joint ventures in an aggregate amount not to exceed $25,000,000;

(e)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)    Guarantees permitted by Section 7.02;

(g)    Investments existing on the date hereof (other than those referred to in  Section 7.03(c)(i)) and set forth on Schedule 7.03;

(h)    advances to employees for the purchase of stock options not to exceed $500,000 outstanding at any time in the case of any one employee and not to exceed $500,000 outstanding at any time in the aggregate to all employees of the Borrower and its Subsidiaries; and

(i)    at all times during the Ironton Project Investment Period, Investments in the Ironton Project.

1.04    **Fundamental Changes**.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)    any Subsidiary may merge with (i) the Borrower; *provided* that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, *provided* that when any Loan Party is merging with another Subsidiary, such Loan Party shall be the continuing or surviving Person;

(b)    any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Loan Party;

(c)        any Subsidiary that is not a Loan Party may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to (i) another Subsidiary that is not a Loan Party or (ii) to a Loan Party; and

(d)        so long as no Default has occurred and is continuing or would result therefrom, each of the Borrower and any of its Subsidiaries may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; *provided*, *however*, that in each case, immediately after giving effect thereto (i) in the case of any such merger to which the Borrower is a party, the Borrower is the surviving Person and (ii) in the case of any such merger to which any Loan Party (other than the Borrower) is a party, such Loan Party is the surviving Person.

**1.05    <u>Dispositions</u>**.

Make any Disposition or enter into any agreement to make any Disposition, except:

(a)        Permitted Transfers;

(b)        Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(c)        Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)        Dispositions permitted by <u>Section 7.04</u> and <u>Section 7.14</u>; and

(e)        non-exclusive licenses of trademarks, service marks, trade names, copyrights, patents, patent rights, trade secrets, know-how, franchises, licenses and other intellectual property rights in the ordinary course of business and substantially consistent with past practice for terms not exceeding five years.

**1.06    <u>Restricted Payments</u>**.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(a)        each Subsidiary may make Restricted Payments to any Person that owns Equity Interests in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)        the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such Person; and

(c)        the Borrower may repurchase Equity Interests of the Borrower deemed to occur upon the "cashless" exercise of warrants, options or similar rights held by employees and directors, and to make payments in respect of or purchase restricted stock and similar stock based awards under employee benefit plans and to settle employees' and directors' tax liabilities (if any) related thereto.

**1.07**    **Change in Nature of Business**.

Engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

**1.08**    **Transactions with Affiliates**.

Enter into or permit to exist any transaction or series of transactions with any officer, director or Affiliate of such Person other than: (a) advances of working capital to any Loan Party, (b) transfers of cash and assets to any Loan Party, (c) intercompany transactions expressly permitted by this Agreement, (d) normal and reasonable compensation and reimbursement of expenses of officers and directors and (e) except as otherwise specifically limited in this Agreement, other transactions which are entered into in the ordinary course of such Person's business on fair and reasonable terms and conditions substantially as favorable to such Person as would be obtainable by it in a comparable arm's length transaction with a Person other than an officer, director or Affiliate.

**1.09**    **Burdensome Agreements**.

Enter into, or permit to exist, any Contractual Obligation (except for this Agreement and the other Loan Documents) that (a) encumbers or restricts the ability of any such Person to (i) to act as a Loan Party; (ii) make Restricted Payments to any Loan Party, (iii) pay any Indebtedness or other obligation owed to any Loan Party, (iv) make loans or advances to any Loan Party, or (v) create any Lien upon any of their properties or assets, whether now owned or hereafter acquired, except, (1) Permitted Liens or any document or instrument governing Indebtedness incurred pursuant to Section 7.02(b), (c), (f), (g) or (j), (2) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and other similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses, or similar agreements, as the case may be), (3) restrictions arising in connection with cash or other deposits permitted hereunder and limited to such cash or deposits, and (4) customary non-assignment provisions in contracts entered into in the ordinary course of business; or (b) requires the grant of any Lien on property for any obligation if a Lien on such property is given as security for the Obligations.

**1.10**    **Use of Proceeds**.

Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U) in violation of Regulation U or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

**1.11**    **[Reserved]**.

**1.12**    **[Reserved]**.

**1.13**    **Amendments of Organization Documents; Fiscal Year ; Legal Name, State of Formation; Form of Entity and Accounting Changes**.

(a)    Amend any of its Organization Documents in a manner inconsistent with the Loan Documents or in a manner which is materially adverse to the interest of the Lenders;

(b)    change its fiscal year;

(c)    without providing ten (10) days' prior written notice to the Administrative Agent (or such shorter period of time as agreed to by the Administrative Agent in its sole discretion), change its name, state of formation, form of organization or principal place of business; or

64

(d)     make any material change in accounting policies or reporting practices, except as required by GAAP.

**1.14    Sale and Leaseback Transactions**.

Enter into any Sale and Leaseback Transaction, other than any Sale and Leaseback Transaction entered in connection with the Augusta Project or the Ironton Project.

**1.15    Sanctions**.

Directly or indirectly, use any Credit Extension or the proceeds of any Credit Extension, or lend, contribute or otherwise make available such Credit Extension or the proceeds of any Credit Extension to any Person, to fund any activities of or business with any Person, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as Lender, Administrative Agent or otherwise) of Sanctions.

**1.16    Anti-Corruption Laws**.

Directly or indirectly, use any Credit Extension or the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other anti-corruption legislation in other jurisdictions.

**Article VIII**

**EVENTS OF DEFAULT AND REMEDIES**

**1.01    Events of Default**.

Any of the following shall constitute an event of default (each, an "*Event of Default*"):

(a)     Non-Payment. The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan, or any fee due hereunder, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)     Specific Covenants. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of  Section 6.01, 6.02, 6.03, 6.05, 6.08, 6.10, 6.11, 6.13, 6.22, Article VII or Article X; or

(c)     Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in  Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days; or

(d)     Representations and Warranties . Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect (or, in the case of any representation, warranty, certification or statement of fact that is qualified by materiality or Material Adverse Effect, in any respect) when made or deemed made; or

(e)     Cross-Default. Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any

65

combined or syndicated credit arrangement) of more than the Threshold Amount, or fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is (i) to cause, or (ii) to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; *provided* that this clause (ii) shall not be applicable to any such Indebtedness or Guarantee evidenced by or made in connection with the Ironton Bonds; or

(f)    Insolvency Proceedings, Etc. Any Loan Party or any Subsidiary thereof institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    Inability to Pay Debts; Attachment. (i) Any Loan Party or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(h)    Judgments. There is entered against any Loan Party or any Subsidiary thereof (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) such judgment has not been satisfied or discharged and enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA. (i) An ERISA Event occurs which has resulted in liability of any Loan Party to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)    Invalidity of Loan Documents. Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all Obligations arising under the Loan Documents, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or it is or becomes unlawful for a Loan Party to perform any of its obligations under the Loan Documents; or

66

(k)    Change of Control. There occurs any Change of Control; or

(l)    Guaranty. The Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Guaranty, or any Guarantor shall fail to comply with any of the terms or provisions of the Guaranty, or any Guarantor shall deny that it has any further liability under the Guaranty, or shall give notice to such effect; or

(m)    Collateral Documents. Any Collateral Document after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral purported to be covered thereby; or

(n)    Intercreditor Agreement and Subordination Arrangements . The provisions of the Intercreditor Agreement or any subordination provisions or subordination agreement applicable to Indebtedness that is subordinated to the Obligations shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any Person party thereto, other than by consensual action by the Administrative Agent, the Security Agent, the Sylebra Administrative Agent, the Sylebra Security Agent, Sylebra Capital Management, Sylebra Capital Limited or any of their respective Related Parties.

**1.02    Remedies upon Event of Default**.

If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the Commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it, the Lenders under the Loan Documents or Applicable Law or equity;

*provided*, *however*, that upon the occurrence of an event described in Section 8.01(f) with respect to the Borrower, the Commitment of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

**1.03    Application of Funds**.

(a)    After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02) or if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all Obligations then due hereunder, any amounts received on account of the Obligations shall, subject to the provisions of Sections 2.14 and 2.15 and the Intercreditor Agreement, be applied by the Security Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and the Security Agent and amounts payable under Article III) payable to the Administrative Agent and the Security Agent in their capacity as such;

67

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender)) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this *Second* clause payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this *Third* clause payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders, in proportion to the respective amounts described in this *Fourth* clause held by them; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

## Article IX

## ADMINISTRATIVE AGENT

### 1.01    Appointment and Authority.

Each of the Lenders hereby irrevocably appoints, designates and authorizes Pure Plastic LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Each of the Lenders hereby irrevocably appoints, designates and authorizes Pure Plastic LLC to act as the Security Agent under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Security Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Security Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Security Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Security Agent), shall be entitled to the benefits of all provisions of this Article IX and Article XI (including Section 11.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the Security Agent under the Loan Documents) as if set forth in full herein with respect thereto.

### 1.02    Rights as a Lender.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any

68

kind of banking, trust, financial, advisory, underwriting or other business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or to provide notice to or consent of the Lenders with respect thereto.

**1.03    Exculpatory Provisions**.

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent and its Related Parties:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their Affiliates that is communicated to, or in the possession of, the Administrative Agent or any of its Related Parties in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein.

(b)    Neither the Administrative Agent nor any of its Related Parties shall be liable for any action taken or not taken by the Administrative Agent under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby or thereby (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary), or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by the Borrower or a Lender.

(c)    Neither the Administrative Agent nor any of its Related Parties have any duty or obligation to any Lender or participant or any other Person to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

69

(d)    Neither the Administrative Agent nor any of its Related Parties shall be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions of this Agreement relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (i) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (ii) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

**1.04    Reliance by Administrative Agent**.

The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying and shall not incur any liability for relying upon, any notice, request, certificate, communication, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall be fully protected in relying and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. For purposes of determining compliance with the conditions specified in Sections 4.01 and 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objections.

