OBCDSouO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JAY SOUTHGATE, et al.,

                Plaintiffs,

        v.                                23 CV 08605

JAMES SMITH, et al.,

                Defendants.
                                     Oral Argument
------------------------------x
                                     New York, N.Y.
                                     November 12, 2024
                                     3:00 p.m.

Before:

                HON. JOHN G. KOELTL,

                                     District Judge


                      APPEARANCES

GLANCY PRONGAY & MURRAY, LLP
     Attorney for Plaintiffs
BY:  JASON L. KRAJCER


DECHERT, LLP
     Attorneys for Defendants
BY:  JONI JACOBSEN
     HAYOUNG PARK
     NINA RIEGELSBERGER

OBCDSouO

(Case called.)

THE DEPUTY CLERK:  All parties, please state who they are for the record.

MR. KRAJCER:  Jason Krajcer, counsel for lead plaintiff, James Smith.

MS. JACOBSEN:  Joni Jacobsen on behalf of defendants PureCycle, Mr. Olson, and Mr. Somma.

MS. PARK:  Hayoung Park on behalf of defendants PureCycle, Mr. Olson, and Mr. Somma.

MS. RIEGELSBERGER:  Nina Riegelsberger on behalf of PureCycle, Mr. Somma, and Mr. Olson.

THE COURT:  All right.  This is a motion to dismiss. I'm familiar with the papers.  I'll listen to argument.

All right.  Defendant.

MS. JACOBSEN:  Good afternoon, your Honor.  May it please the Court.  Joni Jacobsen on behalf of defendants.

I'd like to reserve a few moments for rebuttal.  Also, I do have a hard copy of some demonstratives.  If it pleases the Court, if I can use those during the argument --

THE COURT:  You can pass them up.

Mr. Fletcher.  This is fine.

Go ahead.

MS. JACOBSEN:  Defendant's forward-looking statements are protected by the safe harbor.  They were accompanied by cautionary language.  They contained no material omissions, and

they were not made with actual knowledge.  Plaintiff also fails to plead particularized facts establishing scienter and fails to plead loss causation.

So today I'm going to focus on three points:

First, I will frame the allegations of this case, what this case is about, and what it is not about;

Second, I will address the fundamental flaw underlying plaintiff's allegations.  There are no facts to support --

THE COURT:  I am familiar with the papers.  If this were in the Second Circuit, the amount of time that the parties would be given for argument would be ten minutes.  So you can have 12, and I'm sure I'll be asking you some questions.

Go ahead.

MS. JACOBSEN:  Sound great.

All right.  So turning to page three.  What is this case about?

PureCycle Technology is in the process of commercializing this ground-breaking technology.  And this case relates to a discrete class period, April 2023 through December of 2023.  Throughout the construction process of the company's facility, the company repeatedly disclosed a significant risk, cost, and delays.

If you turn to page four of the demonstratives, plaintiff -- PureCycle missed its original milestone under the loan agreement in December of 2022 and, in March '23, disclosed

OBCDSouO

three new milestones under its loan agreement.

Importantly, PureCycle met the first two milestones:

First, with mechanical completion of the facility in April, and second was the initial appellate production in June. However, in August, a thunderstorm caused a power outage, which led to a system failure, and PureCycle missed its third milestone, which required production of 4.45 million pounds of ultra pure recycled resin during a thirty-day period.

So plaintiff bases his claim on the three stock drops that relate to this missed third milestone, but he pleads no facts to connect the issues in the complaint with that -- those disclosures. So turning to page five, the second issue that I wanted to discuss is that according to defendant's knowledge of issues with its subcontractor --

THE COURT: Before you get to B --

MS. JACOBSEN: Yes.

THE COURT: Paragraph 115 of the complaint alleges that it was false to say that Ironton is operational, and that it was false to say that "for the first time we produced pellets at a commercial scale."

Was that false?

MS. JACOBSEN: No, it wasn't false, your Honor. If the --

THE COURT: It was not false, because --

MS. JACOBSEN: Because the -- first, there's no facts

OBCDSouO

to suggest that that was false, and as I will get to in a moment, there are allegations that specifically incorporate the monthly reports by the independent monitor and --

THE COURT:  Right, but tell me why it was not false.

MS. JACOBSEN:  It wasn't false, because the company -- if you look at the actual disclosures in full, the company describes the various steps in the operational -- there's different components that were operational and some that are not.  What plaintiff has done is they take a snippet out of an entire paragraph that is talking about very detailed disclosures.  The company disclosed monthly reports by its independent monitor that discussed change orders, that discussed operations, et cetera.

THE COURT:  Just tell me, was Ironton operational in August of 2023?

MS. JACOBSEN:  Yes.

THE COURT:  Did it, for the first time, produce pellets at commercial scale?

MS. JACOBSEN:  In April of 2023, it became mechanically complete, and that was certified by its independent auditor.  And in June of 2023, it first produced pellets and was operational at that point in time.

THE COURT:  Okay.  Thank you.

Go ahead.  Now on to DB.

MS. JACOBSEN:  The now on to DB.  So if you turn to

page six, what plaintiff seems to misunderstand is that a project of this size -- several contractors had significant roles during various phases of the project.  DB was in charge of the OSBO, which is outside battery limits.  That refers to the area outside of the plant's boundary that contains secondary processes.  KMPS was actually charged with the inside battery limits.  So they were very different roles on this project, and the actual contract with DB was substantially complete at the very beginning of the class period.

If you turn to the next page, which is page seven --

THE COURT:  At the beginning of what?  It was substantially complete when?

MS. JACOBSEN:  As of May 2023, and it was certified as substantially complete by -- this is contained in the actual Leidos reports, the independent auditor construction monitor actually indicated that the responsibilities of DB were essentially complete as of --

THE COURT:  You had said May 2023.

