**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**JAMES SMITH,**

                    **Plaintiff,**    23-cv-8605 (JGK)

      **- against -**    MEMORANDUM OPINION AND
ORDER

**PURECYCLE TECHNOLOGIES, INC., ET**
**AL.,**

                  **Defendants.**
————————————————————————

**JOHN G. KOELTL, District Judge:**

This case is a securities action brought on behalf of a putative class of investors who purchased or acquired common stock of PureCycle Technologies, Inc. ("PCT"), a plastics recycling company, between April 25, 2023 and December 18, 2023, inclusive (the "Class Period"). Also named as defendants are Dustin Olson, PureCycle's Chief Executive Officer, and Lawrence Somma, PureCycle's Chief Financial Officer from November 2021 until December 1, 2023 (collectively, the "individual defendants") (together with PCT, the "defendants").

The plaintiff, James Smith, alleges that the defendants deceived the investing public and caused members of the class to purchase PCT's securities at artificially inflated prices in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. The plaintiff also alleges

1

control person liability under section 20(a) of the Exchange Act, 15 U.S.C. 78t(a), against the individual defendants.

The main thrust of the plaintiff's complaint is that the defendants' public disclosures during the Class Period failed to explain adequately the problems that PCT encountered in the construction of a new facility implementing a novel recycling technology at scale for the first time. The plaintiff accuses the defendants of being too optimistic in their public descriptions of the construction project. These accusations primarily rely on delays and alleged defects caused by the project's civil and structural contractor.

The defendants now move to dismiss the First Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, explained in greater detail below, the motion to dismiss for failure to state a claim is **granted** and the complaint is **dismissed without prejudice.** PCT disclosed the risks concerning the construction of a new facility, published progress reports prepared by the construction monitor, and promptly disclosed major construction setbacks. Wholly independently of the failure to allege a material misstatement or omission, the plaintiff concedes that the individual defendants had no personal pecuniary motive to inflate the value of PCT stock. And the plaintiff has failed to allege any strong circumstantial evidence of conscious

misbehavior or recklessness. Additionally, the FAC fails to plead loss causation plausibly.

## I.

Unless otherwise noted, the following facts are taken from the First Amended Class Action Complaint ("FAC"), ECF No. 35, and are accepted as true for purposes of the current motion.

### A.

PCT is a Delaware company founded in 2015 and headquartered in Orlando, Florida. FAC ¶ 35. PCT's mission is to commercialize a process developed by The Proctor & Gamble Company for recycling polypropylene, a commonly used plastic. Id. ¶ 41. PCT's two-step recycling process pre-processes polypropylene waste, or "feed," then purifies the feed using solvents, temperature, and pressure. Id. ¶ 47. This proprietary process transforms the feed into ultra-pure recycled polypropylene ("UPR") pellets that can be manufactured into new products. Id.

Dustin Olson joined PCT on August 5, 2022 and continues to serve as the company's CEO. Id. ¶ 36. Lawrence Somma served as PCT's CFO from November 2021 until his resignation on December 1, 2023. Id. ¶ 37.

### B.

In 2020, PCT planned to expand its operations by constructing its first full-scale commercial facility in Ironton, Ohio (the "Ironton Facility"). Id. ¶ 49. On October 1,

2020, PCT entered into a loan agreement with the Southern Ohio Port Authority ("SOPA"), pursuant to which SOPA issued revenue bonds and loaned the proceeds, totaling approximately $250 million, to PCT for use in acquiring, constructing, and equipping the Ironton Facility (the "SOPA Loan Agreement"). Id. ¶ 50. The SOPA Loan Agreement required PCT to complete the Ironton Facility by December 1, 2022. Id. ¶ 51. The agreement also required PCT to maintain at least $100 million in cash on its balance sheet. Id. ¶ 183.

On October 7, 2020, PCT hired Denham-Blythe Company, Inc. ("DB") to construct the Ironton Facility. Id. ¶ 52. DB was responsible for all civil and structural construction. Id. Different companies assumed responsibility for equipment supply and top-level project coordination. Jacobson Decl., Ex A at 12, ECF No. 39. DB began site clearing and demolition in November 2020. FAC ¶ 52.

The plaintiff claims that DB's mismanagement caused numerous delays to the construction schedule. See generally id. On November 9, 2022, PCT disclosed in its November 2022 Form 10-Q that it had exceeded its original construction budget for the Ironton Facility and then continually updated investors thereafter. Jacobson Decl., Ex. R at 12, 34, 39 (11/9/22 Form 10-Q); Ex. G at 33 (Q1 2023 Form 10-Q); PureCycle Technologies,

Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2023) (the "Q2 2023 Form 10-Q"), at 11, 13-16, 38, 45-46.

Until January 31, 2023, PCT approved every change-order request submitted by DB. Id. ¶ 158. On January 31, 2023, DB submitted another change-order request, seeking an additional $1.2 million and a further extension of the project schedule. Id. ¶¶ 61, 160. PCT denied this change-order request in late February 2023. Id. ¶ 61. Then, in March 2023, PCT and DB became embroiled in increasingly hostile negotiations concerning delays and cost overruns. Id.

On March 15, 2023, PCT disclosed in a SEC Form 8-K that it had failed to complete construction of the Ironton Facility by December 1, 2022. Id. ¶ 55. This constituted a default under the SOPA Loan Agreement. Id. To remedy the default, PCT and SOPA agreed to a limited waiver whereby SOPA waived the default ("Amendment I"). Id. In exchange, PCT deposited approximately $87.3 million with the trustee and promised to close by March 31, 2023 a financing transaction that would provide at least $150 million for the project. Id. ¶¶ 55, 183. To secure that sum, PCT entered into a credit agreement maturing June 30, 2024, under which outstanding amounts bore interest at substantial and increasing rates. Id. ¶ 183.

Amendment I also required PCT to meet new milestones at the Ironton Facility. Id. ¶ 56. These milestones included:

> (i)    complete mechanical construction by June 30, 2023, certified by Leidos Engineering, LLC, the construction monitor ("Leidos") (the "June Milestone");
>
> (ii)    achieve 50% operating capacity by September 30, 2023 (the "September Milestone"); and
>
> (iii)    full acquisition, construction and equipping of the Ironton Facility by December 31, 2023 (the "December Milestone")

(collectively, the "Bondholder Milestones"). Id.