**1.05    Delegation of Duties**.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent including, without limitation, any third party that regularly provides administrative agent services. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facility as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**1.06    Resignation of Administrative Agent**.

(a)    Notice. The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be (i) a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States, (ii) a Lender or an Affiliate of a Lender, or (iii) a third party that regularly provides administrative agent services. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within fifteen (15) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that in no

70

event shall any successor Administrative Agent be a Defaulting Lender or a Disqualified Institution. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

( b ) <u>Defaulting Lender</u>. If the Person serving as Administrative Agent is a Defaulting Lender pursuant to <u>clause (d)</u> of the definition thereof, the Required Lenders may, to the extent permitted by Applicable Law, by notice in writing to the Borrower and such Person remove such Person as Administrative Agent and, in consultation with the Borrower, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required Lenders) (the "<u>Removal Effective Date</u>"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(b)    <u>Effect of Resignation or Removal</u>. With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in <u>Section 3.01(g)</u> and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this <u>Section 9.06</u>). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this <u>Article XI</u> and <u>Section 11.04</u> shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (A) while the retiring or removed Administrative Agent was acting as Administrative Agent and (B) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (a) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders, and (b) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

**1.07    <u>Non-Reliance on Administrative Agent and the Other Lenders</u>.**

Each Lender expressly acknowledges that the Administrative Agent has not made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in their (or their Related Parties') possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent

71

any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties. Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

**1.08    No Other Duties, Etc**.

Anything herein to the contrary notwithstanding, none of the titles listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

**1.09    Administrative Agent May File Proofs of Claim; Credit Bidding**.

(a)    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.02(c), 2.06, 2.09, and 11.04) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.02(c), 2.06, 2.09, and 11.04.

(b)    Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

72

(c)    The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.01(a) of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

**1.10    Collateral and Guaranty Matters.**

(a)    Each of the Lenders irrevocably authorizes the Security Agent, at its option and in its discretion, to release any Lien on any property granted to or held by the Security Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent obligations that survive the termination of the Loan Documents that are not due and payable and for which no claims have been made), (ii) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, (iii) if the property subject to such Lien is owned by a Guarantor, upon the release of such Guarantor from its obligations under the Guaranty as a result of a transaction permitted under the Loan Documents or (iv) if approved, authorized or ratified in writing in accordance with Section 11.01.

(b)    Each of the Lenders irrevocably authorize the Security Agent, at its option and in its discretion, to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

(c)    Each of the Lenders irrevocably authorize the Security Agent, at its option and in its discretion, to subordinate any Lien on any property granted to or held by the Security Agent

73

under any Loan Document to the holder of any Lien on such property that is permitted by  Section 7.02(c).

(d)      Each of the Lenders irrevocably authorizes the Administrative Agent and the Security Agent, at their option and in their discretion, to enter into the Intercreditor Agreement.

(e)      Upon request by the Security Agent at any time, the Required Lenders will confirm in writing the Security Agent's authority to release or subordinate its interest in particular types or items of property or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Security Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

(f)      The Security Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Security Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Security Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

**1.11    [Reserved]**.

**1.12    Certain ERISA Matters**.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments, or this agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84–14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95–60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90–1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91–38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96–23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84–14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84–14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84–14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

74

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

**1.13    Recovery of Erroneous Payments**.

Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender or to the Borrower, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Lender and the Borrower receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Lender or the Borrower in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Lender and the Borrower irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount. The Administrative Agent shall inform each Lender or the Borrower promptly upon determining that any payment made to such Lender or the Borrower comprised, in whole or in part, a Rescindable Amount.

**1.14    Application of Article IX**.

For the avoidance of doubt, all the terms of this Article IX and all other protections and indemnities specified in this Credit Agreement as afforded to the Administrative Agent, are extended to, collectively or individually as the context and case may be, and may be relied upon by, the Security Agent and any other delegate (including those as may be appointed by a party in accordance with this Agreement).

**Article X**

**CONTINUING GUARANTY**

**1.01    Guaranty**.

Each Guarantor hereby absolutely and unconditionally, jointly and severally guarantees, as primary obligor and as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all Obligations (for each Guarantor, subject to the proviso in this sentence, its "Guaranteed Obligations"); *provided* that (a) the Guaranteed Obligations of a Guarantor shall exclude any Excluded Swap Obligations with respect to such Guarantor and (b) the liability of each Guarantor individually with respect to this Guaranty shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code of the United States or any comparable provisions of any applicable state law. Without limiting the generality of the foregoing, the Guaranteed

75

Obligations shall include any such indebtedness, obligations, and liabilities, or portion thereof, which may be or hereafter become unenforceable or compromised or shall be an allowed or disallowed claim under any proceeding or case commenced by or against any debtor under any Debtor Relief Laws. The Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon each Guarantor, and conclusive for the purpose of establishing the amount of the Obligations. This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any instrument or agreement evidencing any Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Obligations which might otherwise constitute a defense to the obligations of the Guarantors, or any of them, under this Guaranty, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

1.02    **Rights of Lenders**.

Each Guarantor consents and agrees that the Administrative Agent and the Security Agent may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or any Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent, the Security Agent and the Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Obligations. Without limiting the generality of the foregoing, each Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of such Guarantor under this Guaranty or which, but for this provision, might operate as a discharge of such Guarantor.

1.03    **Certain Waivers**.

Each Guarantor waives (a) any defense arising by reason of any disability or other defense of the Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of Administrative Agent, the Security Agent or any Lender) of the liability of the Borrower or any other Loan Party; (b) any defense based on any claim that such Guarantor's obligations exceed or are more burdensome than those of the Borrower or any other Loan Party; (c) the benefit of any statute of limitations affecting any Guarantor's liability hereunder; (d) any right to proceed against the Borrower or any other Loan Party, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of the Administrative Agent, the Security Agent or any Lender whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by the Administrative Agent or any Lender; and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by Applicable Law limiting the liability of or exonerating guarantors or sureties. Each Guarantor expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or incurrence of new or additional Obligations.

1.04    **Obligations Independent**.

The obligations of each Guarantor hereunder are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other guarantor, and a separate action may be brought against each Guarantor to enforce this Guaranty whether or not the Borrower or any other person or entity is joined as a party.

1.05    **Subrogation**.

No Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and the

76

Commitments and the Facility are terminated. If any amounts are paid to a Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Administrative Agent and shall forthwith be paid to the Administrative Agent to reduce the amount of the Obligations, whether matured or unmatured.

**1.06** **Termination**; **Reinstatement**.

This Guaranty is a continuing and irrevocable guaranty of all Obligations now or hereafter existing and shall remain in full force and effect until the Facility Termination Date. Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of the Borrower or a Guarantor is made, or any of the Administrative Agent or any Lender exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Administrative Agent and any Lender in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Administrative Agent or such Lender are in possession of or have released this Guaranty and regardless of any prior revocation, rescission, termination or reduction. The obligations of each Guarantor under this Section 10.06 shall survive termination of this Guaranty.

**1.07** **Stay of Acceleration**.

If acceleration of the time for payment of any of the Obligations is stayed, in connection with any case commenced by or against a Guarantor or the Borrower under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by each Guarantor, jointly and severally, immediately upon demand by the Administrative Agent and any Lender.

**1.08** **Condition of Borrower**.

Each Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from the Borrower and any other guarantor such information concerning the financial condition, business and operations of the Borrower and any such other guarantor as such Guarantor requires, and that none of the Administrative Agent and any Lender has any duty, and such Guarantor is not relying on the Administrative Agent or any Lender at any time, to disclose to it any information relating to the business, operations or financial condition of the Borrower or any other guarantor (each Guarantor waiving any duty on the part of Administrative Agent and any Lender to disclose such information and any defense relating to the failure to provide the same).

**1.09** **Appointment of the Borrower**.

Each of the Loan Parties hereby appoints the Borrower to act as its agent (when acting in such capacity, the " Loan Party Agent") for all purposes of this Agreement, the other Loan Documents and all other documents and electronic platforms entered into in connection herewith and agrees that (a) the Loan Party Agent may execute such documents and provide such authorizations on behalf of such Loan Parties as the Loan Party Agent deems appropriate in its sole discretion and each Loan Party shall be obligated by all of the terms of any such document and/or authorization executed on its behalf, (b) any notice or communication delivered by the Administrative Agent or a Lender to the Loan Party Agent shall be deemed delivered to each Loan Party and (c) the Administrative Agent or the Lenders may accept, and be permitted to rely on, any document, authorization, instrument or agreement executed by the Loan Part Agent on behalf of each of the Loan Parties.

**1.10** **Right of Contribution**.

The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under Applicable Law.

77

**1.11**    **Keepwell**.

Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article X voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Guarantor under this Section 10.11 shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Each Loan Party intends this Section 10.11 to constitute, and this Section 10.11 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

**Article XI**

**MISCELLANEOUS**

**1.01**    **Amendments**, **Etc**.

(a)    Subject to Section 3.03, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(i)    waive any condition set forth in Section 4.01 (other than Section 4.01(n)) or Section 4.02 without the written consent of each Lender;

(ii)    [reserved];

(ii)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender (it being understood and agreed that a waiver of any condition precedent in Section 4.02 or of any Default is not considered an extension or increase in Commitments of any Lender);

(iii)    postpone any date fixed by this Agreement or any other Loan Document for (i) any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment or (ii) any scheduled reduction of any Facility hereunder or under any other Loan Document without the written consent of each Appropriate Lender;

(iv)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iv) of the second proviso to this Section 11.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to such amount; *provided*, *however*, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

78

(v)       change (i) Section 8.03 or Section 2.13 in a manner that would have the effect of altering the pro rata payments or pro rata sharing of payments required hereunder without the written consent of each Lender or (ii) the order of application of any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.05(b) or 2.06(b), respectively, in any manner that materially and adversely affects the Lenders without the written consent of the Required Lenders, or (iii) Section 2.12(f) in a manner that would alter the *pro rata* application required thereby without the written consent of each Lender directly affected thereby;

(vi)      change any provision of this Section 11.01 or the definition of "Required Lenders" or "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or thereunder or make any determination or grant any consent hereunder;

(vii)     release or subordinate all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(viii)    release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone); or

(ix)      release or subordinate, or have the effect of subordinating, the Obligations hereunder to any other Indebtedness or other obligation, except to the extent the release or subordination is permitted pursuant to Section 9.10 (in which case such release may be made by the Administrative Agent acting alone); or

(x)       release the Borrower or permit the Borrower to assign or transfer any of its rights or obligations under this Agreement or the other Loan Documents without the consent of each Lender;

and *provided*, *further*, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent or the Security Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent or the Security Agent under this Agreement or any other Loan Document.