MS. JACOBSEN:  Yes, May 2023, and that's Exhibit QF4.

THE COURT:  You, in your motion, keep referring to the fact that the construction monitor reports, the Leidos reports, were publicly available, and I take it from your papers that they were available on the PureCycle website; is that right?

MS. JACOBSEN:  Correct.

THE COURT:  Were they otherwise available, such as

exhibits to the 10-K or the 8-K, or the -- any of the quarterly reports?

MS. JACOBSEN:  I don't believe that they were in a public filing, but they were on the website.  And I think the cases the plaintiff cites to with respect to disclosure relate to instances where the information reached the public in different ways other than actually on the company's website.

THE COURT:  Right.  From a third party?

MS. JACOBSEN:  Yes.

THE COURT:  In some obscure publication, sometimes abroad, the truth on the market cases.

MS. JACOBSEN:  Right.  And I would say this is not a truth on the market case, because it was actually disclosed by the company itself.

THE COURT:  Okay.

MS. JACOBSEN:  The other thing on page seven I'd like to note is that the cause of the seal failure which actually led to the missed third milestone in September of 2023 was due to a power outage from 2023.  There's no facts to connect the seal failure that is the heart of the complaint to the issuer with respect to DB.  Two separate experts determined that the power outage was the cause of the seal failure.

MS. JACOBSEN:  I also want to turn to page --

THE COURT:  Could you just -- what's the gist of your best argument against the plaintiff's allegation that there was

OBCDSouO

a failure to disclose how bad DB was?

MS. JACOBSEN:  Well, the delay's as a result of DB's work, right?  Cost increases delays.  DB related to the first part of the contract, and the first milestone was met in April of 2023.  Now, those costs, those delays were all disclosed. The missed milestone from December 1st of 2022 was disclosed to the public.  So my argument would be the issues that arose with respect to DB, the consequences of those were disclosed in realtime by the company and all of those relate to issues that predate this complaint.

THE COURT:  By the way, I didn't do this at the beginning of this argument, but I imagine I've done this before.  I traditionally disclose that I have a nephew-in-law who's a partner of Dechert, but who doesn't work on any of my cases and who doesn't share in any income from any cases that are assigned to me.  But I bring that to your attention.

MS. JACOBSEN:  Thank you.

With respect to the counterclaim that PureCycle filed against DB in October of 2023, plaintiff seems to think it's some smoking gun or some admission, but all this really does it is it shows there were some admissions with respect to DB that started back in November of 2020 that all predate this class period and do not relate to the actual stock drops that were alleged in the complaint and formerly the heart of this case. That relates to the missing of the third milestone, not the

OBCDSouO

first milestone, and I think it's important to note that after DB finished and left the project, which was in spring of 2023, the company actually met its first two milestones, the mechanical completion, as well as the fact that it was the initial pellet production, which was met June 20 of 2023.

THE COURT:  In your papers, you say that the milestones that Leidos used were shorter than the milestones that were in the loan agreement, right?

How can I rely on that?  Is that in the papers somewhere?

MS. JACOBSEN:  Yes, it is, your Honor.  It is in the papers with respect to there's the -- in our briefs, as well as the Exhibit Q of the quarterly -- the LP -- Leidos Construction report specifically lays out change orders, schedule orders, very detailed information with respect to these issues.

THE COURT:  Exhibit 2 of what?

MS. JACOBSEN:  Exhibit Q.

THE COURT:  Q?

MS. JACOBSEN:  Q, at page 4.

THE COURT:  Okay.  At paragraphs 134, 135, 176, the plaintiff appears to say that there was a misstatement when PureCycle says that it had completed commercial shipments of our on-spec material, to both Formera and Milican.  While in the quarterly report for the third quarter of 2023, it says, there has been no product sold, zero production, and zero hours

OBCDSouO

of beneficial operation.  So the plaintiff says that the report can't be accurate.

MS. JACOBSEN:  If you turn to page 11 on the slide, that will give you a good idea of what the QPR report actually looks like.  It is a one-page document that is very bare bones, high level, and that is what the QPR report looks like.

Now, this is filed in conjunction with -- and it's in the middle of an 8-K, that has substantial information detailing the progress of the plant.  It also -- the monthly reports were filed on the website on a monthly basis, and they -- and if you look at Exhibit Q of the monthly -- that shows one of the monthly reports.  You'll get an idea of the type of detail that is in these monthly reports.  That is at times picked up by analysts.

And you also, if you look at some of the disclosures, for example, if you turn to slides 12 and 13, you get a feel for plaintiffs taking one sentence out of an entire paragraph. The paragraph talks about this part was -- is certified and operational, this part is certified and operational, this part is certified and operational, but then it goes ahead and discloses what's next on the agenda.

THE COURT:  But on -- I would have thought a simple answer was the quarterly statement, that there has been no product sold, zero product yield, zero hours of beneficial operations at the Ironton facility, was not inaccurate, that

OBCDSouO

what PureCycle had done at that point was to complete commercial shipments on-spec material to Formera and Milican, unless I'm misreading that.

MS. JACOBSEN:  No.  No.  You're absolutely right, your Honor.  I was getting a step ahead, so I apologize, but, yes, the difference between selling and selling on-spec is completely different in a start-up company like this.  There was nothing false about that statement.

THE COURT:  Okay.  Go ahead.

MS. JACOBSEN:  So turning back to the issues with respect to DB, I'm now on page nine, I just wanted to note the timing of DB's role.  Per the independent monitor, the responsibilities were complete at the beginning of the class period, which I already noted.  Any delays relating to pushing back the milestones were already disclosed prior to the class period, and after the shutdown or delays during Q2, those were actually disclosed at the end of each quarter.