On March 16, 2023, PCT filed its Form 10-K annual report with the SEC pursuant to sections 13 and 15(d) of the Exchange Act (the "2022 Form 10-K"). Jacobson Decl., Ex. D. In the Form 10-K, PCT informed investors that construction "will not be completed in the originally-expected timeframe and may not be completed in a cost effective manner." Id. at 16. PCT also warned that if "unexpected construction problems," "severe weather," and "[f]urther significant unexpected delays in construction" occurred, those events "could severely impact PCT's business . . . and impact PCT's ability to comply with . . . the [SOPA] Loan Agreement." Id. The 2022 Form 10-K issued numerous other warnings about the risks of investing in PCT, including that "PCT is a pre-revenue early commercial stage company, and may never achieve or sustain profitability," and that "PCT may be unable to obtain additional financing to fund

the operations and growth of the business." Id. at 14–26 (detailing these and various other "Risk Factors").

By April 25, 2023, the start of the Class Period, PCT had submitted to Leidos the certification for mechanical completion. Id. ¶ 62. Leidos issued the certificate on May 1, 2023. Id. ¶ 65. But even as civil and structural construction neared completion, issues with DB allegedly persisted. On April 11, 2023, DB issued a notice of payment default to PCT. Id. ¶ 61. By April 25, 2023, DB had threatened to walk off the job and DB and PCT had scheduled a mediation as required by their contract. Id. ¶ 61. DB and PCT then attended mediation on May 3, 2023, and again on May 12, 2023, but failed to settle their dispute. Id. ¶¶ 66, 72, 162. On May 17, 2023, DB issued a renewed payment default notice to PCT, which PCT refused to cure. Id. ¶ 72. On June 6, 2023, PCT notified DB that it was withholding all amounts potentially due under the contract. Id. ¶ 162.

On June 16, 2023, DB filed a demand for binding arbitration against PCT seeking over $17 million. Id. ¶ 164. By June 20, 2023, DB had abandoned the Ironton Facility project. Id. ¶¶ 75, 162, 165. On June 20, 2023, PCT discovered, among other issues, that a critical valve in a butane system at the Ironton Facility had been installed incorrectly. Id. ¶ 76. On June 21, 2023, DB filed a mechanic's lien in Ohio. Id. ¶ 164.

On August 30, 2023, DB filed a breach-of-contract lawsuit against PCT in Ohio state court. Id. ¶ 169. On October 19, 2023, in the Ohio state-court action, PCT filed a counterclaim against DB. Id. ¶ 157. PCT's counterclaim alleged, among other things, that "[a]lmost immediately after [DB] began its work," PCT "discovered that [DB] could not perform as promised," and that DB "also struggled with basic engineering." Id.

Ultimately, although PCT and DB's contract set the guaranteed maximum price for DB's work at $62,722,583, out of scope items and delays at the Ironton Facility swelled the total cost of DB's work to approximately $185 million. Id. ¶ 168. After DB left, PCT hired two third-party contractors to complete civil and structural construction at the Ironton Facility. See id. ¶ 165.

On August 7, 2023, a full power outage shut down operations at the Ironton Facility for about a day (the "8/7/23 Power Outage"). Id. ¶ 78. The power outage also damaged a seal system. Id. But operations quickly resumed. Id. ¶¶ 78, 85.

On August 21, 2023, PCT announced a senior notes offering. Id. ¶¶ 83, 185. The private offering took place on August 24, 2023 and provided PCT with $219.25 million in net cash proceeds (the "8/24/23 Notes Offering"). Id. ¶¶ 84, 184.

On September 3, 2023, the damaged seal system failed (the "9/3/23 Seal Failure") and the Ironton Facility shut down. Id. ¶

85. On September 7, 2023, PCT concluded that the 8/7/23 Power Outage caused the 9/3/23 Seal Failure. Id. On September 11, 2023, PCT initiated restart procedures. Id. However, the 9/3/23 Seal Failure effectively shut down operations at the Ironton Facility for the entire month of September 2023. Id. ¶ 89.

On September 13, 2023, PCT filed a Form 8-K with the SEC. Jacobson Decl., Ex. J (the "9/13/23 Form 8-K"). The 9/13/23 Form 8-K disclosed the 8/7/23 Power Outage, explaining that "a severe weather impact to a third party power supplier" had caused the incident. FAC ¶ 124. PCT also disclosed that the 9/3/23 Seal Failure occurred. Id. Connecting the two events, PCT explained that on September 7, 2023, PCT had concluded that the 8/7/23 Power Outage caused the 9/3/23 Seal Failure. Id. The 9/13/23 Form 8-K also warned that PCT had "provided a Notice of Force Majeure" to SOPA and shared that PCT "intends to engage with the Trustee regarding required adjustments to the September Milestone." Jacobson Decl., Ex. J at 2. The following day, on September 14, 2023, PCT's "share price dropped by $1.39 per share, or 18.4%, from $7.17 per share to close at $6.18 per share . . . on unusually heavy trading volume." FAC ¶ 150.

PCT was unable to meet the September Milestone. See id. ¶¶ 89, 91. In October 2023, PCT agreed in principle with SOPA to a second limited waiver of a default under the SOPA Loan Agreement ("Amendment II"). Id. ¶ 91. Amendment II extended PCT's

Bondholder Milestones, including the past due September
Milestone, by three months. Id. ¶ 98. In exchange, Amendment II
required PCT to post an additional $50 million in collateral
with the trustee. Id. ¶¶ 98, 183. On October 25, 2023, PCT filed
a Form 8-K with the SEC, disclosing that PCT had failed to meet
the September Milestone but had agreed in principle with SOPA to
Amendment II. Id. ¶¶ 91, 128.

On November 7 and 8, 2023, PCT announced its Q3 2023
results, disclosed that PCT expected to execute Amendment II
"this week," and disclosed that the Ironton Facility would shut
down from November 8 to November 22 to complete the 9/3/23 Seal
Failure repair and to fix other mechanical issues. Id. ¶¶ 92-95,
97, 130, 132, 134, 136, 137, 139, 141. On November 8, 2023,
PCT's "share price dropped by $0.64, or 14.7%, from $4.36 per
share to close at $3.72 per share . . . on heavy trading
volume." Id. ¶¶ 99, 153. On November 9, 2023, PCT filed a Form
10-Q with the SEC, disclosing that PCT had executed Amendment II
with SOPA. Id. ¶ 98. On November 9, 2023, PCT's share price
dropped another "$0.63 per share, or 16.9%, to close at $3.09
per share . . . on heavy trading volume." FAC ¶¶ 99, 153.