(b)       Notwithstanding anything to the contrary herein, (i) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender, or all Lenders or each affected Lender under a Facility, may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (A) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (B) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender, or all Lenders or each affected Lender under a Facility, that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender; (ii) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein and (iii) the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders.

(c)       Notwithstanding anything to the contrary herein, this Agreement may be amended and restated without the consent of any Lender (but with the consent of the Borrower and the Administrative Agent) if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the

79

Commitments of such Lender shall have terminated, such Lender shall have no other commitment or other obligation hereunder and shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement.

(d)    Notwithstanding any provision herein to the contrary, if the Administrative Agent and the Borrower acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document (including the schedules and exhibits thereto), then the Administrative Agent and the Borrower shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement.

**1.02    Notices; Effectiveness; Electronic Communications.**

(a)    <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in <u>clause (b)</u> below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax transmission or e-mail transmission as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower or any other Loan Party or the Administrative Agent or the Security Agent, to the address, fax number, e-mail address or telephone number specified for such Person on <u>Schedule 1.01(a)</u>; and

(ii)    if to any other Lender, to the address, fax number, e-mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in <u>clause (b)</u> below shall be effective as provided in such <u>clause (b)</u>.

(b)    <u>Electronic Communications</u>.

(i)    Notices and other communications to the Administrative Agent, the Security Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail, FPML messaging, and Internet or intranet websites) pursuant to an electronic communications agreement (or such other procedures approved by the Administrative Agent in its sole discretion); *provided* that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such <u>Article II</u> by electronic communication. The Administrative Agent, the Security Agent or the Borrower may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless the Administrative Agent or the Security Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended

80

recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement) and (B) notices and other communications posted to an Internet or intranet website shall be deemed received by the intended recipient upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail address or other written acknowledgement) indicating that such notice or communication is available and identifying the website address therefor; *provided* that for both clauses (A) and (B), if such notice or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    The Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the " Agent Parties") have any liability to Borrower, any other Loan Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

(d)    Change of Address, Etc . Each of the Borrower and the Administrative Agent may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, fax number or telephone number or e-mail address for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and e-mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one (1) individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and Applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

(e)    Reliance by Administrative Agent and Lenders . The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including, without limitation, telephonic or electronic notices, Loan Notices and Notice of Loan Prepayment) purportedly given by or on behalf of any Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party. All telephonic notices to and other telephonic communications with the Administrative Agent and the Security Agent may be recorded by the Administrative Agent and the Security Agent, and each of the parties hereto hereby consents to such recording.

81

1.03    **No Waiver; Cumulative Remedies; Enforcement**.

(a)        No failure by any Lender, the Administrative Agent or the Security Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

(b)        Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; *provided*, *however*, that the foregoing shall not prohibit (a) the Administrative Agent or the Security Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent or Security Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 11.08 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and *provided, further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

1.04    **Expenses; Indemnity; Damage Waiver**.

(a)        <u>Costs and Expenses</u>. The Loan Parties shall pay (i) all out-of-pocket expenses incurred by the Administrative Agent, the Security Agent and their respective Affiliates (including, but not limited to, (A) the reasonable fees, charges and disbursements of one counsel for the Administrative Agent and its Affiliates (and, if necessary, one local counsel in each applicable jurisdiction and regulatory counsel) and (B) due diligence expenses), and shall pay all fees and time charged and disbursements for attorneys who may be employees of the Administrative Agent, in connection with the syndication of the credit facility provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii)  all out-of-pocket expenses incurred by the Administrative Agent, the Security Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent, the Security Agent or any Lender), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent, the Security Agent or any Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 11.04, or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)        <u>Indemnification by the Loan Parties</u>. The Loan Parties shall indemnify the Administrative Agent (and each sub-agent thereof), the Security Agent (and any sub-agent thereof) and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be

82

employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby (including, without limitation, the Indemnitee's reliance on any Communication executed using an Electronic Signature, or in the form of an Electronic Record, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof), the Security Agent (and any sub-agent thereof) and their respective Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned, leased or operated by a Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to a Loan Party or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the provisions of Section 3.01(c), this Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Reimbursement by Lenders. To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under clauses (a) or (b) of this Section 11.04 to be paid by it to the Administrative Agent (or any sub-agent thereof), the Security Agent (and any sub-agent thereof) or any respective Related Party of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Security Agent (and any sub-agent thereof) or such respective Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Outstandings at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), *provided,* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Security Agent (or any sub-agent thereof) or against any respective Related Party acting for the Administrative Agent (or any such sub-agent) or the Security Agent (or any sub-agent thereof) in connection with such capacity. The obligations of the Lenders under this clause (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in clause (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    Payments. All amounts due under this Section 11.04 shall be payable not later than ten (10) Business Days after demand therefor.

83

(f)    Survival. The agreements in this Section 11.04 and the indemnity provisions of Section 11.02(e) shall survive the resignation of the Administrative Agent, the resignation of the Security Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

(g)    Lien. The Security Agent may, in priority to any payment to the Secured Parties, indemnify itself out of the Collateral in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Section 11.04 and shall have a lien on the Collateral and the proceeds of the enforcement of the Collateral for all moneys payable to it.

**1.05    Payments Set Aside**.

To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Security Agent or any Lender, or the Administrative Agent, the Security Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Security Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent or the Security Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent or the Security Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**1.06    Successors and Assigns**.

(a)    Successors and Assigns Generally. The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 11.06(b), (ii) by way of participation in accordance with the provisions of Section 11.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 11.06(e) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 11.06(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitments and the Loans at the time owing to it); *provided* that (in each case with respect to any Facility) any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under the Facility or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the

84

amount specified in clause (b)(i)(B) of this Section 11.06 in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in clause (b)(i)(A) of this Section 11.06, the aggregate amount of the Commitment or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement and the other Loan Documents with respect to the Loans or the Commitments assigned.

(iii)    Required Consents. No consent shall be required for any assignment except to the extent required by clause (b)(i)(B) of this Section 11.06 and, in addition (A) the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender, or an Approved Fund; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and (B) the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required unless such assignment is to a Lender, an Affiliate of a Lender, or an Approved Fund; provided that the Administrative Agent is not obligated to consent until it has complied with all its "know your customer" and similar procedures as may be reasonably required.

(iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that (A) no processing and recordation fee shall be paid if the assignment is to another Lender that was a Lender on the Closing Date, and (B) the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent and the Security Agent an Administrative Questionnaire and all documentation and other information reasonably determined by the Administrative Agent and the Security Agent to be required by applicable regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(v)    No Assignment to Certain Persons. No such assignment shall be made (A) to the Borrower or any of the Borrower's Affiliates or Subsidiaries, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of one or more natural Persons).

(vi)    Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which

85

may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (B) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this <u>clause (b)(vi)</u>, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(vii)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>Section 11.06(c)</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>11.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment); *provided*, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>clause (b)</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 11.06(d)</u>.

(c)    <u>Register</u>. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely for Tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower, the Security Agent and any Lender (with respect to such Lender's interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)    <u>Participations</u>.

(i)    Any Lender may at any time, without the consent of, or notice to, the Borrower, the Administrative Agent or the Security Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of one or more natural Persons, a Defaulting Lender, a Disqualified Institution or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible

to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Security Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.04(c) without regard to the existence of any participations.

(ii)    Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 11.01 that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 11.06; *provided* that such Participant (A) shall be subject to the provisions of Sections 3.06 and 11.13 as if it were an assignee under clause (b) of this Section 11.06 and (B) shall not be entitled to receive any greater payment under Sections 3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 3.06 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and interest amounts) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103–1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note or Notes, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    [Reserved].

(g)    Disqualified Institutions.

87

(i) No assignment or, to the extent the DQ List has been posted on the Platform for all Lenders, participation shall be made to any Person that was a Disqualified Institution as of the date (the "Trade Date") on which the applicable Lender entered into a binding agreement to sell and assign or participate all or a portion of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment as otherwise contemplated by this Section 11.06, in which case such Person will not be considered a Disqualified Institution for the purpose of such assignment). For the avoidance of doubt, with respect to any assignee or participant that becomes a Disqualified Institution after the applicable Trade Date (including as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "Disqualified Institution"), such assignee shall not retroactively be considered a Disqualified Institution. Any assignment in violation of this clause (g)(i) shall not be void, but the other provisions of this clause (g) shall apply.

(ii) If any assignment is made to any Disqualified Institution without the Borrower's prior consent in violation of clause (i) above, the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, terminate any Commitment of such Disqualified Institution and/or repay all obligations of the Borrower owing to such Disqualified Institution, *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and under the other Loan Documents and/or (C) require such Disqualified Institution to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this Section 11.06), all of its interest, rights and obligations under this Agreement and related Loan Documents to an Eligible Assignee that shall assume such obligations at the *lesser of* (1) the principal amount thereof and (2) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and other the other Loan Documents; provided, that, (x) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 11.06(b), (y) such assignment does not conflict with Applicable Law.