So in August of 2023, the company disclosed nine shutdowns.  They disclosed that there'd been an arbitration with DB.  And when you get to November, they also disclose those issues.

THE COURT:  I'm sorry.  When was the first disclosure with respect to DB?

MS. JACOBSEN:  August.  The fact that it was in arbitration.

THE COURT:  Okay.  You also argue that there is no loss causation.  Why isn't this loss causation?

There were on two occasions revelations about problems at Ironton and there was a stock price drop.

MS. JACOBSEN:  There was no -- there was no materialization of a concealed risk.  What materialized was the fact that the company had already disclosed we could have issues with weather, we could have issues with equipment, we could have a number of issues.  Those risks were disclosed.  They materialized.  And that is not loss causation.

THE COURT:  Why not?

MS. JACOBSEN:  Because the loss causation requires a connection.  It requires a connection between the alleged misstatements and the actual fraud that is revealed or the risk that materialized.  Here, there was a risk that materialized, but it wasn't a concealed risk.  It was a disclosed risk.

THE COURT:  But that simply collapses your argument on loss causation with your argument that there was no misrepresentation because the on-going problems were disclosed.

MS. JACOBSEN:  I actually don't think it collapses my argument.  I think it's consistent with my argument.

THE COURT:  It may be consistent with the argument.  It's not a separate argument.

MS. JACOBSEN:  The issues that were known were disclosed.  The issues that were not known, for example, that a

OBCDSouO

storm, severe thunderstorm could cause a power outage, which resulted in a seal failure, and the company failed to meet its third milestone, that issue was not disclosed, because it was not known.

THE COURT:  Well, I mean, you also argue that there was general disclosure at the outset in the public filing of all of the potential problems which could happen to the plant, including weather.

MS. JACOBSEN:  Yes.

THE COURT:  So it was a disclosed risk.

MS. JACOBSEN:  Right.  It was a disclosed risk.  It wasn't a concealed risk.  Right?  It wasn't -- the company disclosed to investors all of these things could potentially happen, and one of them happened.  That is not fraud.

What is fraud is if the company --

THE COURT:  I know.  I know.  But what I'm saying is you have no additional argument with respect to loss causation. Your argument is there was no fraud, but --

MS. JACOBSEN:  I guess my argument would be that there is a mismatch between the alleged misrepresentations, where plaintiff is basing his complaint, and the actual disclosures that caused the stock drop.  There's a mismatch between those things, and, therefore, he hasn't pled loss causation.  There was no -- from a corrective disclosure standpoint, there was no fraud that was revealed at that point in time.  What was

revealed was that they had new issues that caused them to not meet the milestone.  That had nothing to do with the issues with respect to DB.  That's a completely different phase of the project.

THE COURT:  Okay.  Thank you.

MS. JACOBSEN:  So, to sum -- unless you have other questions, your Honor --

THE COURT:  No.

MS. JACOBSEN:  To summarize, there's no link between DB and the cause of the seal failure.  Thus, the forward-looking statements and opinions were protected by the safe harbor.  Plaintiffs cannot establish an omission or scienter based on publicly disclosed reports.  In fact, the more plausible inference is that if the company was disclosing all of these reports by an independent monitor, that undermines any inference of fraud.

The only other allegation that I'll mention quickly is this allegations that comes from the short seller report, which had referenced anonymous sources or former employees.  The problem is that plaintiffs failed to allege those  individuals' positions, dates, or any contact with the defendants.  So, therefore, that allegation fails as well.

And, finally, I would just say, because the entire premise of the complaint is unsound, amendment would be futile and dismissal should be with prejudice.

OBCDSouO

THE COURT:  All right.  Thank you.  I'll listen to the plaintiff.

MR. KRAJCER:  Jason Krajcer for lead plaintiff Smith.

THE COURT:  Keep your voice up, please.

How do you pronounce your last name?

MR. KRAJCER:  Krajcer.

THE COURT:  Krajcer?

MR. KRAJCER:  Yes.

THE COURT:  Okay.  I've got it, Mr. Krajcer.

MR. KRAJCER:  Okay.  So defendant's principal challenge to the amended complaint is her argument that there's no link between the operational issues that emerge in September of the 2023 and the supposedly separate conflict with PureCycle and DB.  The facts in the complaint support a strong inference that there was a connection between the equipment failure that occurred in September 2023 and the piping estimates that were overseen by DB.

Now, defendants say that the piece of equipment failed was --

THE COURT:  Before you get into that, do you contend that there was any specific false statement of material facts in the disclosures?

MR. KRAJCER:  I'm sorry.  Could you say that again?

THE COURT:  Yes.  Do you contend that there was any specific false statements of material facts that were contained

OBCDSouO

in the disclosure statements on which you're relying?

MR. KRAJCER:  So if you're saying affirmatively false statements as opposed to omissions --

THE COURT:  Well, they're false statements of material fact.

MR. KRAJCER:  Yes.  I mean, so, for instance --

THE COURT:  No.  No.  Hold on.  It's -- you know, it's really a simple question, right?  There can be false statements of material fact.  There can be failures to disclose facts, which you can contend should be disclosed.  Those are two different things.  So I'm trying to understand her complaint.

MR. KRAJCER:  Right.

THE COURT:  Because in some cases you put in three pages from a disclosure statement and say this was false and misleading, because, first, it didn't disclose what was contained in the construction manager's report, the Leidos report, and second, it didn't disclose what was going on with DB.  But I read your complaint and I don't see any specific allegations of specific material facts that were false in the disclosures.  So I'm not saying that that's fatal.  I'm just trying to understand the complaint.

MR. KRAJCER:  Understood.  Your Honor, I'm going to preface this by saying I apologize if there's certain details of the complaint that I may not understand fully.  My partner, Natalie Pang, she wrote this complaint and just got married, so

OBCDSouO

I just came onto this a week ago. My understanding is these are principally theories of omission, if you're saying things are false.