On December 1, 2023, Somma resigned from PCT. Id. ¶ 100.
The same day, PCT disclosed that it had laid off approximately
12% of its workforce. Id. Then, during the week of December 11,
2023, the Ironton Facility shut down again due "a leaking block

10

valve and a[nother] mechanical seal failure" (the "12/11/23 Mechanical Failures"). Id. ¶ 101.

On December 18, 2023, PCT disclosed that due to "a couple of mechanical problems [which] arose last week," PCT would "not meet the [December Milestone]." Id. ¶ 145. That day, PCT's share price dropped "by $2.16, or 43.5%, from $4.96 per share to close at $2.80 per share on December 18, 2023, on unusually heavy trading volume." Id. ¶ 154.

PCT ultimately failed to meet the remaining Bondholder Milestones. Id. ¶ 103. Instead, the defendants negotiated a new agreement with SOPA, effective February 2024, that extinguished the defendants' obligations under the SOPA Loan Agreement. Id. In exchange, PCT purchased approximately 99% of the $250 million in revenue bonds that SOPA had issued. Id. As of April 2024, PCT had not demonstrated 50% production capacity at the Ironshore Facility, much less nameplate capacity. Id. ¶ 104.

## C.

The plaintiff alleges that during the Class Period, the defendants fraudulently deceived "the purchasers of [PCT's] securities in an effort to maintain artificially high market prices for [PCT's stock]." Id. ¶ 211. Specifically, the plaintiff accuses the defendants of issuing overly optimistic statements about construction and operational progress at the Ironton Facility despite knowing that DB had caused various

mechanical failures and delays. <u>See</u> <u>id.</u> ¶¶ 107, 112, 114, 119, 121, 123, 125, 127, 129, 131, 133, 135, 138, 140, 142, 144, 146. The FAC incorporates various statements made by the defendants during the Class Period.

**D.**

On April 5, 2024, the plaintiff filed the FAC, asserting federal causes of action under sections 10(b) and 20(a) of the Exchange Act. <u>See</u> FAC. On May 6, 2024, the defendants filed the present motion to dismiss. ECF No. 37. On November 12, 2024, the Court heard oral argument. Transcript ("Tr."), ECF No. 51.

**II.**

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007).[1] The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." <u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the plaintiff's complaint must contain "enough facts to state a claim to relief that is

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.
544, 570 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678
(2009). While the Court should construe the factual allegations
in the light most favorable to the plaintiff, "the tenet that a
court must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." <u>Id.</u>

A claim under section 10(b) of the Exchange Act sounds in
fraud and must meet the pleading requirements of Federal Rule of
Civil Procedure 9(b) and of the Private Securities Litigation
Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires
that the complaint "(1) specify the statements that the
plaintiff contends were fraudulent, (2) identify the speaker,
(3) state where and when the statements were made, and (4)
explain why the statements were fraudulent." <u>ATSI Commc'ns, Inc.
v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA
similarly requires that the complaint "specify each statement
alleged to have been misleading [and] the reason or reasons why
the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA
adds, "if an allegation regarding the statement or omission is
made on information and belief, the complaint shall state with
particularity all facts on which that belief is formed." <u>Id.</u>

When presented with a motion to dismiss a complaint, the Court may consider documents attached to or referenced in the complaint, documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which judicial notice may be taken. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). The Court can take judicial notice of public disclosures that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991).

### III.

The FAC alleges that all three defendants violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The FAC also alleges that the individual defendants violated section 20(b) of the Exchange Act.

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 implements section 10(b) by making it "unlawful for any person" to:

> (a) employ any device, scheme, or artifice to defraud,

14

> (b) make any untrue statement of a material
> fact or to omit to state a material fact
> necessary in order to make the statements
> made, in the light of the circumstances under
> which they were made, not misleading, or
>
> (c) engage in any act, practice, or course of
> business which operates or would operate as a
> fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To pursue any claim under section 10(b) of the Exchange
Act, a plaintiff must plead an actionable, material misstatement
or omission. See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers
Squibb Co., 28 F.4th 343, 351-52 (2d Cir. 2022) ("APERS");
Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir.
2007). To state a claim under Rule 10b-5, the plaintiff must
allege that, in connection with the purchase or sale of a
security, the defendants made a materially false statement or
omitted a material fact, with scienter, and that the plaintiff's
reliance on the defendants' action caused injury to the
plaintiff. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d
Cir. 2000); see also Lau v. Opera Ltd., 527 F. Supp. 3d 537, 556
(S.D.N.Y. 2021).

Section 20(a) of the Exchange Act imposes liability on
individuals or entities that "control[] any person liable" under
section 10(b). 15 U.S.C. § 78t(a); see S.E.C. v. First Jersey
Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). A primary

violation of the Exchange Act is a prerequisite to control-person liability under section 20(a). See First Jersey, 101 F.3d at 1472.

## IV.

The defendants argue the following in support of their present motion to dismiss: first, that the FAC fails to allege any actionable statements or omissions under section 10(b); second, that the FAC does not adequately plead scienter, an essential element of a section 10(b) claim; and third, that the FAC fails to allege loss causation plausibly. Additionally, the defendants contend that the claims for control person liability must be dismissed for lack of a primary violation of the securities laws. Each argument is addressed in turn.

## A.

In attempting to allege misrepresentations, the FAC references the defendants' various public disclosures during the Class Period, often reproducing several pages of dense text. The FAC then lists numerous alleged deficiencies without specifically identifying the allegedly false or misleading statements. Instead, the FAC lists a litany of generalized complaints.

Despite the plaintiff's obfuscation, the FAC fails to allege any misstatement of a material fact. Indeed, at oral argument, when pressed to identify "specific material

16

misstatements of fact," the plaintiff's counsel could not
identify any such statement. Tr. 18-19. Rather, the plaintiff
claims that PCT's disclosures were misleading because they
failed to disclose the severity of the construction shortfalls
at the Ironton Facility, and in particular DB's defective work.
However, the statements challenged as misleading are not
actionable because they are protected under the PSLRA's safe-
harbor provision or because they were nonactionable statements
of opinion, puffery, or corporate optimism.[2]

**1.**

The PSLRA amended the Exchange Act in 1995, Pub.L. No. 104-
67, 109 Stat. 737 (Dec. 22, 1995), and "established a statutory
safe-harbor for forward-looking statements," Slayton v. Am. Exp.
Co., 604 F.3d 758, 765 (2d Cir. 2010). With certain limited
exceptions, where a "private action . . . is based on an untrue
statement of a material fact or omission of a material fact
necessary to make the statement not misleading," a defendant
"shall not be liable with respect to any forward-looking
statement . . ." if and to the extent that:

> (A) the forward-looking statement is—
>
>> (i) identified as a forward-looking statement,
>> and is accompanied by meaningful cautionary
>> statements identifying important factors that
>> could cause actual results to differ materially
>> from those in the forward-looking statement; or

---

[2] The alleged omissions are addressed below at IV.B.