(iii) Notwithstanding anything to the contrary contained in this Agreement, Disqualified Institutions (A) will not (1) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (2) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (3) access any electronic site established for the Lenders or confidential communications from counsel to or financial advisors of the Administrative Agent or the Lenders and (B) (1) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Institution will be deemed to have consented in the same proportion as the Lenders that are not Disqualified Institutions consented to such matter, and (2) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws ("Plan of Reorganization"), each Disqualified Institution party hereto hereby agrees (I) not to vote on such Plan of Reorganization, (II) if such Disqualified Institution does vote on such Plan of Reorganization notwithstanding the restriction in the foregoing clause (I), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws) and (III) not to contest any request by any party for a determination by the bankruptcy court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (II).

(iv) The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent, to (A) post the list of Disqualified

88

Institutions provided by the Borrower and any updates thereto from time to time (collectively, the " DQ List") on the Platform, including that portion of the Platform that is designated for "public side" Lenders or (B) provide the DQ List to each Lender requesting the same.

**1.07    Treatment of Certain Information; Confidentiality**.

(a)    Treatment of Certain Information. Each of the Administrative Agent, the Security Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates, its auditors and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by Applicable Law or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section 11.07, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or any Eligible Assignee invited to be a Lender pursuant to Section 11.01 or (B) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (it being understood that the DQ List may be disclosed to any assignee or Participant, or prospective assignee or Participant, in reliance on this clause (vi)), (vii) on a confidential basis to (A) any rating agency in connection with rating the Borrower or its Subsidiaries or the credit facility provided hereunder or (B) the provider of any Platform or other electronic delivery service used by the Administrative Agent to deliver Borrower Materials or notices to the Lenders or (viii) the CUSIP Service Bureau or any similar agency in connection with the application, issuance, publishing and monitoring of CUSIP numbers or other market identifiers with respect to the credit facility provided hereunder, or (ix) with the consent of the Borrower or to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 11.07, (xi) becomes available to the Administrative Agent, the Security Agent any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower or (xii) is independently discovered or developed by a party hereto without utilizing any Information received from the Borrower or violating the terms of this Section 11.07. For purposes of this Section 11.07, "*Information*" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, the Security Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary, provided that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 11.07 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. In addition, the Administrative Agent, the Security Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent, the Security Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents and the Commitments.

(b)    Non-Public Information. Each of the Administrative Agent, the Security Agent and the Lenders acknowledges that (i) the Information may include material non-public information concerning a Loan Party or a Subsidiary, as the case may be, (ii) it has developed compliance procedures regarding the use of material non-public information and (iii) it will

89

handle such material non-public information in accordance with Applicable Law, including United States federal and state securities Laws.

(c)    Press Releases. The Loan Parties and their Affiliates agree that they will not in the future issue any press releases or other public disclosure using the name of the Administrative Agent, the Security Agent or any Lender or their respective Affiliates or referring to this Agreement or any of the Loan Documents without the prior written consent of the Administrative Agent or the Security Agent, unless (and only to the extent that) the Loan Parties or such Affiliate is required to do so under law and then, in any event the Loan Parties or such Affiliate will consult with such Person before issuing such press release or other public disclosure.

(d)    Customary Advertising Material. The Loan Parties consent to the publication by the Administrative Agent, the Security Agent or any Lender of customary advertising material relating to the transactions contemplated hereby using the name, product photographs, logo or trademark of the Loan Parties.

**1.08    Right of Setoff.**

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, the fullest extent permitted by Applicable Law to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower or any other Loan Party against any and all of the obligations of Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or such Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured, secured or unsecured, or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; *provided* that such rights of setoff are subject to the Intercreditor Agreement; and *provided further* that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section 11.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have under Applicable Law. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**1.09    Interest Rate Limitation.**

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**1.10**    **Integration; Effectiveness**.

This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Security Agent and when the Administrative Agent and the Security Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successor and assigns.

**1.11**    **Survival of Representations and Warranties**.

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent, the Security Agent and each Lender, regardless of any investigation made by the Administrative Agent, the Security Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent, the Security Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**1.12**    **Severability**.

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 11.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**1.13**    **Replacement of Lenders**.

(a)    If the Borrower is entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(i)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 11.06(b);

(ii)    such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

91

(iii)     in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not conflict with Applicable Law; and

(v)     in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent and <u>Section 11.06(b)</u> shall have been satisfied.

(b)     A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(c)     Each party hereto agrees that (i) an assignment required pursuant to this <u>Section 11.13</u> may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and (ii) the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective and shall be deemed to have consented to an be bound by the terms thereof; <u>provided</u>, <u>that</u>, following the effectiveness of any such assignment, the other parties to such assignment agree to execute and deliver such documents necessary to evidence such assignment as reasonably requested by the applicable Lender, *provided further* that any such documents shall be without recourse to or warranty by the parties thereto.

(d)     Notwithstanding anything in this <u>Section 11.13</u> to the contrary, the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of <u>Section 9.06</u>.

**1.14     <u>Governing Law</u>; <u>Jurisdiction</u>; <u>Etc</u>.**

(a)     <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)     <u>SUBMISSION TO JURISDICTION</u>. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE

CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN CLAUSE (b) OF THIS SECTION 11.14. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**1.15    Waiver of Jury Trial.**

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.15.

**1.16    Subordination.**

Each Loan Party (a "Subordinating Loan Party") hereby subordinates the payment of all obligations and indebtedness of any other Loan Party owing to it, whether now existing or hereafter arising, including but not limited to any obligation of any such other Loan Party to the Subordinating Loan Party as subrogee of the Administrative Agent or resulting from such Subordinating Loan Party's performance under this Guaranty, to the indefeasible payment in full in cash of all Obligations. If the Administrative Agent so requests, any such obligation or indebtedness of any such other Loan Party to the Subordinating Loan Party shall be enforced and performance received by the Subordinating Loan Party as trustee for the Administrative Agent and the proceeds thereof shall be paid over to the Administrative Agent on account of the Obligations, but without reducing or affecting in any manner the liability of the Subordinating Loan Party under this Agreement. Without limitation of the foregoing, so long as no Default has occurred and is continuing, the Loan Parties may make and receive payments with respect to Intercompany Debt; *provided*, that in the event that any Loan Party receives any payment of any Intercompany Debt at a time when such payment is prohibited by this Section 11.16, such payment shall be held by such Loan Party, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to the Administrative Agent.

93

**1.17    No Advisory or Fiduciary Responsibility**.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Borrower and each other Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Security Agent and the Lenders and their respective Affiliates are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent, the Security Agent, and the Lenders and their respective Affiliates, on the other hand, (ii) each of the Borrower and the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each Borrower and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Administrative Agent, the Security Agent, and each Lender and each of their respective Affiliates each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, any other Loan Party or any of their respective Affiliates, or any other Person and (ii) neither the Administrative Agent, nor the Security Agent, nor any Lender nor any of their respective Affiliates has any obligation to the Borrower, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Security Agent, and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower , the other Loan Parties and their respective Affiliates, and neither the Administrative Agent, nor the Security Agent, nor any Lender nor any of their respective Affiliates has any obligation to disclose any of such interests to the Borrower, any other Loan Party or any of their respective Affiliates. To the fullest extent permitted by law, each of each Borrower and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent, the Security Agent, the Lenders and their respective Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

**1.18    Electronic Execution; Electronic Records; Counterparts**.

This Agreement, any Loan Document and any other Communication, including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each of the Loan Parties and each of the Administrative Agent and each Lender (collectively, each a "Credit Party") agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on such Person to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.   Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.   For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Credit Parties may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("Electronic Copy"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document.   All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, the Administrative Agent is not under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative Agent and each of the Credit Parties shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party and/or any Credit Party without further verification and (b) upon the request of the Administrative Agent or any Credit Party, any Electronic Signature shall be promptly followed by

such manually executed counterpart.  For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document (including, for the avoidance of doubt, in connection with the Administrative Agent's reliance on any Electronic Signature transmitted by telecopy, emailed .pdf or any other electronic means). The Administrative Agent shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by acting upon, any Communication (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution or signed using an Electronic Signature) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the maker thereof).

Each of the Loan Parties and each Credit Party hereby waives (i) any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document based solely on the lack of paper original copies of this Agreement, such other Loan Document, and (ii) waives any claim against the Administrative Agent, each Credit Party for any liabilities arising solely from the Administrative Agent's and/or any Credit Party's reliance on or use of Electronic Signatures, including any liabilities arising as a result of the failure of the Loan Parties to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

**1.19    USA Patriot Act Notice**.

Each Lender that is subject to the Patriot Act, the Administrative Agent (for itself and not on behalf of any Lender) and the Security Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower and the other Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107–56 (signed into law October 26, 2001)) (the "*Patriot Act*"), it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes the name and address of the Borrower and each other Loan Party and other information that will allow such Lender, the Administrative Agent or the Security Agent, as applicable, to identify the Borrower and each other Loan Party in accordance with the Patriot Act. The Borrower and each other Loan Party shall, promptly following a request by the Administrative Agent, the Security Agent or any Lender, provide all such other documentation and information that the Administrative Agent, the Security Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**1.20    Acknowledgement and Consent to Bail-In of Affected Financial Institutions**.

Solely to the extent any Lender that is an Affected Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an Affected Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or

95

a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

**1.21    Acknowledgement Regarding Any Supported QFCs**.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**11.22    Time of the Essence**.

Time is of the essence of the Loan Documents.

**11.23    ORIGINAL ISSUE DISCOUNT LEGEND**.

THE LOANS HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES.  THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THE LOANS MAY BE OBTAINED BY WRITING TO THE BORROWER AT ITS ADDRESS SPECIFIED HEREIN.