THE COURT: Whoa. Whoa. Whoa. That's too much of a -- you say this is a case of omissions, and then you say quickly this is a case where there were false statements. If there are false statements, I want you to take the complaint in all of its prolixity and just point out the specific false statements. Not omissions, all right, not --

MR. KRAJCER: Or statements that were misleading in light of omissions.

THE COURT: Or specific statements that were allegedly -- well, we can ask, were there false statements, and if there are not that you can point to, then you can tell me, oh, but there were misleading statements. And if they were misleading statements, then you have to tell me with the next breath which were the "misleading statements" and why, right?

MR. KRAJCER: Sure. Sure.

THE COURT: So on the first point, there are no false statements of material fact that you can point to.

MR. KRAJCER: That's what I was saying is that I can tell you right now these are the statements that I believe are misleading with respect to statements -- you're going to say this statement is flatly false, some of the arguments made here about commercial production, et cetera, those are ones where

OBCDSouO

they were -- the statement that we weren't doing commercial production, and I heard that, you know, your colloquy with defense counsel about that, and say there's a difference between on-spec materials -- I'm not certain what the answer is on that except to say that that statement was misleading, because it failed to disclose that there were facts that made real commercial production highly attenuated.  So whether or not that statement was literally false --

THE COURT:  No.  No.  No.  It really doesn't, frankly, help your case with me to cavel, if you will, over the simple question of were there specific material misstatements of fact, and, if so, which are they, so that I can analyze those, as opposed to, we think that there were statements, though not false, were misleading for not disclosing other things.

MR. KRAJCER:  Okay.

THE COURT:  Because that's the way I have to analyze it.  So if you choose not to answer that, it's okay, but then the opinion will say the plaintiff fails to point to any material misstatements of fact, and, rather, contends that there were failures to disclose other facts.

MR. KRAJCER:  Okay.  For the purposes of conceding that --

THE COURT:  I mean, that's the way in which, for better or for worse, cases work in 10(b)(5).

MR. KRAJCER:  Understood.  For purposes of concision,

I'd like to just focus on the statements that we're alleging are materially misleading in the light of omissions.

THE COURT:  Okay.  That can't point to material misstatements of fact, but, rather, failure to disclose facts, which made the statements materially misleading.

MR. KRAJCER:  Okay.  So I think I'd like to start with the statements made on August 8th, 2023, well positioned to accomplish remaining milestones, worked through --

THE COURT:  Which paragraph are you on?

MR. KRAJCER:  Paragraphs 79 I believe -- hold on.  We are well positioned to accomplish the remaining milestones. Ironton is running and raising production every day.

And so, by this time, DB had already left the project. That wasn't disclosed.  And I was -- I don't know if you want me to return to it yet or not, but I was going to talk about why the problems that were, you know, attributed to that storm were problems that were pre-existing, that were known, and that seriously undermined the accuracy of that statement.

THE COURT:  Go ahead.

MR. KRAJCER:  Okay.  So the first and most direct statement --

THE COURT:  Let me --

MR. KRAJCER:  I'm sorry.  Go ahead.

THE COURT:  I mean, it's a statement of fact.  We accomplish the first two bondholder milestones, and for the

first time, produced pellets at commercial scale.  You don't say that that's false.

Then it says, we are well-positioned to accomplish the remaining milestones; Ironton is running and raising production rates every day.  Again, no allegation that it's factually incorrect.

Then the defendant argues statements of optimism aren't actionable.  "We are well-positioned to accomplish the remaining milestones."  This is from the part of the complaint where it doesn't attempt to explain why the statement was materially misleading.  You only get to that in paragraph 117, with the description of why it was materially misleading.  And the defendant says, it's just not right, if you look at all of the Leidos reports, to say that there was no -- that the plant hadn't produced pellets at a commercial scale.

Go ahead.  It's also hard to fathom, if you will, how you can say that there's no specific false statement, and then say that the statements you're pointing to were "misleading."  And one of the problems that I have with the complaint is you throw out three pages, if you will, of single-spaced quotes from the disclosure statement and say, this is false and misleading for the following reason, without saying, this statement was misleading because, and say this is why that statement was misleading.  But go ahead.  It's not the first complaint that's done that.

OBCDSouO

MR. KRAJCER:  Okay.  So I apologize for directing the Court to that other paragraph, which was the sort of chronology as opposed to the false section, but with respect to paragraph 117, I'll focus on now operations were shut down after PureCycle first produced pellets in 2023, and commissioning had been challenging because ever since November of 2020 no curable project management deficiencies had existed --

THE COURT:  You're going to have to go a little slower.

MR. KRAJCER:  And at the time of the statements, DB abandoned the project leaving PureCycle scrambling to start and commission and causing significant additional delays.  So with respect to specifically the statement that said, you know, we feel really good about the milestones --

THE COURT:  Well, why isn't the statement "we feel good about the milestones" plainly the kind of optimism which is not actionable?

MR. KRAJCER:  There were known concrete conditions that undermined the substance of those statements --

THE COURT:  But why wouldn't the periodic Leidos reports on which you rely repeatedly be sufficient to put a reasonable investor on notice of what the current conditions of the facility were?

MR. KRAJCER:  None of those reports disclosed the conditions relating to DB.

THE COURT:  But so what, if they disclosed what the facts were of the production at the facility?

MR. KRAJCER:  For instance, the statements that others we're going through teething challenges --

THE COURT:  I'm sorry?

MR. KRAJCER:  The statement that we're going through teething challenges, you know, these statements were characterizing what the problems were at the -- at the facility as normal, run of the mill, this happens on all these projects, and there was known conditions that made these not teething challenges.  These were serious systemic problems relating to DB that they identified in their counterclaim that DB was causing these gigantic problems, including with the drawings, with the pipes, and that's what ended up materializing when this outage occurred.