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i)  if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1). "The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton, 604 F.3d at 766. Forward-looking statements include "a statement containing projection of revenues, income . . . , capital expenditures, . . . or other financial items," § 78u-5(i)(1)(A), and statements "of the plans and objectives of management of future operations, including plans or objectives relating to the products or services of the issuer," § 78u-5(i)(1)(B). "[T]he facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking." Slayton, 604 F.3d at 769.

18

Oral statements are deemed to satisfy the requirements set forth in § 78u-5(c)(1)(A) where the statement:

(A) . . . is accompanied by a cautionary statement—

    (i) that the particular oral statement is a forward-looking statement; and

    (ii) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if—

    (i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

    (ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

    (iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

§ 78u-5(c)(2).

The parties dispute whether the PSLRA's safe-harbor provision covers the statements challenged as misleading by the FAC. PCT's Mem. of Law ("Mem.") 13-17, ECF No. 38; Plaintiff's Opp. ("Opp.") 18-22, ECF No. 41; PCT's Reply ("Rep.") 6-8, ECF No. 42. In particular, the plaintiff argues that the challenged statements were not accompanied by meaningful cautionary

language and that some statements addressed present or past facts. Opp. 18-22.

The PSLRA's safe-harbor provision applies to the statements about projected financial items, § 78u-5(i)(1)(A), and plans or objectives for the Ironton Facility, § 78u-5(i)(1)(B), reproduced in the FAC. See generally FAC. As required by § 78u-5(c)(2)(B), the forward-looking statements in each of the challenged statements were identified as forward-looking statements "and accompanied by meaningful cautionary language." See Jacobson Decl., Exs. E-H, J, L-P, R, S; Jacobson Decl. II, Exs. Y, Z, ECF No. 43.

Cautionary language is meaningful when it identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "Boilerplate warnings will not suffice, nor will words of caution about future risk if in fact the risk has already transpired." In re WEBMD Health Corp. Sec. Litig., No. 11-cv-5382, 2013 WL 64511, at *8 (S.D.N.Y. Jan. 2, 2013). The ultimate question is whether "a reasonable investor could have been misled into thinking that the risk that materialized and resulted in [the alleged] loss did not actually exist." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002).

In this case, PCT's relevant SEC filings before and during the Class Period warned that forward-looking statements "involve a number of risks, uncertainties, or other assumptions that may cause actual results or performance to be materially different from those expressed or implied." See, e.g., Jacobson Decl., Ex. S at 3.[3] PCT then listed risk factors specific to PCT's business, such as: "PCT's ability to scale and build its first commercial-scale recycling facility"—the Ironshore Facility—"in a timely and cost-effective manner;" "PCT's future capital requirements and sources and uses of cash;" "PCT's ability to obtain funding for its operations and future growth;" and "operational risk." See, e.g., id. at 3-4.

Moreover, investors received detailed advance warnings about the risks inherent in PCT's business. The 2022 Form 10-K, filed in March 2023, warned of the potential risks that later materialized during the Class Period, including: unexpected construction problems, severe weather, and further unexpected construction delays. Jacobson Decl., Ex. D at 10-15. Subsequent filings referred investors to the risk factors detailed in the 2022 Form 10-K. Id. Ex. E at 5-6; Ex. H at 5-6; Ex. N at 16-19; Ex. O at 5-9; Ex. P at 4-7; Q2 2023 Form 10-Q at 10. Such

---

[3] The FAC also challenges as misleading certain oral statements, such as statements made during earnings calls. See, e.g., FAC ¶¶ 95-97. The challenged oral statements met the requirements set forth in § 78u-5(c)(2) and therefore qualified as forward-looking statements. See, e.g., Jacobson Decl., Ex. M at 4.

references back to the 2022 Form 10-K constituted meaningful
cautionary language pursuant to 15 U.S.C. § 78u-5(c)(1)(A)(i).
In re Dynagas LNG Partners LP Sec. Litig., 504 F. Supp. 3d 289,
319 (S.D.N.Y. 2020) (noting that courts in the Second Circuit
"routinely find that references to SEC filings that expound more
fully on the risks suffice to adequately convey the risks").

Considering the warnings in PCT's SEC filings, in
conjunction with the defendants' otherwise forthcoming factual
disclosures, a reasonable investor could not have been misled
into thinking that the risks that materialized during the Class
Period did not actually exist. Therefore, the defendants'
warnings and factual disclosures were sufficient to put
investors on notice that "actual results [might] differ
materially from those in the forward-looking statement[s]." 15
U.S.C. § 78u-5(c)(1)(A)(i).

The plaintiff argues that the defendants' warnings of
hypothetical risks were insufficient, complaining that the risks
had already materialized when the warnings were made. But on a
monthly basis from November 2020 until Leidos certified civil
and structural construction as mechanically complete in May
2023, PCT publicly posted on its website the progress reports
submitted by the construction monitor, Leidos (the

"construction-manager reports").[4] Each construction-manager report stated that "progress made through the Relevant Period was not commensurate with the Project objectives." FAC ¶ 177-78. The publicly viewable reports also reported on approved and pending change orders submitted by DB. Plainly, the reports disclosed to investors and the public each month until the Ironton Facility achieved mechanical completion that construction was behind schedule and over budget. PCT's failure to repeat publicly information that it was otherwise disclosing was not misleading. Moreover, the specific plant problems about which the plaintiff complains—the 8/7/23 Power Outage, the 9/3/23 Seal Failure, and the 12/11/23 Mechanical Failures—were disclosed promptly after they occurred. PCT's disclosures thus "moot[] one of [the] [p]laintiff's main complaints"—that PCT failed to disclose that the Ironton Facility was behind schedule

---

[4] The construction-manager reports are posted and available to view at https://ir.purecycle.com/sec-filings-reports/independent-construction-monitoring-reports. The Court takes judicial notice of the construction-manager reports as "information publicly announced on a party's website" because "the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (quoting Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173, 179 n. 8 (S.D.N.Y. 2006)). Although the plaintiff argues that it is unknown whether PCT contemporaneously posted the construction-manager reports to its website, he "do[es] not challenge the authenticity of these documents." See Hesse v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020). Indeed, the plaintiff relies on the construction-manager reports. See, e.g., FAC ¶¶ 177-78. Therefore, the PCT website and the construction-manager reports are suitable to be judicially noticed, although "their purposes at the motion-to-dismiss stage are limited. They may be used only for 'determining what the documents state,' and [PCT] cannot rely on them to 'prove the truth of their contents.'" Hesse, 463 F. Supp. 3d at 463 (quoting Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)).

and over budget, meaning that PCT might fail to comply with the
Bondholder Milestones. Cf. Shemian v. Rsch. In Motion Ltd., No.
11-cv-4068, 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013).