**11.24    ENTIRE AGREEMENT**.

**THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

96

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWER**:                                        **PURECYCLE TECHNOLOGIES, INC.**


By: /s/ Larry Somma
Name: Larry Somma
Title: Chief Financial Officer




[Signature Page to Credit Agreement]

<u>**GUARANTORS**</u>:                    **PURECYCLE TECHNOLOGIES HOLDINGS CORP.**


By: <u>/s/ Larry Somma</u>
Name: Larry Somma
Title: Chief Financial Officer


**PURECYCLE TECHNOLOGIES, LLC**


By: <u>/s/ Larry Somma</u>
Name: Larry Somma
Title: Chief Financial Officer


[Signature Page to Credit Agreement]

**PURE PLASTIC LLC**,
as Administrative Agent


By: /s/ Daniel Gibson
Name: Daniel Gibson
Title: Member


[Signature Page to Credit Agreement]

**PURE PLASTIC LLC**,
as Security Agent


By: /s/ Daniel Gibson
Name: Daniel Gibson
Title: Member



[Signature Page to Credit Agreement]

**PURE PLASTIC LLC**,
as a Lender


By: /s/ Daniel Gibson
Name: Daniel Gibson
Title: Member


[Signature Page to Credit Agreement]

[Signature Page to Credit Agreement]

Exhibit 10.2

*Execution Version*

**FIRST AMENDMENT TO CREDIT AGREEMENT**

This **FIRST AMENDMENT TO CREDIT AGREEMENT**, dated as of May 8, 2023 (this "**Amendment**"), is entered into by and among **PURECYCLE TECHNOLOGIES, INC.**, a Delaware corporation (the "**Borrower**"), (b) the Guarantors (as defined herein), (c) the Lenders (as defined herein), (d) **MADISON PACIFIC TRUST LIMITED**, as Administrative Agent (in such capacity, the "**Administrative Agent**"), and (e) **MADISON PACIFIC TRUST LIMITED**, as Security Agent (in such capacity, the "**Security Agent**").

**PRELIMINARY STATEMENTS:**

**WHEREAS**, the Borrower, the Guarantors, the Lenders, the Administrative Agent and the Security Agent are party to that certain Credit Agreement, dated as of March 15, 2023 (amended, amended and restated, modified, extended, restated, replaced or supplemented prior to the date hereof, the "**Credit Agreement**" and, the Credit Agreement as amended and modified by this Amendment, the "**Amended Credit Agreement**"). Capitalized terms used herein and not otherwise defined in this Amendment shall have the same meanings as specified in the Amended Credit Agreement.

**WHEREAS**, the parties hereto have agreed to amend the Credit Agreement as hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto hereby agree as follows:

**SECTION 1.    Amendments to Credit Agreement.** Subject to the terms and conditions set forth herein, (a) the Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~), and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages attached as Exhibit A hereto.

**SECTION 2.    Amendments to Security Agreement.** Subject to the terms and conditions set forth herein, the Security Agreement is hereby amended as follows:

(a)    Subsection (f) of the definition of "Excluded Property" in the Security Agreement is hereby amended by adding the phrase "and Section 7.01(q) of the Credit Agreement to secure Indebtedness permitted pursuant to Section 7.02(k) of the Credit Agreement" after the phrase "Section 7.01(i) of the Credit Agreement to secure Indebtedness permitted pursuant to Section 7.02(c) of the Credit Agreement".

(b)    Section 4.03 of the Security Agreement is hereby amended and restated to read in its entirety as follows:

"Section 4.03    Deposit Account Control Agreement.

Subject to Section 6.21 of the Credit Agreement, within ninety (90) days following the date hereof or following the date of opening or replacing any Deposit Account (or, in each case, such later date as may be agreed to by the Security Agent in its reasonable discretion), the Grantor will provide to the Security Agent a Deposit Account Control Agreement duly executed on behalf of each financial institution holding a Deposit Account (other than Excluded Accounts) of the Grantor."

**SECTION 3.    Conditions of Effectiveness.** The amendments to the Credit Agreement contained in Section 1 hereof shall become effective as of the first date on which the following conditions shall have been satisfied (or waived):

(a)      The Administrative Agent shall have received counterparts of this Amendment executed by the Borrower, the Guarantors, the Lenders, the Administrative Agent and the Security Agent.

(b)      The Administrative Agent shall have received executed copies of each of (i) the Pure Plastic Credit Agreement, (ii) the Security Agreement (as defined in the Pure Plastic Credit Agreement), (iii) the Intellectual Property Security Agreement (as defined in the Pure Plastic Credit Agreement) and (iv) the Intercreditor Agreement, in each case reasonably satisfactory to the Administrative Agent.

**SECTION 4.  Representations and Warranties**. The Borrower and each Guarantor hereby represents and warrants to the Administrative Agent:

(a)      The representations and warranties of the Borrower and each Guarantor contained in the Credit Agreement or any other Loan Document are true and correct on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date and except that for purposes of this Section 4, the representations and warranties contained in Sections 5.05(a) and (b) of the Credit Agreement shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(a) and (b) of the Credit Agreement, respectively.

(b)      The execution, delivery and performance by the Borrower and each Guarantor of this Amendment are within the Borrower's and such Guarantor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational action and, if required, action by any holders of its Equity Interests.

(c)      This Amendment constitutes the legal, valid and binding obligations of the Borrower and each Guarantor, enforceable against the Borrower and each Guarantor in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d)      After giving effect to this Amendment, no Default or Event of Default has occurred and is continuing.

**SECTION 5.  Ratification and Reaffirmation; Effect of this Amendment.**

(a)      Each Loan Party hereby consents to the amendments effected hereby and confirms and agrees that, notwithstanding the effectiveness of this Amendment, each Loan Document to which such Loan Party is a party is, and the obligations of such Loan Party contained in the Credit Agreement and in any other Loan Document to which it is a party are, and shall continue to be, in full force and effect and are hereby ratified and confirmed in all respects, in each case as amended by this Amendment. For greater certainty and without limiting the foregoing, each Loan Party hereby (I) confirms that (i) the existing security interests granted by such Loan Party in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the Loan Documents (as defined in the Credit Agreement) in the Collateral described therein shall continue to secure the obligations of the Loan Parties under the Credit Agreement and the other Loan Documents as and to the extent provided therein and (ii) neither the modifications effected pursuant to this Amendment nor the execution, delivery, performance or effectiveness of this Amendment (A) impairs the validity, effectiveness or priority of the Liens granted pursuant to any Loan Document, and such Liens continue unimpaired with the same priority to secure repayment of all Obligations, whether heretofore or hereafter incurred or (B) requires that any new filings be made or other action taken to perfect or to maintain the perfection of such Liens and (II) ratifies its guarantee of the Obligations as provided in any Guaranty that is effective immediately prior to the date hereof.

(b)      Except as expressly set forth or referenced herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver or novation of, or otherwise affect the rights and remedies of the Lenders, the Administrative Agent or the Security Agent under, the Credit Agreement or any other Loan Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document or any other provision of the Credit Agreement or of any other Loan Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be

2

deemed to entitle any party hereto to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.

(c)      Unless the context otherwise requires, from and after the date hereof, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the "Credit Agreement" or words of like import in any other Loan Document shall be deemed a reference to the Amended Credit Agreement. This Amendment shall constitute a "Loan Document" for all purposes of the Credit Agreement and the other Loan Documents.

**SECTION 6.    GOVERNING LAW.** THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK. Section 11.14 and Section 11.15 of the Credit Agreement shall apply to this Amendment, *mutatis mutandis*.

**SECTION 7.    Headings.** Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment.

**SECTION 8.    Execution in Counterparts; Effectiveness.** This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Amendment. The words "execution," "signed," "signature," and words of like import in this Amendment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. Except as provided in Section 5, this Amendment shall become effective by and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

**SECTION 9.    Payment of Expenses.** The Borrower agrees to pay or reimburse the Administrative Agent for its out-of-pocket costs and expenses incurred in connection with this Amendment, any other documents prepared in connection herewith and the transactions contemplated hereby, in each case, in accordance with Section 11.04 of the Credit Agreement.

[*Remainder of page intentionally left blank*]

3

   **IN WITNESS WHEREOF**, the parties have caused this Amendment to be executed by their respective authorized officers as of the date first above written.

<u>**BORROWER**</u>**:**

**PURECYCLE TECHNOLOGIES, INC.**

By: <u>/s/ Larry Somma</u>
Name: Larry Somma
Title: Chief Financial Officer

<u>**GUARANTORS**</u>**:**

**PURECYCLE TECHNOLOGIES HOLDINGS CORP.**

By: <u>/s/ Larry Somma</u>
Name: Larry Somma
Title: Chief Financial Officer

**PURECYCLE TECHNOLOGIES, LLC**

By: <u>/s/ Larry Somma</u>
Name: Larry Somma
Title: Chief Financial Officer

[Signature Page to First Amendment to Credit Agreement]

**MADISON PACIFIC TRUST LIMITED**, as Administrative Agent

By: /s/ Cassandra Ho
Name: Cassandra Ho
Title: Managing Director

**MADISON PACIFIC TRUST LIMITED**, as Security Agent

By: /s/ Cassandra Ho
Name: Cassandra Ho
Title: Managing Director

**SYLEBRA CAPITAL PARTNERS MASTER FUND, LTD**, as a Lender

By: /s/ Matthew Whitehead
Name: Matthew Whitehead
Title: Authorized Signatory

[Signature Page to First Amendment to Credit Agreement]

**SYLEBRA CAPITAL PARC MASTER FUND**, as a Lender

By: /s/ Matthew Whitehead
Name: Matthew Whitehead
Title: Authorized Signatory

**SYLEBRA CAPITAL MENLO MASTER FUND**, as a Lender

By: /s/ Matthew Whitehead
Name: Matthew Whitehead
Title: Authorized Signatory

[Signature Page to First Amendment to Credit Agreement]

**Exhibit A**

(*Attached hereto*)

Exhibit 99.1



**PureCycle Technologies Provides First Quarter 2023 Update**

*-PureCycle's flagship purification facility in Ironton, Ohio, ("Ironton") is mechanically complete, pre-startup process safety management ("PSM") processes required for solvent delivery is complete, all core operating systems have been commissioned and are ready for startup, and solvent is arriving on site.*

*-Secured $62 million of debt financing and evaluating additional proposals to incrementally fund the Augusta project and to further strengthen the Company's balance sheet.*

*-Submitted plan of finance to the Development Authority of Augusta, GA ("AEDA") for one purification line. We are working towards the goal of closing on the land rights ("Augusta Bonds") by June 30, 2023.*

**(ORLANDO, Florida – May 9, 2023)** – PureCycle Technologies, Inc. ("PureCycle" or "the Company") (NASDAQ: PCT), a U.S.-based company revolutionizing plastic recycling, today announced a corporate update and financial results for the first quarter ending March 31, 2023.