THE COURT:  But DB had left the job by then.  The complaint or, rather, the public disclosures disclosed an arbitration with the prior contractor, and when the counterclaim became public, it disclosed the counterclaim.

MR. KRAJCER:  And, by the way, just to go back to when I was referring to that teething challenges quotation, that was on May 9.  That was not at the point in time -- this was the beginning of the class period.  So what you had leading up to the class period, there were these prior delays, prior issues that occurred prior to the class period.  PureCycle secured

this first limited waiver and extended the deadlines, so right starting immediately at the beginning of the class period --

THE COURT:  But that was disclosed as well as a thorough disclosure in the 10-K I think about what the problems were that the plant faced, including weather, among other things.

MR. KRAJCER:  There was no disclosure about the DB issue until August, so between May and August and April and August, during this initial period, beginning of the class period, where they say, we're going through certain minor problems, right, at that time, it was a disaster.  They knew it was a disaster.  There were these consistent problems across all systems that they said they would need to revalidate everything, and at the time they're saying, we're going through minor teething challenges.  That's misleading.

THE COURT:  Minor --

MR. KRAJCER:  Minor teething challenges, like a dog teething on something.  That's the term they used.  They said, this is minor, we're sorting it all out, everything's fine and hunky-dory.  And during this period, beginning of the class period, late April, and first disclosure with respect to -- in August with respect to DB, there were these known disastrous conditions going on with the progress of the project.  So for them to say at that point, we are confident that we're going to hit the remaining milestones on time and rolling through these

OBCDSouO

problems, those are materially misleading statements.  They eliminated known material conditions at that time that rendered those statements misleading.  And maybe they're opinion statements but even under *Omnicare*, your statement needs to fairly align with what the actual conditions are, and you can't -- and if you omit material information, material facts that render that statement materially misleading, that states a statement for false opinion under *Omnicare*.

THE COURT:  Go ahead.

MR. KRAJCER:  Okay.  So with respect to the facts showing a connection between what was occurring with DB and the subsequent failure to occur --

THE COURT:  It sounds like the complaint is all about the failure to disclose what the allegations in the counterclaim were against DB.

MR. KRAJCER:  I think that's a very significant part of it, yes.

THE COURT:  Okay.  If you put that aside, what's the other significant part?

MR. KRAJCER:  I mean, our allegation, and this goes into sort of this whole thing about the truth on market, this information was out there.  There is an allegation that there were these conditions that were reported in their monthly reports and posted on their website, but that they're statements that were not transmitted with the same form of

intensity as the other information.  So an ordinary investor would not be able to dig through all that -- all those materials, absorb it.

And, you know, the defendants say that truth on market defense is limited to information that's posted by third parties.  That's not correct.  If you look at *Gamino*, which is a Second Circuit lead decision on truth on the market theory that involved allegations that were made by both the defendant and a third party in separate instances, and the Court treated them the same in terms of the analysis, its highly fact specific analysis.  We don't know at this point precisely when all of these reports were posted, whether they were done precisely contemporaneously or whether they lagged for a few weeks.  That information is not part of the record, which is why it's not appropriate to decide it on a motion to dismiss.

THE COURT:  But the public filings are part of the record, and the website can be judicially noticed not for the truth but for the fact of the disclosure.

MR. KRAJCER:  At this point we don't know if they can be judicially noticed for -- the report was uploaded onto the website this day, we don't have those facts on the record.

THE COURT:  But how can you allege in your complaint that the statements that were being made by the defendant were false and misleading because pursuant to the construction monitor's report, PureCycle's progress at the time was not

commensurate with project objectives?  You're citing the report that you say can't be considered and yet --

MR. KRAJCER:  We're not saying it can't be considered. What we're saying with respect to analyzing when and how that information was transmitted to the market, those facts are missing right now.

THE COURT:  But I guess I'm -- how can the complaint rely upon the information that was being disclosed by the defendant and then say the defendant can't rely on that information as something that was being disclosed?

MR. KRAJCER:  I'm just saying, in terms of whether it was timely disclosed and when it was I disclosed, I understand what your Honor's statement is here, that these statements were out there in the public domain and, therefore, the public -- you know, the investing public knew about it.

THE COURT:  It's not only that they were out there in the public domain.  It's that the defendant was making these statements.  So it's hard to say that when the defendant was making these statements, that the other statements that the defendant was making were knowingly false and misleading.  That would be -- that certainly would challenge common sense, wouldn't it?

MR. KRAJCER:  Understood.  I understand what you're saying.  Those reports certainly didn't disclose what was going on with DB.  And so at least for that part of it, I'd like to

sort of return to that part of it.

THE COURT:  Okay.  One of you can help me.  One of the problems with respect to DB is you don't have an obligation to disclose simply because people would like you to disclose.  You don't have to talk about a topic simply because people would like you to talk about a topic.  But if you do talk about a topic, then you have to be accurate when you're talking about the topic.  So the company doesn't disclose the litigation it has with DB until finally down the road when it's filed a counterclaim and all and everything is out.  Up until that point, it's not saying anything about DB, because it's a potential lawsuit.

Why is there an obligation to dump on DB prior to the time when they make disclosure that we have this lawsuit now with DB in which we've made these various allegations against DB after DB has been -- has left the project?

MR. KRAJCER:  They didn't say anything about DB, but they said things that were misleading in light of their failure to say it.  So the defendant cites two cases I believe that stand for the general proposition that you don't have to -- you don't have to disclose -- you don't have a pre-standing duty to disclose some sort of dispute with a business partner if there's a contract negotiation unless something tangibles occurred.  But the rule, again, is you don't have to say anything about it, but if you don't say anything about it --

but if you say things that are misleading in light of that omission, then you are liable for it.