In short, PCT's cautionary language conveyed "substantive
information about factors that realistically could cause results
to differ materially from those projected in the forward-looking
statements." Slayton, 604 F.3d at 766. That those risks later
materialized did not constitute fraud. The PSLRA's safe-harbor
provision therefore protected the defendants' forward-looking
statements from liability.[5]

**2.**

The parties also dispute whether certain statements were
statements of opinion, puffery, or corporate optimism. Mem. 18–
19; Opp. 22–24; Rep. 8–9. Statements of opinion are actionable
only when based on untrue facts or are not honestly believed.
See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.
Pension Fund, 575 U.S. 175, 182–86 (2015). Statements are
nonactionable as general puffery when they are "too general to
cause a reasonable investor to rely upon them" or are "merely
generalizations regarding [a company]'s business practices."

---

[5] The plaintiff also fails to allege plausibly that any of the defendants
actually knew that any of the challenged statements were false. See id. at
773. Thus, PCT's forward-looking statements were also insulated from
liability pursuant to 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II) for substantially
the same reasons that the FAC fails to allege plausibly the defendants'
scienter. Scienter is addressed below.

ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase
Co., 553 F.3d 187, 206 (2d Cir. 2009).

The plaintiff complains that the defendants' public
representations were too optimistic. But many of the challenged
statements are nonactionable as statements of opinion or
corporate puffery. See generally FAC. For example, statements
like, "We now know how to operate this plant," id. ¶ 81, and,
"We got off to a nice start following the outage," id. ¶ 145,
are statements of opinion. See APERS, 28 F.4th at 355. Such
statements of subjective opinion are nonactionable because they
do not "contain[] one or more embedded factual statements that
can be proven false." See Abramson v. Newlink Genetics Corp.,
965 F.3d 165, 175 (2d Cir. 2020). And statements like, "[W]e
feel very confident in our ability to hit very high rates across
the plant above the 50% mark," FAC ¶ 136, are nonactionable
general puffery. ECA, Loc. 134, 553 F.3d at 206.

The defendants' statements containing opinion and puffery
may have turned out to be overly optimistic, but "[i]t is not
sufficient to allege" that someone else could have reached a
different opinion or that the "defendant[s'] opinion was
unreasonable." Podany v. Robertson Stephens, Inc., 318 F. Supp.
2d 146, 154 (S.D.N.Y. 2004). A "Monday morning quarterback" like
the plaintiff may not bring securities fraud actions that
second-guess "inherently subjective and uncertain assessments"

25

about the future success of the issuer's operations. <u>See</u>
<u>Omnicare</u>, 575 U.S. at 186; <u>Podany</u>, 318 F. Supp. 2d at 154
(noting that such "second-guesses [are] made all too easy with
the benefit of hindsight"). "Up to a point," corporate officers
"are not required to take a gloomy, fearful or defeatist view of
the future." <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004).
Nothing in the FAC plausibly alleges that the defendants in this
case crossed that line when they expressed puffery and corporate
optimism. Accordingly, the FAC fails to identify any actionable
misstatements.

### B.

    The plaintiff also alleges that the defendants omitted
material information from their statements during the Class
Period in violation of the securities laws. <u>See generally</u> FAC.
The plaintiff argues that because the defendants' disclosures
addressed construction, operations, delays, and costs at the
Ironton Facility, the defendants triggered a duty to speak
truthfully and to make additional disclosures required to avoid
making the challenged statements misleading. Opp. 9-15. These
purported omissions concern the alleged: (1) delays and "cost
overruns" at the Ironton Facility; (2) "fallout from PureCycle's
dispute with DB;" and (3) "deficiencies in DB's work." <u>Id.</u> at
10-11. Arguing for dismissal, the defendants argue that no

material facts were omitted from the public statements
challenged as misleading by the plaintiff. Mem. 13–15; Rep. 2–6.

Section 10(b) "do[es] not create an affirmative duty to
disclose any and all material information." Matrixx Initiatives,
Inc. v. Siracusano, 563 U.S. 27, 44 (2011). "Just because a
reasonable investor would very much like to know a fact does not
create any obligation to speak up." APERS, 28 F.4th at 353. An
omission is actionable under the federal securities laws "only
when the [defendant] is subject to a duty to disclose the
omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259,
267 (2d Cir. 1993). While parties generally have no independent
duty to disclose all material nonpublic information, once a
party "choos[es] to speak," it has a "duty to be both accurate
and complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d
Cir. 2002). Rule 10b-5 "therefore covers half-truths, not pure
omissions." Macquarie Infrast. Corp. v. Moab Partners, L.P., 601
U.S. 257, 264 (2024). Thus, "an entirely truthful statement may
provide a basis for liability if material omissions related to
the content of the statement make it . . . materially
misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F.
Supp. 2d 148, 160 (S.D.N.Y. 2008); see also City of Roseville
Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395,
410 (S.D.N.Y. 2011). An omitted fact is material where "there is
'a substantial likelihood that the disclosure of the omitted

27

fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" In re Time Warner, 9 F.3d at 267-68 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

**1.**

Concerning delays and cost overruns, the defendants argue that there was no omission of a material fact because the construction-manager reports were published on PCT's website. Mem. 13-14; Rep. 5-6. In response, misconstruing the defendants' argument as invoking the truth-on-the-market defense, the plaintiff contends that the construction-manager reports must have been published with at least as prominent disclosure as the alleged misstatements. Opp. 13-15.

The defendants are correct. In this case, publication of the construction-manager reports alerted the reasonable investor to the risks that later materialized during the Class Period. The construction-manager reports were made publicly available on PCT's website. Thus, additional disclosures about delays and cost overruns at the Ironton Facility, including earlier disclosures concerning PCT's contractual dispute with DB, would not "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., 426 U.S. at 449).