**Management Commentary**

**Dustin Olson, PureCycle's Chief Executive Officer,** said, "Our flagship facility in Ironton is days away from beginning the start-up phase of commercial pellet production of ultra-pure recycled ("UPR") resin. As part of our mission to create an 'infinitely sustainable planet,' we are focused on the health and safety of PureCycle team members and the communities in which we operate. With that in mind, we are excited to begin safely ramping up commercial operations and the production of UPR resin in our state-of-the-art purification facility in Ironton."

**Larry Somma, PureCycle's Chief Financial Officer**, added, "We continue to execute on our goal of maintaining financial flexibility and optionality prior to Ironton being operational by securing $62 million of additional debt financing since our last update, further strengthening our balance sheet. We submitted a plan of finance to the AEDA and are working toward closing the Augusta Bonds by the end of June. Our strategy remains to obtain long-term project financing once Ironton is operational. We believe that having capital that can "bridge" the Augusta project until Ironton is operational will allow the Company to access a longer-term, lower-cost source of funds."

**Ironton Update**

The Company's flagship purification facility in Ironton is certified mechanically complete, has completed the pre-startup PSM certification required for solvent deliveries and all core operating systems have been commissioned and are ready for startup. The first solvent delivery was received, and the Company expects to start producing pellets from virgin resin feedstock in the next few weeks. We will then plan to introduce post-industrial and post-consumer feedstock into the purification process and begin producing UPR resin pellets for sale and distribution to customers.

PureCycle's ramp-up strategy is to gradually increase plant capacity utilization while scaling in higher volumes of feedstock deliveries and customer offtake shipments. Management remains confident that PureCycle will achieve the operational milestones as set out in the bondholder limited waiver agreement executed in March in a timely manner.

**Expansion Update**

PureCycle continued to make progress on its various development projects since its last update. Site engineering work is progressing for the Company's Augusta location and module preparation for construction has commenced in Beaumont, Texas.

Updates on our three international development projects include: (i) the PureCycle team in Belgium has initiated site engineering work at the Port of Antwerp to start the permitting process; (ii) our joint venture team in South Korea continued to progress on engineering plans in accordance with the priorities defined by the joint venture; and (iii) we continued our JVA discussions with Mitsui, while the joint venture team has started the feasibility study process on potential purification plant locations in Japan.

**Liquidity and Capital Resources**

As of March 31, 2023, PureCycle had total liquidity of $263.9 million including $38.4 million of cash and cash equivalents and $225.5 million in restricted cash. PureCycle also had $249.6 million in debt, less $15.8 million of discount and issuance costs. As of March 31, 2023, PureCycle estimated between $26-$51 million remaining investment in 2023 to complete the Ironton project, of which $25.2 million is included in restricted cash and can be used to fund the remaining investment. This puts the higher end of the project investment at approximately $361 million. This range is dependent upon various contract contingencies and their ultimate resolution. PureCycle expects to successfully negotiate at least some of these contingencies, which would reduce the remaining 2023 investment to the lower end of the range.

Subsequent to quarter end, PureCycle closed on an equipment financing agreement for up to $22 million which is secured by Augusta PreP wash equipment. The lease has a term of 36 months, a 7% interest rate and flexible end-of-lease terms. Additionally, the Company secured a $40 million term loan with an entity controlled by Dan Gibson, the Chief Investment Officer of Sylebra Capital, PureCycle's largest shareholder. The loan matures on December 31, 2025, and bears interest at a floating rate of SOFR + 7.5%.

**Conference Call**

The Company will hold a conference call Tuesday, May 9 th at 4:00 p.m. EST to provide an update on recent corporate developments, including activity from the first quarter and updated future strategic plans.

**First Quarter 2023 Conference Call Details**

Date:             Tuesday, May 9, 2023
Time:             4:00 p.m. EST
Participant Registration:   **Click Here**

Please register for the conference call using the above link in advance of the call start time. The webcast platform will register your name and organization as well as provide dial-ins numbers and a unique access pin. If you have any difficulty connecting with the conference call, please contact PureCycle Investor Relations at (689) 233-3595.

The conference call will have a live Q&A session and be available for replay  **Click Here** and on the Company's website at www.purecycle.com. Please note there will no longer be a telephonic replay.

A replay of the conference call will be available after 8:00 p.m. Eastern time on the day of the call through May 8, 2024.

###

**Forward-Looking Statements**
This press release contains forward-looking statements, including statements about the financial condition, results of operations, earnings outlook and prospects of PCT. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements.

Forward-looking statements are typically identified by words such as "plan," "believe," "expect," "anticipate," "intend," "outlook," "estimate," "forecast," "project," "continue," "could," "may," "might," "possible," "potential," "predict," "should," "would" and other similar words and expressions, but the absence of these words does not mean that a statement is not forward-looking.

The forward-looking statements are based on the current expectations of the management of PCT and are inherently subject to uncertainties and changes in circumstances and their potential effects and speak only as of the date of this press release. There can be no assurance that future developments will be those that have been anticipated. These forward-looking statements involve a number of risks, uncertainties or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described in the section of PCT's Annual Report on Form 10-K for the fiscal year ended December 31, 2022, entitled "Risk Factors," those discussed and identified in public filings made with the U.S. Securities and Exchange Commission (the "SEC") by PCT (including PCT's Quarterly Report on Form 10-Q for the current quarterly period) and the following:

- PCT's ability to obtain funding for its operations and future growth and to continue as a going concern;
- PCT's ability to meet, and to continue to meet, applicable regulatory requirements for the use of PCT's UPR resin (as defined below) in food grade applications (both in the United States, Europe and internationally);
- PCT's ability to comply on an ongoing basis with the numerous regulatory requirements applicable to the UPR resin and PCT's facilities (both in the United States, Europe and internationally);
- Expectations and changes regarding PCT's strategies and future financial performance, including its future business plans, expansion plans or objectives, prospective performance and opportunities and competitors, revenues, products and services, pricing, operating expenses, market trends, liquidity, cash flows and uses of cash, capital expenditures, and PCT's ability to invest in growth initiatives;
- PCT's ability to scale and build its first commercial-scale recycling facility in Lawrence County, Ohio (the "Ironton Facility") in a timely and cost-effective manner;
- PCT's ability to complete the necessary funding with respect to, and complete the construction of, (i) its first U.S. multi-line facility, located in Augusta, Georgia (the "Augusta Facility"); (ii) its first commercial-scale European plant located in Antwerp, Belgium and (iii) its first commercial-scale Asian plant located in Ulsan, South Korea, in a timely and cost-effective manner;
- PCT's ability to sort and process polypropylene plastic waste at its plastic waste prep ("Feed PreP") facilities;
- PCT's ability to maintain exclusivity under the Procter & Gamble Company ("P&G") license (as described below);
- the implementation, market acceptance and success of PCT's business model and growth strategy;
- the success or profitability of PCT's offtake arrangements;
- the ability to source feedstock with a high polypropylene content at a reasonable cost;
- PCT's future capital requirements and sources and uses of cash;
- developments and projections relating to PCT's competitors and industry;
- the outcome of any legal or regulatory proceedings to which PCT is, or may become, a party including the securities class action case;

- geopolitical risk and changes in applicable laws or regulations;
- the possibility that PCT may be adversely affected by other economic, business, and/or competitive factors, including rising interest rates, availability of capital, economic cycles, and other macro-economic impacts;
- turnover or increases in employees and employee-related costs;
- changes in the prices and availability of labor (including labor shortages), transportation and materials, including significant inflation, supply chain conditions and its related impact on energy and raw materials, and PureCycle's ability to obtain them in a timely and cost-effective manner;
- any business disruptions due to political or economic instability, pandemics, armed hostilities (including the ongoing conflict between Russia and Ukraine);
- the potential impact of climate change on the company, including physical and transition risks, higher regulatory and compliance costs, reputational risks, and availability of capital on attractive terms;
- operational risk; and
- the risk that the COVID-19 pandemic ("COVID-19"), including any new and emerging variants and the efficacy and distribution of vaccines may have an adverse effect on PCT's business operations, as well as PCT's financial condition and results of operations.

Should one or more of these risks or uncertainties materialize or should any of the assumptions made by the management of PCT prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements.

All subsequent written and oral forward-looking statements or other matters attributable to PCT or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this press release. Except to the extent required by applicable law or regulation, PCT undertakes no obligation to update these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect the occurrence of unanticipated events.