So the defendants cites this cases which say under certain circumstances the company could have a duty to disclose a breach of contract that puts an important publicly touted business relationship at great risk. So it acknowledged that. It was quoting another case there called *Hi-Crush*. It expressed and distinguished *Hi-Crush*, because the business partner in that case had actually terminated the contractual relationship. Whereas the defendant in *Express Scripts* was merely in negotiations using a dispute resolution procedure. So the Court there said, you know, here they're still mediating, arbitrating. They don't need to disclose it.

However, the issue here was not just the business relationship between PureCycle and DB or whether PureCycle could rely on DB for source of revenue, because both those cases are cases in which company A was using DB as a significant source of revenues. So the question is whether they have to disclose when having a dispute here, the question was whether or not PureCycle could rely on DB to complete the project on time and on budget. And according to what's in the counterclaim, not only did DB make the project seriously behind schedule and create life-threatening conditions, but it created a series of cascading conditions that made it highly unlikely the project would be completed on time, which is precisely what

OBCDSouO

the challenge statements are here that were misleading in light of that failure to disclose the other state case and *In Re: Bristol-Myers Squibb* case, and that case actually denied the defendant's motion to dismiss.

There the defendants were making disclosures about their attempts to saddle patent litigation with a generic drug company but failed to disclose certain legal rights, so in light of those facts, the Court held here that the plaintiff's statements were plausibly misleading, because it failed to include relevant information about the nature of the information and the terms of the settlement agreement.

So here I just wanted to briefly go through, because I hadn't sort of gotten to the most important facts -- I wanted to start out with --

THE COURT:  Go ahead.  I want to get to the most important facts.

MR. KRAJCER:  Yes.  I do.  So they say there's no direct connection between what happened later and what happened with DB.  The first and most direct evidence obviously is the short seller report, the Bleecker Street research report, which says, according to several former employees, the part that failed in August and September was a mechanical seal on a facility --

THE COURT:  Hold on.  You're going to have to go slower if you want the court reporter to take your --

OBCDSouO

MR. KRAJCER:  I apologize.  The statement was, "according to several former employees, the part that failed in August and September was a mechanical seal on the facility candle filter that has been having issues since the factory was mechanically complete in April.  Due to high pressures and temperatures present in the process train, this candle filter perpetually unable to hold pressure."

So what happened at that point in time, according to the Bleecker Street research report, which they say we can't rely on but I'll get to in a moment, according to the reported problem with the same equipment, starting in April, they knew about it, and there was a consistent problem with it being unable to hold pressure.  Okay?  So that was a known condition that existed in April that made their statements in May, in June, in August about minor teething challenges, about we're confident we can complete the milestones on time, rendered those statements highly misleading.

Now, defendants say we can't rely on the short seller report because it doesn't have sufficient particularity, it doesn't identify who the former employees were, what dates of employment were, what the title was, and subject to the same rules as confidential witnesses, you can know that the people who made these statements were in a position to know what they said.  But the cases they cite, *Long Miao v. Fanhau*, says there's two ways you can use a short seller report:  If either,

OBCDSouO

A, you provide all those supporting details about the particular witnesses that are relied on, or if there are other forms of factual corroboration that suggest that what the short sellers saying is correct.

And here there are several forms of factual corroboration that suggest that what the Bleecker Street report was saying is correct. First, you have the Olson statement during the August 8th, 2023, conference call. He says, what we did have some issues that were -- that we had to work our way through are in some of the piping around pieces of equipment. We had a little bit higher pressure drop in that system than what we expected, and we redesigned the piping and implemented it in the course of July.

So what he says here, I want to focus on the words here "piping around the pieces of equipment," he was saying we are having pressure drop offs, the same exact thing alleged by the Bleecker Report, occurring following this weather event. And it was in the piping around the equipment. And that sounds like outside battery limits, not inside battery limits. And these factories, the distinction between OSDL and ISDL is sometimes blurry. You have these giant pipes running around the ceiling, and those things are not able to hold pressure.

So maybe what happened there was an inside factory piece of equipment failed, but there was a consistent problem before and after this event that had to do with the pipes not

OBCDSouO

having pressure.

Then you look at what's alleged in the counterclaim, in PureCycle's counterclaim against DB filed in October of 2023, almost immediately after DB began its work on the facility. PureCycle discovered DB could not perform as promised, but DB also struggled with basic engineering. DB often did not have engineering drawings, such as piping and instrument diagrams, which meant that piping subcontractors perform their work without established and approved drawings to guide their work.

THE COURT: In the August 2023 10-Q, there was a fairly detailed disclosure of what the contentions were against DB.

Was there anything false or misleading about that?

MR. KRAJCER: It was certainly incomplete. We're not challenging that. That is not one of the statements alleged as a false and misleading statement that we're trying to predicate, but certainly if what the defendants are saying --

THE COURT: I'm sorry. You've cited in 123, 22 and then in 123, you've stated the foregoing statements are materially false and misleading.

MR. KRAJCER: Hold on. I may be incorrect about that.

So you're right about that. I didn't realize that that was a challenged statement. It is a challenged statement.

THE COURT: Then the question is why is it false and

misleading?

MR. KRAJCER:  Several things.  If you look at what's disclosed in that paragraph and you compare what's in paragraph 157 and paragraph 165, there are a number of different things that are specifically in there that are not, that are in the counterclaim that are not in this disclosure.  It doesn't say that, for instance, they were placing life and safety in jeopardy and everything that would need to be revalidated as a result of the deficiencies DB had caused.

So here you have this statement that says there were various deficiencies that caused damage.  They had incomplete drawings.  But it didn't say, we're going to have to redo everything.