28

The two truth-on-the-market cases that the plaintiff relies on are inapposite. In N.J. Carpenters Health Fund v. Royal Bank of Scotland Group, the defendants omitted from their public disclosures information that was disclosed in "sporadic news reports, which d[id] not alone clarify or contextualize the alleged misstatements." 709 F.3d 109, 127 (2d Cir. 2013). Unlike the defendants in N.J. Carpenters, however, the defendants in this case themselves disclosed the allegedly omitted information. In Ganino, the plaintiffs' allegations, taken as true, added up to an unequivocal misrepresentation that "satisfied [the plaintiffs'] burden of pleading a material misrepresentation." 228 F.3d at 168. But unlike the plaintiffs in Ganino, the plaintiff in this case has failed to identify any statements that were false when made.

## 2.

Regarding the "fallout from PureCycle's dispute with DB," Opp. 10, there is no general duty to disclose ongoing negotiations while the confidential alternative-dispute-resolution procedure required by the parties' contract is in progress. Cf. In re Express Scripts Holding Co. Sec. Litig., No. 16-cv-3338, 2017 WL 3278930, at *12-13 (S.D.N.Y. Aug. 1, 2017) (finding that proceeding through the "agreed-upon" ADR procedure did not "trigger[] a duty to disclose"). In this case, having warned investors about the possibility of construction delays

29

and budget overruns in its prior filings, PCT did not have a
duty to disclose immediately its dispute with DB when it arose
during Q2 2023. And in PCT's next quarterly report, the Q2 2023
Form 10-Q filed on August 8, 2023, PCT timely disclosed its
dispute with DB. Q2 2023 Form 10-Q, at 33-34 (describing the
unsuccessful mediation efforts and DB's binding arbitration
demand).

### 3.

Concerning the alleged deficiencies in DB's work, the
plaintiff has failed to identify any material omissions. Before
and during the Class Period, including in the 2022 Form 10-K,
the defendants warned investors about the risk of operational
setbacks and missing Bondholder Milestones (among other risks).
When those risks materialized, PCT told investors about those
events with reasonable punctuality. See Slayton, 604 F.3d at 777
("Managers . . . are entitled to investigate for a reasonable
time, until they have a full story to reveal.").

The plaintiff highlights the 8/7/23 Power Outage and the
9/3/23 Seal Failure, arguing that the defendants concealed facts
from investors regarding PCT's ability to meet the September
Milestone. But on September 13, 2023, ten days after the 9/3/23
Seal Failure, PCT disclosed that the 8/7/23 Power Outage and the
9/3/23 Seal Failure had occurred. FAC ¶ 124. Similarly, at the
latest on October 25, 2023, PCT disclosed its failure to meet

the September Milestone and agreement in principle to Amendment
II. Id. ¶¶ 91, 128. Then, on November 9, 2023, PCT disclosed
that PCT had executed Amendment II. Id. ¶ 98. And on December
18, 2023, in advance of the December 31, 2023 Bondholder
Milestone, PCT disclosed that PCT would not meet that deadline.
Id. ¶ 145. Because the defendants had previously warned
investors about these later-materialized risks, there were no
material omissions in the challenged statements.

The plaintiff attempts to bolster his omission allegations
concerning the 9/3/23 Seal Failure with a short-seller report
published by Bleecker Street Research on November 3, 2023. See
FAC ¶¶ 90, 167, 170. The short-seller report stated that,
according to "former [PCT] employees," the Ironton Facility "had
[previously] been having issues with a mechanical failure in its
process." Id. Bleecker Street Research thus "suspect[ed] that
blaming a month-old power outage" (the 8/7/23 Power Outage) was
pretext "to declare a Force Majeure." Id.

But even on the report's own terms, mere suspicions provide
no support to the plaintiff's allegations. Moreover, the report
"suffer[s] from all the indicia of unreliability that have led
courts often not to credit attributions to unnamed sources in
short-seller reports." In re DraftKings Inc. Sec. Litig., 650 F.
Supp. 3d 120, 154-55 (S.D.N.Y. 2023). Therefore, speculative
statements in the short-seller report, "if not corroborated, are

fairly discounted or put aside altogether as ill-pled." Id. The
FAC therefore fails to plead any actionable omissions.

* * *

Accordingly, because the plaintiff has failed to allege any
actionable misrepresentations or omissions, the plaintiff's
section 10(b) claims must be **dismissed**.

**V.**

The plaintiff's section 10(b) claims merit dismissal for an
independent reason: failure to plead scienter adequately. The
plaintiff claims that the individual defendants had the motive
and opportunity to commit the alleged fraudulent scheme because
the defendants needed to generate working capital to cover the
budget overruns at the Ironton Facility and permit timely
completion of the Bondholder Milestones. FAC ¶¶ 179, 181-84,
189, 191. In addition, as circumstantial evidence of motive, the
plaintiff highlights the timing of the 8/24/23 Notes Offering
and the significant capital expenditures required to advance
PCT's other recycling facility projects. Id. ¶¶ 185-91. These
allegations, however, fail to support a strong inference of
scienter for any of the challenged statements and omissions.

The scienter required to support a section 10(b) claim is
"intent to deceive, manipulate, or defraud, or at least knowing
misconduct." First Jersey, 101 F.3d at 1467. The PSLRA requires
that a complaint alleging securities fraud "state with

32

particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" of scienter can arise from (1) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (2) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. Recklessness is "an extreme departure from the standards of ordinary care" regarding a known or obvious risk. ECA, Loc. 134, 553 F.3d at 198.

To plead scienter adequately, the plaintiff must allege facts supporting a strong inference with respect to each defendant. See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). In other words, a plaintiff "ha[s] to allege that [the] defendants benefitted in some concrete and personal way from the purported fraud," Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000), or plead strong circumstantial evidence of conscious misbehavior, see ATSI, 493 F.3d at 99.

"[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges a strong inference of scienter when "a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton, 604 F.3d at 766; Silsby v. Icahn, 17 F. Supp. 3d 348, 364-65 (S.D.N.Y. 2014), aff'd sub nom., Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015). Courts conduct the scienter analysis holistically to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." Tellabs, Inc., 551 U.S. at 322-23.

### A.

The FAC fails to plead motive. The plaintiff conceded, at oral argument, that there was no personal profit motive for the individual defendants. Tr. 38. Instead, the plaintiff alleges motive based on PCT's need to succeed in its efforts to obtain financing. Id. at 38-39. But this is exactly the type of corporate motive that the Second Circuit Court of Appeals has rejected. See Tabak v. Canadian Solar Inc., 549 F. App'x 24, 28 (2d Cir. Dec. 20, 2013) (summary order).