**About PureCycle Technologies**
PureCycle Technologies LLC., a subsidiary of PureCycle Technologies, Inc., holds a global license for the only patented solvent-driven purification recycling technology, developed by The Procter & Gamble Company (P&G), that is designed to transform polypropylene plastic waste (designated as No. 5 plastic) into a continuously renewable resource. The unique purification process is designed to remove color, odor, and other impurities from No. 5 plastic waste resulting in an ultra-pure recycled (UPR) plastic that can be recycled and reused multiple times, changing our relationship with plastic. www.purecycle.com

**Investor Relations Contact:**
Charles Place
cplace@purecycle.com
689.233.3595

**Media Contact:**
Christian Bruey
cbruey@purecycle.com
352.745.6120



# Forward-Looking Statements

Certain statements in this Presentation contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), including statements about the financial condition, results of operations, earnings outlook and prospects of PureCycle Technologies, Inc. ("PCT"). Forward-looking statements generally relate to future events or our future financial or operating performance and may refer to projections and forecasts. Forward-looking statements are typically identified by words such as "plan," "believe," "expect," "anticipate," "intend," "outlook," "estimate," "forecast," "project," "continue," "could," "may," "might," "possible," "potential," "predict," "should," "would" and other similar words and expressions (or the negative versions of such words or expressions), but the absence of these words does not mean that a statement is not forward-looking. The forward-looking statements are based on the current expectations of the management of PCT and are inherently subject to uncertainties and changes in circumstances and their potential effects and speak only as of the date of this presentation. There can be no assurance that future developments will be those that have been anticipated. These forward-looking statements involve a number of risks, uncertainties or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described in the section of PCT's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 entitled "Risk Factors," those discussed and identified in public filings made with the U.S. Securities and Exchange Commission (the "SEC") by PCT and the following: PCT's ability to obtain funding for its operations and future growth and to continue as a going concern; PCT's ability to meet, and to continue to meet, applicable regulatory requirements for the use of PCT's UPR resin in food grade applications (both in the United States, Europe, and internationally); PCT's ability to comply on an ongoing basis with the numerous regulatory requirements applicable to the UPR resin and PCT's facilities (in the United States, Europe and internationally); expectations and changes regarding PCT's strategies and future financial performance, including its future business plans, expansion plans or objectives, prospective performance and opportunities and competitors, revenues, products and services, pricing, operating expenses, market trends, liquidity, cash flows and uses of cash, capital expenditures, and PCT's ability to invest in growth initiatives; PCT's ability to complete and commission its first commercial-scale recycling facility in Lawrence County, Ohio (the "Ironton Facility") in a timely and cost-effective manner; PCT's ability to complete the necessary funding with respect to, and complete the construction of t, (i) its first U.S. multi-line facility, located in Augusta, Georgia (the "Augusta Facility"); (ii) its first commercial-scale European plant located in Antwerp, Belgium and (iii) its first commercial-scale Asian plant located in Ulsan, South Korea, in a timely and cost-effective manner; PCT's ability to sort and process polypropylene plastic waste at its plastic waste prep ("Feed PreP") facilities; PCT's ability to maintain exclusivity under the Procter & Gamble Company license; the implementation, market acceptance and success of PCT's business model and growth strategy; the success or profitability of PCT's offtake arrangements; the ability to source feedstock with a high polypropylene content at a reasonable cost; PCT's future capital requirements and sources and uses of cash; developments and projections relating to PCT's competitors and industry; the outcome of any legal or regulatory proceedings to which PCT is, or may become a party, including the securities class action case; geopolitical risk and changes in applicable laws or regulations; the possibility that PCT may be adversely affected by other economic, business, and/or competitive factors, including rising interest rates, availability of capital, economic cycles, and other macro-economic impacts; turnover or increases in employees and employee-related costs; changes in the prices and availability of labor (including labor shortages), transportation and materials, including significant inflation, supply chain conditions and its related impact on energy and raw materials, and PCT's ability to obtain them in a timely and cost-effective manner; any business disruptions due to political or economic instability, pandemics, armed hostilities (including the ongoing conflict between Russia and Ukraine); the potential impact of climate change on PCT, including physical and transition risks, higher regulatory and compliance costs, reputational risks, and availability of capital on attractive terms; and operational risk.

Should one or more of these risks or uncertainties materialize or should any of the assumptions made by the management of PCT prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. All subsequent written and oral forward-looking statements or other matters attributable to PCT or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this Presentation. Except to the extent required by applicable law or regulation, PCT undertakes no obligation to update these forward-looking statements to reflect events or circumstances after the date of this Presentation or to reflect the occurrence of unanticipated events.

 PURECYCLE    2

# 1Q Update: Ironton and Future Growth

| IRONTON 1 | GROWTH 2 | FINANCE 3 |
|---|---|---|
| • Ironton is mechanically complete, certified by independent engineer<br><br>• Completed pre-startup Process Safety Management (PSM) process required for solvent deliveries<br><br>• Solvent deliveries have started to the facility and circulation is expected early next week<br><br>• All core operating systems have been commissioned and are ready for startup<br><br>• Start-up of commercial pellet production using virgin, PIR and PCR feeds expected in 2Q23 | • Working toward agreement with AEDA to begin activities in Augusta. Preparing modules for construction in Beaumont, TX<br><br>• Initiated pre-construction engineering and permitting processes for the Antwerp, Belgium project<br><br>• Advanced the engineering process for the South Korean project in accordance with schedule<br><br>• Continued discussions on JVA with Mitsui and started feasibility study process on potential locations<br><br>• Initiating advocacy efforts to amplify PureCycle's technology within the emerging recycling space | • Secured $62M of non-dilutive debt financing and have additional PreP equipment proposals that are being evaluated<br><br>• Pursuing a range of financing options to support various growth initiatives<br><br>• PCT has submitted financing plan for one purification line in Augusta, GA; working to close the transaction by June 30, 2023 |





# Path to Pellets



# PCT Long Term Growth Continues to Progress



Beaumont, TX

### Augusta

Initiated OSBL engineering

Progressed ISBL engineering to ~90% complete

Preparing modules for construction in Beaumont, TX

### Belgium

Initiated engineering work to support permitting process

### South Korea

Advanced engineering to maintain schedule and priorities defined in the joint venture

### Japan

Continuing to make progress on a JVA with Mitsui

Started feasibility study process on preferred locations

\* All global expansion contingent on securing financing

# 1Q23 Liquidity and Changes from Prior Quarter - Actual

| (IN MILLIONS) | Dec 31, 2022 | Mar 31, 2023 | change |
|---|---|---|---|
| Cash and Cash Equivalents | $63.9 | $38.4 | $(25.5) |
| Debt Securities Available for Sale | 98.6 | - | (98.6) |
| **Total Unrestricted** | **$162.5** | **$38.4** | **$(124.1)** |
| **Restricted Cash** | | | |
| Plant 1 project fund (Ironton, OH) | $13.2 | $25.2 | $12.0 |
| Augusta Construction Escrow | 39.4 | 24.4 | (15.0) |
| Other corporate requirements | 1.3 | 1.3 | - |
| **Reserve Requirements per Revenue Bonds** | | | |
| General Liquidity Reserve | 50.5 | 100.9 | 50.4 |
| Capitalized Interest and Debt Reserves | 38.0 | 50.2 | 12.2 |
| Other Required Reserves | 21.2 | 23.5 | 2.3 |
| **Total Restricted** | **$163.6** | **$225.5** | **$61.9** |
| **Total Available** | **$326.1** | **$263.9** | **$(62.2)** |

## Unrestricted Cash Changes

- Bondholder Waiver agreement
  - $50.0M moved to restricted cash for General Liquidity Reserve
  - $12.2M moved to restricted cash for capitalized interest
  - $12.0M (net) moved to restricted cash to fund remaining Ironton
  - $1.6M additional Ironton reserves
- $35.7M Ironton construction
- $2.3M Augusta and Prep
- $6.6M Payroll and benefits
- $7.6M General corporate purposes
- $1.1M LOC Fee
- $(5.0M) net released from Augusta escrow

# Capital Raise Strategy and Details

**Goals**

- Manage cash burn rate until Ironton is operational
- Maintain financial flexibility and optionality for PCT's long term capital structure
- Seek lower cost project finance capital for growth projects

**Opportunity**

- Near term: focused on equipment financing and capital outsourcing (design, build, own, operate, maintain, or "DBOOM")
- Evaluating up to $125 million of Augusta PreP equipment and outsourcing opportunities, excluding central utilities plant (CUP)
- Applied for an EU Innovation Fund grant related to Antwerp $CO_2$ emission reduction opportunity

**Realized**

- Executed $22 million Augusta PreP wash equipment financing with CSC Leasing
  - 36-month agreement with a 7% interest rate
  - Flexible end of lease terms
- Executed $40 million shareholder loan with net proceeds of $35.9 million
  - December 31, 2025 maturity with a floating rate of SOFR + 7.5%
  - No mandatory prepayments until PCT closes secured financing at Augusta purification facility
- Received proposals for additional Augusta PreP equipment financing; evaluating next steps



# PureCycle Q1 Highlights

**1** Ironton is **mechanically complete,** pre-startup operations have commenced

**2** Ironton is now functioning as a PSM facility; **Solvent is on site** and prepping for circulation

**3** **Secured $62M** of non-dilutive financing for Augusta; proposals received for additional financing

**4** Visible path to **closing AEDA land transaction** by June 30, 2023

**5** **Preparing Augusta modules** for construction in Beaumont, TX

**6** **Initiated EU engineering** which will set timing for Antwerp plant startup

**7** Voted One of the **Best Places to Work** by Plastic News in 2022 for the second year in a row



Exhibit 99.3

# Unaudited Consolidated Financial Statements

**PureCycle Technologies, LLC**

March 31, 2023

**PureCycle Technologies, LLC.**

**QUARTERLY SUBMISSION SUMMARY**

| Delivery Requirement: | Submission Compliance |
|---|---|
| Interim Financial Statements (Guarantor) | See Form 10-Q for the period ended 3/31/2023 as filed with the SEC. |
| Interim Financial Statements (Company) | Included herein |
| Compliance Certificates | Included herein for Guarantor and Company |
| Operating Statements<br><br>a) Budget to Actual for the period<br><br>b) Total product sold<br><br>c) Amount of Product sold under offtake contracts (in total) and amount of other products sold (with information about sale/purchaser)<br><br>d) Production Yield and values by weight/value<br><br>e) Supplied waste processed by weight / values<br><br>f) IHS/Chemical Data indices used<br><br>g) Terms/ extensions / replacements of Offtake or Feedstock contracts<br><br>h) Additional production capacity under development<br><br>i) hours of operation for the Project | <br><br>a) Refer to budget to actual<br><br>b) Not applicable for Q1. There has been no product sold.<br><br>c) Not applicable for Q1. There has been no product sold under Offtake Contracts or of other Products which require disclosure.<br><br>d) Not applicable until production begins.<br><br>e) Not applicable for Q1.<br><br>f) Not applicable for pricing for Q1<br><br>g) None other than those previously disclosed.<br><br>h) Not applicable. There have been no changes to production capacity.<br><br>i) Not applicable for Q1. The plant will be operational during Q2. |
| Reconciliation Statements (Operating Revenue Fund) | Not applicable for Q1 as there have been no inflows or outflows from to/from the Operating Revenue Fund. |