THE COURT:  It was a publicly-filed counterclaim, wasn't it?

MR. KRAJCER:  It was.  It was filed in October.

THE COURT:  No, but you're -- we're talking about the August disclosure.

MR. KRAJCER:  Right.  I understand that.  The August disclosure was incomplete, and it was misleading in light of its incompleteness.

So returning to the point, though, you have here the statements and the counterclaim.  You have Olson's statement on August 8.  And both those are corroborative of what Bleecker Street was saying, which is that is a problem failure to

maintain pressure that was known since April.  I believe that you can credit those allegations.  Short seller reports are often relied on in this circuit, and the two cases that we cite, which were *Ho v. Duoyuan Global Water* and *Henning v. Orion Paper*, the defendants attempt to distinguish those cases by saying those cases both dealt with financial analyst reports, which do not implicate the same skepticism.  That's not accurate.  Those cases, they didn't involve financial analyst reports -- the financial analyst happened to be Muddy Waters, a well-known short seller, and in those cases, the defendant argued you couldn't rely on Muddy Waters because Muddy Waters is not reliable.

And, you know, it has a stake in this.  And so the court said -- those courts said, those are issues of credibility.  We're not going to engage in those forms of credibility weighing.  And you can rely on it -- and that was not even dealing with the sort of additional factual corroboration.  That was saying, you can take the short seller report, the plaintiffs can rely on that.

Under *Tellabs*, you have to consider the complaint holistically.  You're not allowed to ignore any facts.  The fact that this is a short seller.  The fact it may have an incentive to exaggerate or misstate things, those are things you can consider in weighing the totality of interests under the totality of circumstances.

But here you have the CEO of the company telling you, yeah, but months earlier we're having this problem we can't maintain pressure.  This sounds like this is the same problems that are occurring, the same types of problems that are occurring, that they're related to the lack of adequate piping drawings from DB, and that caused all these other problems.

This was not -- you know, this event that occurred, this act of God, this force majeure, they withdrew that as part of their agreement to the second limited waiver and said, okay, we're not going to say that anymore, take that back, withdraw our claim, this was an act of God.  All these circumstances, they support the conclusion that these were known existing problems that occurred prior to the failure that occurred in September.

THE COURT:  Okay.

MR. KRAJCER:  With respect to the truth on market, I have two main points about that.  The first is these construction reports were technical and not the type of information that would be -- that investors could read and digest and understand the details of it.  Those reports seriously undermined, so that the comparison exercise of saying, okay, here are these public statements, we're going through minor teething challenges, everything is okay, you go and read these reports which were issued some time later --

THE COURT:  It's hard to credit that argument when so

many of the statements that you rely upon as being false and misleading are allegedly false and misleading because they allegedly are not consistent with the construction manager's report --

MR. KRAJCER:  These were --

THE COURT:  -- which you then say is much too complicated for investors.

MR. KRAJCER:  There were both particular statements, like you said, about of course specific things, and that's why this goes back to what we were talking about at the very beginning, false statements and misleading statements.  So the question is whether any of these specific facts about speck material versus commercial production, are any of those specific statements false, and the question -- my answer is, those statements were materially misleading because they did not detail this entire set of circumstances, which included both the circumstances that were outlined in these monthly reports and also, more importantly, the circumstances relating to DB and the known problems that were going on with the equipment.

In light of the totality of these circumstances, these statements that were -- they weren't just puffery.  These are statements about a gigantic project that was necessary for the sake of the company, and they're saying, basically, after all these other failures had occurred for two and a half years

after this, led to the beginning of the class period limited waiver, at that point in time, the relationship with DB's completely falling apart, and they didn't disclose any of that. So that's why I think the DB stuff takes precedence over the stuff in the construction reports.

The construction reports provide additional corroborative details that provide part of that mosaic of why things are going so seriously wrong, but at the public level they say everything is going right.  But in the weeds, it wasn't.  It wasn't.

And yes, they disclosed that there were risks, and so I'm going to go to the forward-looking statements.  First, we cite the *Salix* case, which says that omissions -- omission allegations are not subject to the safe harbor.  And, you know, we cited one case there, but there are dozens of other, multiple cases within the Second Circuit that say when you're dealing with omission claims, the safe harbor simply does not apply.

Second --

THE COURT:  When you're dealing with what?

MR. KRAJCER:  When you're dealing with omission claims, *Aeropostale* says, even if the statement that is rendered misleading by an omission is forward-looking, if it's an omission claim, the safe harbor doesn't apply, period.  Full stop.

But, also, the safe harbor doesn't apply because the cautionary language here was not meaningful.  In the *Bear Stearns* case, the Court said warnings of specific risk do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.  So they describe risks relating to weather, describe maybe project delays, maybe project increases.  This is the kind of thing said in every single filing relating to major construction projects.

What they didn't say is known problems maintaining pressure, these were problems since the beginning, and that DB had screwed up all the diagrams and hadn't given diagrams to the subcontractors, and that the whole project was a disaster. Those types of omissions are not protected by the safe harbor.

THE COURT:  Let me ask you another question.  Was there any personal profit, motive for the individual defendants?

MR. KRAJCER:  No, but there was a corporate motive. And during the class period, in the middle of this class period, which they had to have these continual renegotiations with their lender, with the lender extracting more and more concessions as a condition for these limited waivers, in the middle of that they, on August 21st, they did another offering for $219 million and so now --

THE COURT:  Aren't there lots of cases that say

scienter for individual defendants, if you're going on motive and opportunity, depends on personal motive, not corporate profit motive?

MR. KRAJCER:  No, and for this, there are lots of cases that say that.  Also, there are several cases that say base motive on corporate motive.  Normally what's said is it's not described with sufficient particularity that these are the types of motives that companies have all the time to raise money, so it's not enough by itself.  But under *Tellabs* you have to look at things holistically.  A number of courts have recognized that allegations of motive combined together --

THE COURT:  Not -- in this district or the Second Circuit?