PCT's need for financing fails to suggest that the individual defendants acted with a personal motive to defraud because such goals are possessed by "virtually all corporate insiders." Novak, 216 F.3d at 307. To allege motive plausibly, "it is not sufficient" to allege goals "such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success

34

of an investment." S. Cherry St., LLC v. Hennessee Grp., 573 F.3d 98, 109 (2d Cir. 2009). Similarly, "a desire to raise capital to repay loans is insufficient to establish motive." Tabak, 549 F. App'x at 28; see also In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 215–16 (S.D.N.Y. 2008) (finding that "[a]ny corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product"). The FAC thus fails to raise the plausible inference that the individual defendants "benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 307–08.

Moreover, although the lack of insider stock sales is not fatal, Tellabs, 551 U.S. at 325, conversely, de minimis stock sales or increases in stock holdings during the Class Period by corporate insiders can undermine scienter allegations, Avon Pension Fund v. GlaxoSmithKline PLC, 343 F. App'x 671, 673 (2d Cir. 2009); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006). In this case, SEC filings show that both individual defendants increased their PCT holdings during the Class Period. Jacobson Decl., Exs. T, U, V, W. Olson increased his net holdings by 57,761 shares at a net cost of $107,325.83, see id. Exs. T, U, V, and Somma increased his holdings by $49,964.94, id. Ex. W.

Thus, there was nothing "unusual or suspicious" about the individual defendants' stock trades during the Class Period. See In re Axis Cap. Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 595-96 (S.D.N.Y. 2006). Rather, the individual defendants' stock transactions render cogent only the opposing inference that Olson and Somma were confident in the progress of construction and operations at the Ironton Facility and in PCT's overall future success. Avon Pension Fund, 343 F. App'x at 673; In re eSpeed, 457 F. Supp. 2d at 290 n.182 (noting that executives do not ordinarily purchase stock at ballooned prices that they themselves inflated). Therefore, the individual defendants' stock transactions further undermine any inference of scienter. See Avon Pension Fund, 343 F. App'x at 673.

In sum, nothing in the FAC indicates that the individual defendants possessed any motive different in kind from the ordinary desire to "sustain the appearance of corporate profitability or the success of an investment." S. Cherry St., 573 F.3d at 109. Accordingly, the FAC fails to allege a plausible motive.

**B.**

In the absence of motive, the plaintiff can still establish scienter by pleading "strong circumstantial evidence of conscious misbehavior or recklessness." See ATSI, 493 F.3d at 99. But "the strength of the circumstantial allegations must be

36

correspondingly greater." <u>ECA, Loc. 134</u>, 553 F.3d at 198–99. In this case, however, there is no compelling showing of conscious misbehavior or recklessness, especially given the absence of any personal motive to defraud. <u>See</u> <u>id.</u>

The plaintiff accuses the defendants of deliberately or recklessly misrepresenting the truth about progress at the Ironton Facility leading up to the September Milestone. Opp. 18, 20–22.[6] But there are no alleged facts showing that the individual defendants actually knew that DB's deficient work and delays were likely to impact PCT's ability to meet the September Milestone. Defects in a contractor's work, even when damages are significant enough for the owner to sue the contractor, do not always support the inference that the company "knew its proposed schedule was no longer viable" or did not believe "it could remedy this damage within the existing time frame." <u>In re Molycorp, Inc. Sec. Litig.</u>, No 13-cv-5697, 2015 WL 1097355, at *10 (S.D.N.Y. Mar. 12, 2015). And in this case, by the time DB abandoned the project in June 2023, mechanical construction was certified as complete. <u>See</u> FAC ¶ 65. Because much of DB's scope of work was finished when the Class Period began, it is "more compelling[] that [the defendants] believed [PCT] could remedy

---

[6] The only alleged basis for PCT's scienter is imputing to PCT the alleged scienter of the individual defendants. Failure to allege scienter for the individual defendants is thus fatal for any alleged corporate scienter.

[any] damage within the existing time frame" when the defendants said so. See In re Molycorp, Inc., 2015 WL 1097355, at *10.

Similarly, PCT's state-court counterclaim is not strong circumstantial evidence of scienter. The counterclaim shows that DB caused delays and cost overruns, but the defendants publicly disclosed those delays and cost overruns by posting the construction-manager reports to PCT's website. And the plaintiff has failed to support with nonconclusory facts the inferential leap required to establish that the defendants knew the delays and cost increases from before May 2023 would cause the operational setbacks that occurred during and after August 2023.

PCT's contemporaneous filings further discredit the plaintiff's scienter allegations. The September 13, 2023 Form 8-K stated that the company did not trace the 9/3/23 Seal Failure back to the 8/7/23 Power Outage until September 7, 2023—information that PCT then promptly disclosed. Jacobson Decl., Ex. J at 2. By then, aware of the impending September 30 deadline, PCT warned investors that it was "unable to eliminate the risk that the restart will be unsuccessful, or whether other failures resulting from the [8/7/23 Power Outage] may be discovered in the future." Id. In short, PCT's SEC form filings show that the defendants disclosed, with reasonable punctuality,

additional risks to investors following the 9/3/23 Seal Failure.[7]
Thus, the cogent inference is that the defendants disclosed
risks to investors as additional risks arose. By contrast, the
plaintiff's assertion that the defendants deliberately or
recklessly misrepresented the truth is implausible.

Moreover, the plaintiff has failed to plead any
nonconclusory facts suggesting that the individual defendants,
or anyone else at PCT, knew that any of the challenged
statements were misleading when made. This is not a case where
the plaintiff can point to internal documents or other
information reviewed by the individual defendants that cast
doubt on any of the public statements. Nor has the plaintiff
identified any confidential sources to support any allegation
that the individual defendants knew or were reckless in not
knowing that any public statements were false or misleading.
Without any reliable witness or any internal reports that
contradicted the defendants' public statements, the FAC falls
far short of alleging enough circumstantial evidence to show
that the defendants deliberately or recklessly misrepresented
the truth. City of Monroe Emps.' Ret. Sys. v. Hartford Fin.
Servs. Grp., No. 10-cv-2835, 2011 WL 4357368, at *1 (S.D.N.Y.
Sept. 19, 2011) (dismissing an action with prejudice where,

---

[7] This conclusion is reached without "rely[ing] on the truth of defendants'
assertion[s]" regarding these filings. See Kramer, 937 F.2d at 773.

"unlike many securities class actions, [the] plaintiffs d[id] not rely on a single confidential witness or internal document in order to support their allegations").