2

# PureCycle Technologies, LLC.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Unaudited Consolidated Financial Statements | 4 |
| Balance Sheets as of March 31, 2023 (Unaudited) and December 31, 2022 | 4 |
| Unaudited Statements of Operations for the Three months ended March 31, 2023 and 2022 | 5 |
| Unaudited Statements of Member's Equity for the Three months ended March 31, 2023 and 2022 | 6 |
| Unaudited Statements of Cash Flows for for the Three months ended March 31, 2023 and 2022 | 7 |
| Comparison of Actual to Budgeted Results for the Three months ended March 31, 2023 and 2022 | 8 |
| Covenant Compliance for the Three months ended March 31, 2023 | 9 |

3

# PureCycle Technologies, LLC.

### CONSOLIDATED BALANCE SHEETS

**ASSETS**

| (in thousands) | | (Unaudited) March 31, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash | $ | 16,596 | $ | 50,928 |
| Restricted cash - current | | 53,786 | | 29,389 |
| Prepaid expenses and other current assets | | 3,216 | | 1,612 |
| Total current assets | | 73,598 | | 81,929 |
| Restricted cash - non-current | | 145,468 | | 93,415 |
| Prepaid expenses and other non-current assets | | 4,147 | | 4,206 |
| Operating lease right-of-use assets | | 5,277 | | 5,042 |
| Property, plant and equipment, net | | 422,465 | | 373,848 |
| **TOTAL ASSETS** | $ | 650,955 | $ | 558,440 |

**LIABILITIES AND MEMBER'S EQUITY**

| | | | | |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Accounts payable | $ | 10,334 | $ | 816 |
| Accrued expenses | | 29,962 | | 26,715 |
| Accrued interest | | 6,127 | | 1,532 |
| Total current liabilities | | 46,423 | | 29,063 |
| **NON-CURRENT LIABILITIES** | | | | |
| Deferred revenue | | 5,000 | | 5,000 |
| Bonds payable - non-current | | 233,778 | | 233,513 |
| Operating lease right-of-use liabilities | | 4,157 | | 3,956 |
| Other non-current liabilities | | 1,068 | | 1,117 |
| Due to parent | | 270,412 | | 188,989 |
| **TOTAL LIABILITIES** | $ | 560,838 | $ | 461,638 |
| | | | | |
| **MEMBER'S EQUITY** | | | | |
| LLC Member Interest | | 223,387 | | 223,387 |
| Accumulated deficit | | (133,270) | | (126,585) |
| **TOTAL MEMBER'S EQUITY** | | 90,117 | | 96,802 |
| **TOTAL LIABILITIES AND MEMBER'S EQUITY** | $ | 650,955 | $ | 558,440 |

4

**PureCycle Technologies, LLC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**

**(Unaudited)**

|  | Three months ended March 31, | |
|---|---|---|
|  | 2023 | 2022 |
| *(in thousands)* | | |
| **Costs and expenses** | | |
| Operating costs | $ 4,524 | $ 2,916 |
| Research and development | 307 | 293 |
| Selling, general and administrative | 2,624 | 1,701 |
| Total operating costs and expenses | 7,455 | 4,910 |
| Interest (income) expense | (819) | 564 |
| Other expense | 49 | 6 |
| Total other (income) expenses | (770) | 570 |
| **Net loss** | $ (6,685) | $ (5,480) |

5

**PureCycle Technologies, LLC.**

**CONSOLIDATED STATEMENTS OF MEMBER'S EQUITY**

**(Unaudited)**

| (in thousands) | For the three months ended March 31, 2023 | | | | | |
|---|---|---|---|---|---|---|
| | LLC Member Interest | | Accumulated deficit | | Total Member's Equity | |
| **Balance, December 31, 2022** | $ | 223,387 | $ | (126,585) | $ | 96,802 |
| Net Loss | | — | | (6,685) | | (6,685) |
| **Balance, March 31, 2023** | $ | 223,387 | $ | (133,270) | $ | 90,117 |

| (in thousands) | For the three months ended March 31, 2022 | | | | | |
|---|---|---|---|---|---|---|
| | LLC Member Interest | | Accumulated deficit | | Total Member's Equity | |
| **Balance, December 31, 2021** | $ | 223,387 | $ | (104,276) | $ | 119,111 |
| Net Loss | | — | | (5,480) | | (5,480) |
| **Balance, March 31, 2022** | $ | 223,387 | $ | (109,756) | $ | 113,631 |

6

**PureCycle Technologies, LLC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(Unaudited)**

| | | Three months ended March 31, | | |
|---|---|---|---|---|
| (in thousands) | | 2023 | | 2022 |
| Cash flows from operating activities | | | | |
| Net loss | $ | (6,685) | $ | (5,480) |
| Adjustments to reconcile net loss to net cash used in operating activities | | | | |
| Depreciation expense | | 827 | | 768 |
| Accretion of debt instrument discounts | | 62 | | 58 |
| Amortization of debt issuance costs | | 202 | | 187 |
| Operating lease amortization expense | | 338 | | 17 |
| Changes in operating assets and liabilities | | | | |
| Prepaid expenses and other current assets | | (1,603) | | (683) |
| Prepaid expenses and other non-current assets | | 59 | | — |
| Accounts payable | | 967 | | 611 |
| Accrued expenses | | 206 | | 375 |
| Accrued interest | | 324 | | 324 |
| Operating lease right-of-use liabilities | | (176) | | (17) |
| Net cash used in operating activities | $ | (5,479) | $ | (3,840) |
| Cash flows from investing activities | | | | |
| Purchases of property, plant and equipment | | (33,786) | | (47,364) |
| Net cash used in investing activities | $ | (33,786) | $ | (47,364) |
| Cash flows from financing activities | | | | |
| Due to Parent | | 81,423 | | 100,126 |
| Other payments from financing activities | | (40) | | (10) |
| Net cash provided by financing activities | $ | 81,383 | $ | 100,116 |
| Net increase in cash and restricted cash | | 42,118 | | 48,912 |
| Cash and restricted cash, beginning of year | | 173,732 | | 330,574 |
| Cash and restricted cash, end of year | $ | 215,850 | $ | 379,486 |
| Supplemental disclosure of cash flow information | | | | |
| Non-cash investing activities: | | | | |
| Additions to property, plant, and equipment in accounts payable | $ | 9,066 | $ | 224 |
| Additions to property, plant, and equipment in accrued interest | $ | 4,271 | $ | 4,271 |
| Additions to property, plant, and equipment in accrued expenses | $ | 27,766 | $ | 13,871 |

7

**PureCycle Technologies, LLC.**

**BUDGET TO ACTUAL**

| | Actual | Budget | $ Variance | % Variance | Explanations |
|---|---|---|---|---|---|
| **For the Quarter Ended March 31, 2023** | | | | | |
| *(in thousands)* | | | favorable / (unfavorable) | | |
| **Costs and expenses** | | | | | |
| **Operating costs** | $ 4,524 | $ 4,174 | $ (350) | (8) % | ~$240k in professional services incurred related to commissioning the plant and LLC stand alone audit fees not included in budget ~$215k related to maintenance tools and supplies (one time costs)<br><br>Overage partially offset by ~ $165k favorable related to employee costs resulting from shifts in the hiring plan |
| **Research and development** | 307 | 40 | (267) | (666) % | Overage driven primarily by additional feedstock testing performed by third-parties (e.g. Phasex, GALAB, etc.) |
| **Selling, general and administrative** | 2,624 | 417 | (2,207) | (530) % | ~$700k of legal fees paid to the Trustee's counsel<br><br>~$1.5M in corporate overhead allocation for shared services; allocation of some costs required under GAAP |
| **Total operating costs and expenses** | 7,455 | 4,631 | (2,824) | (61) % | |
| **Interest (income) expense** | $ (819) | $ 590 | $ 1,409 | 239 % | ~$997k of interest income on bond and escrow accounts partially offset by interest expense of ~$327k<br><br>~$140k net debt related amortization not included in the budget |
| **Other expense** | 49 | — | (49) | 100 % | immaterial for review |
| **Total other (income) expense** | $ (770) | $ 590 | $ 1,360 | 230 % | |
| **Net loss** | $ (6,685) | $ (5,221) | $ (1,464) | (28) % | |

8

**PureCycle Technologies, LLC.**

**COVENANT COMPLIANCE**

| Days Cash on Hand: >75 | | As of March 31, 2023 |
|---|---|---|
| Cash on Hand[1] | $ | 66,597 |
| Operating Expenses[2] | | (6,628) |
| Debt Service for Period[3] | | — |
| Total Operating Expenses + Debt Service | $ | (6,628) |
| Daily Cash Required[4] | $ | 74 |
| **Days Cash on Hand** | | **904** pass |

| Minimum Cash Required (at least $100M) | | As of March 31, 2023 |
|---|---|---|
| Cash & cash equivalents | $ | 16,596 |
| Liquidity Escrow Reserve | | 50,796 |
| PureCycle Trustee Account | | 50,000 |
| Operating Revenue Escrow Fund | | 1 |
| Total Cash | $ | 117,393 pass |

[1] Cash on hand includes the following amounts: Unrestricted cash & cash equivalents, the PureCycle Trustee Account, and the Operating Revenue Fund
[2] Operating expenses include all operating costs except for depreciation and amortization
[3] None for Q1 2023
[4] Daily cash required = (total operating expenses + debt service) / days in period

9