MR. KRAJCER:  Yeah.  I'm talking about *In Re: Silver Corp. Metals, Inc.* securities litigation 26 F. Supp. 3d 266, says "even weak allegations of motive, when combined with other allegations, can turn what might be a weak inference standing alone into a strong one."  And what I'm suggesting here is there's these two separate prongs of scienter and motive and opportunity, and then strong circumstantial evidence of strong reckless misconduct.  Those are not two completely separate tests.

Under *Tellabs*, you have to look at and assess holistically.  So while there may not be enough motive by itself, certainly there was an incentive to conceal these

OBCDSouO

problems.

We are primarily basing our scienter allegations on the known conditions. We're basing it on what's in the countercomplaint, what's in DB's counterclaim -- sorry, PureCycle's counterclaim against DB. That's our principal evidence of scienter, combined with the Bleecker Street report. Those are the things that show that there was knowledge, plus following all these things through progress reports. And I know we've talked back and forth about the fact they were disclosed, but certainly they knew the conditions going on in the factory.

And, by the way, they did have incentive to downplay any issues known with respect to the project, and it was a substantial financial issue. This is something prior to the class period. They had to engage in this painful waiver and all these additional conditions, but they didn't want to do it again.

THE COURT: When you were talking about financial motive, you're not saying personal financial motive --

MR. KRAJCER: No, I'm not saying personal financial motive.

THE COURT: Okay. Thank you.

MR. KRAJCER: Okay. With respect to loss causation, there are three alleged partial corrective disclosures and partial materializations of concealed risk. There was

September 13. That was the announcement of the power outage. And there was an 18 percent stock drop.

Then on November 7, they announce that operations would be shut down for two weeks, and then the stock dropped over a two-day period by 16.9 percent.

Then on December 18 --

THE COURT: No, I've read the briefs.

MR. KRAJCER: Okay. So simply, your Honor -- and I think your comments about loss causation, you understand that the principal argument here is the same as the fraud argument, and I've already addressed that.

THE COURT: It's not necessary to repeat what I've already said.

MR. KRAJCER: One point I feel I wanted to address that was in their briefs, I wanted to respond, in their reply brief -- I'm sorry. They made this in the opening brief, but I wanted to respond. They said, because the stock price went up after the Bleecker Street report, that disproves loss causation. That argument did not make sense. There is a series of partial corrective disclosures or partial materializations of concealed risk. It's not unusual after one big stock drop, that following another partial disclosure, there won't be a drop or even an increase.

Here, on December 13, the defendants note the system failure that caused a massive stock drop. Then on October 25,

OBCDSouO

PureCycle announced it had reached an agreement in principal with the Southern Ohio Port Authority concerning a second limited waiver.  So at that time --

THE COURT:  You're going to have to -- I'm amazed that the reporter can even get this down.

MR. KRAJCER:  I'm sorry.  I have a habit of talking too fast, and it's hard to reign it in sometimes.

THE COURT:  Finish up, please.

MR. KRAJCER:  So the Bleecker Street report came down on November 3rd, detailing that there was -- you know, that the power issue was -- you know, that the issue of failure was related to a pre-existing condition.  The fact that the price may have gone up at that point, that doesn't do anything to negate loss causation.

And, finally, and I'll note this as a technicality, I believe that the defendants, they -- in their motion to dismiss, they cited to Exhibit X for the prices, you know, for the price charts to show that there was a price increase, but I believe that they attached prices of PureCycle during 2021, so it wasn't even the correct stock prices during this period.

So I know it's probably just a clerical error and they may try to correct that, but putting that aside, this issue that there was a partial bounce back on a later date after the market had been reassured by a second limited waiver, that -- and the causes of what that bounce back were are factual

OBCDSouO

questions for a different day and not issues that should be decided on a motion to dismiss.

And then, finally --

THE COURT:  All right.  Thank you.

What were you going to say, finally?

MR. KRAJCER:  I was just going to say, finally, with respect to leave to amend, I just want to say that, generally, it's improper to deny an amendment without first giving the plaintiff the benefit of a judicial opinion.

THE COURT:  Trust me, I'm familiar with the Second Circuit law and amended complaints.

You have two minutes.

MS. JACOBSEN:  I'll be brief.

To start, there's no duty to disclose information mid-quarter.  The issues that arose with respect to DB in June and July of 2023 were disclosed at the next quarterly disclosure in August.  It also -- that disclosure disclosed the arbitration that was occurring during that quarter.  The litigation with DB was disclosed in November of 2023 in the 10-Q.  Nothing more was required.

The company did disclose delays.  They disclosed cost increases, et cetera, throughout.  And there's no allegation that those were false or misleading.

I would also note that I misspoke earlier.  The difference in milestones you had asked me about, it can be

OBCDSouO

found between the reports and the actual milestones.  The internal schedule can be found at Exhibit Q at eight, compared to Exhibit C at nine.

With respect to the short seller reports and the confidential witnesses, I would draw the Court's attention to Draftings, as well as *Long Miao*, which specifically holds that anonymous witnesses in a short seller report must be pled with the sufficient particularity, and there are no other factual -- facts to corroborate.

And then, finally, with respect to the argument that the forward-looking misstatements are not actionable because they contained omissions, the difference here is plaintiff has not alleged an actionable omission.  What you've got is forward-looking statements that are accompanied by cautionary language, that -- and there's no facts to suggest actual knowledge, which is required in this scenario.

THE COURT:  Okay.

MS. JACOBSEN:  Thank you.

THE COURT:  I'll take the motion under advisement. Thank you all.

(Adjourned)