In attempting to support scienter under the strong circumstantial evidence prong, the plaintiff principally relies on the Bleecker Street Research report. But that report, which merely "suspect[ed] that blaming" the 8/7/23 Power Outage for "multiple mechanical issues . . . was the pretext [PCT] needed to declare a Force Majeure," FAC ¶ 170, is not circumstantial evidence of fraud, even when taken at face value. Moreover, the report "relies on 'confidential' or anonymous sources, without corroboration," and implicates "the risk of motivated reporting by [the] short-seller." Long Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020). Despite these obvious infirmities, the plaintiff's counsel "ha[s] done nothing whatsoever to confirm the identities or statements of the confidential sources." Id. at 804. Moreover, given that anonymous former employees may harbor resentments against PCT, the short seller's report is fairly "put aside altogether as ill-pled." In re DraftKings Inc., 650 F. Supp. 3d at 155.

Finally, the plaintiff asserts that the individual defendants' scienter should be imputed to PCT. FAC ¶¶ 192-93. But because the FAC fails to plead scienter plausibly against any individual defendant, and the plaintiff has failed to

"create a strong inference that someone [else] whose intent could be imputed to [PCT] acted with the requisite scienter," the FAC also fails to plead corporate scienter. See <u>Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.</u>, 531 F.3d 190, 195–96 (2d Cir. 2008).

* * *

"[I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." <u>Tellabs, Inc.</u>, 551 U.S. at 323. In this case, the FAC's numerous infirmities render plausible only the opposing inference: the defendants believed that PCT's disclosures were accurate when made. But afterwards, the risks PCT had warned of materialized, impacting the Ironton Facility's production schedule and PCT's ability to meet the Bondholder Milestones. Then, with reasonable punctuality, PCT disclosed these challenges and additional risks as they arose. Therefore, the inference of non-fraudulent intent far outweighs any inference of scienter. Because the FAC fails to raise a strong inference of scienter, the FAC must be **dismissed.**

### VI.

The FAC also fails to plead loss causation plausibly. Loss causation "is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." <u>ATSI</u>, 493 F.3d at 107 (citing <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 346

(2005) & <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005)). At the pleadings stage, "the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." <u>Id.</u> at 107; <u>see also</u> <u>Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC</u>, 750 F.3d 227, 232-33 (2d Cir. 2014); <u>In re New Oriental Educ. & Tech. Grp. Sec. Litig.</u>, 988 F. Supp. 2d 406, 428 (S.D.N.Y. 2013).

The plaintiff seeks to establish loss causation through two means. First, the plaintiff "claim[s] the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud." <u>See</u> <u>In re Omnicom Grp. Sec. Litig.</u>, 597 F.3d 501, 511 (2d Cir. 2010). Second, the plaintiff attempts to "prove loss causation by showing 'that the loss was foreseeable and caused by the materialization of the risk[s] concealed by the [defendants'] fraudulent statement[s].'" <u>See</u> <u>id.</u> at 513 (quoting <u>ATSI</u>, 493 F.3d at 107).

Both attempts fail. The plaintiff fails to allege plausibly that the alleged price drops occurred because of a corrective disclosure or the materialization of an undisclosed risk. The alleged stock price drops more plausibly occurred following the timely disclosure of materialized risks at the Ironshore Facility that PCT had previously warned investors about.

Pointing out that each of those stock price drops followed the disclosure of adverse information, the plaintiff relies on the significant drops themselves as reflecting the disclosure of the alleged fraud. But there is no plausible argument that the adverse information was either a corrective disclosure or the disclosure of information that had been previously concealed through fraud. On September 14, 2023, PCT's stock price dropped by 18.4% following the release of the 9/13/23 Form 8-K, which disclosed the 8/7/23 Power Outage and the 9/3/23 Seal Failure. FAC ¶¶ 124, 150. On November 8 and 9, 2023, PCT's share price dropped by 14.7% and then 16.9%, respectively, following disclosure of a two-week shutdown for repairs, among other items. Id. ¶¶ 92-95, 97, 99, 153. On December 18, 2023, PCT's share price dropped by 43.5% after disclosure of the 12/11/23 Mechanical Failures and PCT's inability to meet the December Milestone. Id. ¶¶ 145, 154.

Without more, dramatic price drops do not adequately plead loss causation. A lower stock price may reflect merely "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions," or any number of other factors. Dura Pharms., 544 U.S. at 343. Precipitous declines in stock prices raise a plausible inference of loss causation only where the price drop follows the disclosure of fraud or a concealed risk. See In re Petrobas Sec.

43

Litig., 116 F. Supp. 2d 368, 380 (S.D.N.Y. 2015); In re Bear
Stearns Cos., Inc. Sec., Deriv. & ERISA Litig., 763 F. Supp. 2d
423, 483-84 (S.D.N.Y. 2011). The plaintiff has failed to allege
plausibly that the stock price declines were caused by either
corrective disclosures or disclosures of hitherto concealed
risks. The FAC must therefore be **dismissed.**

**VII.**

Finally, because the plaintiff's claims brought pursuant to
section 10(b) fail, the plaintiff cannot establish control
person liability pursuant to section 20(a). Section 20(a) of the
Exchange Act imposes liability on anyone who "controls any
person liable under" certain other provisions, including Section
10(b). 15 U.S.C. § 78t. "To establish a prima facie case of
control person liability, a plaintiff must show (1) a primary
violation by the controlled person, (2) control of the primary
violator by the defendant, and (3) that the defendant was, in
some meaningful sense, a culpable participant in the controlled
person's fraud." ATSI, 493 F.3d at 108; see also In re Lions
Gate Ent. Corp. Sec. Litig., 165 F. Supp. 3d 1, 25 (S.D.N.Y.
2016).

The plaintiff has failed to allege plausibly any of the
claims brought pursuant to section 10(b). Accordingly, the
plaintiffs' claims brought pursuant to Section 20(a) must be
**dismissed.** See First Jersey, 101 F.3d at 1472.

44

**CONCLUSION**

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted** and the First Amended Class Action Complaint is **dismissed without prejudice.**

If the plaintiff wishes to file an amended complaint, the plaintiff must file a motion to amend by **January 10, 2024.** The motion to amend must include a copy of the second amended complaint and explain how the amendments solve the deficiencies noted in this opinion. The defendants may respond by **January 24, 2025.** The plaintiff may reply by **January 31, 2025.** If the plaintiff does not move to file an amended complaint by **January 10, 2024,** the current complaint will be dismissed with prejudice.

The Clerk is directed to amend the official caption to conform to the listing of the parties stated above and to close all pending motions.

**SO ORDERED.**

Dated: New York, New York
     December 20, 2024

                        _____
                           John G. Koeltl
               United States District Judge